UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUDGE STANTON

| | |
|---|---|
| LEON D. BOROCHOFF, on behalf of himself and all others similarly situated, | CIVIL ACTION No. **07 CIV 5574** |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| v. | **JURY TRIAL DEMANDED** |
| GLAXOSMITHKLINE PLC, DR. JEAN-PIERRE GARNIER, and JULIAN HESLOP, | |
| Defendants. | |

Plaintiff Leon D. Borochoff, on behalf of himself and all others similarly situated, by his undersigned counsel alleges the following based upon the investigation of plaintiff's counsel which included, among other things, a review of GlaxoSmithKline PLC ("GSK" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media and news reports about the Company, transcripts of United States Food and Drug Administration ("FDA") press conferences, and publicly available trading data relating to the price and volume of GSK's publicly traded securities.

## I.    INTRODUCTION

1.    This is a securities class action brought on behalf of all purchasers of GSK securities between October 27, 2005 and May 21, 2007, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC.

2.      GSK engages in the "creation, discovery, development, manufacture, and marketing of pharmaceutical and consumer health-related products."

3.      Throughout the Class Period, Defendants made numerous positive statements regarding Avandia, GSK's popular diabetes drug, including statements regarding positive study results about the efficacy and safety of the drug and the positive effect of Avandia's sales on GSK's revenues and profitability. However, Defendants never adequately disclosed that it had conducted a meta-analysis that showed that Avandia could increase the risk of heart attacks in users.

4.      On May 21, 2007, before the close of trading, a meta-analysis (a pooled analysis of several clinical trials) was published in the New England Journal of Medicine regarding the Company's widely used diabetes pill, sold under the name Avandia. The published analysis revealed that Avandia increased the risk of heart attacks and possibly heart-related deaths. According to the article, persons taking Avandia had a 43% higher risk of heart attack compared to people not taking diabetes medication or taking other diabetes drugs.

5.      As a result of the publication of the meta-analysis, the price of GSK securities declined $4.53 per share, or 7.8%, to close at $53.18 per share, on unusually heavy trading volume.

6.      It was later revealed that GSK had performed a similar meta-analysis related to the Avandia drug, which also showed increased risk of heart attacks. Preliminary results of this analysis were presented to the FDA in September 2005 and updated results were disclosed to the FDA in August 2006. However, the results of GSK's meta-analysis were never adequately disclosed to the investing public.

2

## II.    JURISDICTION AND VENUE

7.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

8.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). GSK conducts significant business in this District and the acts charged herein had a substantial effect in this District. In addition, GSK trades on the New York Stock Exchange ("NYSE").

9.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    THE PARTIES

10.    Plaintiff Leon D. Borochoff purchased GSK securities during the Class Period as detailed in the attached Certification and was damaged thereby.

11.    Defendant GSK is a corporation headquartered in Brentford, the United Kingdom. It conducts significant business in this District and has offices in several cities in the United States and elsewhere. GSK's American Depository Shares, which represent two common shares of GSK, trades on the NYSE under the symbol GSK.

12.    Defendant Dr. Jean-Pierre Garnier ("Garnier") was Chief Executive Officer of the Company during the Class Period. During the Class Period, Garnier signed the Company's annual reports on Form 20-F for the periods ended December 31, 2005

3

and December 31, 2006 which were filed with the SEC.

13.     Defendant Julian Heslop ("Heslop") was Chief Financial Officer of the Company during the Class Period. During the Class Period, Heslop signed the Company's annual reports on Form 20-F for the periods ended December 31, 2005 and December 31, 2006 which were filed with the SEC.

14.     The individuals named as defendants in ¶¶12-13 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their position with the Company, possessed the power and authority to control the contents of GSK's financial statements, press releases and other statements to the public, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them, these defendants knew that the adverse facts specified herein had not been adequately disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the actions of the Individual Defendants.

IV.     **CLASS ACTION ALLEGATIONS**

15.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and a class consisting of all persons who purchased the securities of GSK during the period from October 27, 2005 through May 21, 2007, inclusive, and who were damaged thereby (the "Class").

Excluded from the Class are defendants, officers and directors of the Company, members of the immediate families of such officers and directors as well as officers and directors of subdivisions and/or affiliates of the Company.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members of the Class located throughout the United States. Throughout the Class Period, GSK's securities were actively traded on the NYSE in an efficient market.

17.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and will fairly and adequately protect the interests of the Class. Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

18.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

       (a)    whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

       (b)    whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

       (c)    whether defendants participated directly or indirectly in the course of conduct complained of herein;

       (d)    whether the defendants acted knowingly and/or recklessly in making materially false statements and omitting material facts as alleged herein;

       (e)    whether the market price of GSK's securities was artificially inflated during the Class Period due to the non-disclosures and/or material misrepresentations alleged herein; and

       (d)    whether the members of the Class have sustained damages and the proper measure of such damages.

## V.    FALSE AND MISLEADING STATEMENTS

20.    The Class Period begins on October 27, 2005, when the Company announced its results for the third quarter ended September 30, 2005, and made the following statements regarding Avandia:

Excellent pharmaceutical sales growth of 10% to £4.7 billion

- Key products continue to perform well:
  …
  -Avandia/Avandamet for diabetes (+22% to £355 million)

Commenting on the performance for the quarter and GSK's outlook, JP Garnier, Chief Executive Officer, said: "This quarter's performance shows the vitality of our business, which is again being driven by great performances from key products such as Advair, Avandia and our Vaccines franchise . . ."

6

Sales of diabetes treatments Avandia/Avandamet were up 22% to £355 million in the quarter. In the USA, sales rose 21% to £265 million, while in Europe sales increased 44% to £40 million.

21.    On February 8, 2006, the Company announced its preliminary results for the year ended December 31, 2005 and stated the following with regard to its diabetes drug Avandia:

Key growth products drive 2005 pharma turnover +8% to £18.7 billion:

...

-Avandia/Avandamet for diabetes +18% to £1.3 billion

Commenting on the 2005 performance and GSK's outlook, JP Garnier, Chief Executive Officer, said: "GSK's fourth quarter performance was a great finish to an excellent year for the company. Looking into 2006, the strong growth seen from key products such as Seretide/Advair, Avandia and from our vaccines business is set to continue, and we expect further good news on GSK's late-stage pipeline. . ."

Avandia/Avandamet (+18% to £1.3 billion) continues to maintain its leadership position in the TZD class of anti-diabetic agents. In the USA, sales grew 14% to £977 million. Avandia/Avandamet is also establishing a strong position in Europe, with sales rising 52% to £157 million helped by the launch of Avandamet throughout the region.

22.    On March 3, 2006, the Company filed its annual report with the SEC on Form 20-F for the year ended December 31, 2005, in which GSK made the following statements regarding Avandia:

GSK delivered an excellent financial performance in 2005. Turnover of £21.7 billion grew by 7% at constant exchange rates (CER). Earnings per share (EPS) were 82.6p, with growth of 18% at CER, putting GSK in the top tier of global pharmaceutical companies in terms of performance. "These figures confirm the excellent growth of our key products and the efficiency of our global operations," says JP [Garnier, Chief Executive Officer]. GSK's performance was driven by sales of key pharmaceutical products. "Sales of Seretide/Advair, Avandia, Coreg, Lamictal and Valtrex all continued their impressive growth," says JP.

At 30th September 2005, GSK held second position in the world pharmaceutical market with a market share of 6.3%, behind Pfizer with a market share of 8.9%. GSK had eight of the world's top 60 pharmaceutical products. These were Avandia, Flixonase, Imigran/Imitrex, Lamictal, Seretide/Advair, Seroxat/Paxil, Wellbutrin and Zofran.

Sales of diabetes treatments were also strong, with Avandia/Avandamet up 18% to £1.3 billion. GSK launched Avandia for the treatment of type 2 diabetes in 1999 and a combination product, Avandamet , for blood sugar control in 2002. The product group was expanded further in February 2006 with the launch in the USA of a fixed-dose combination treatment, Avandaryl, which combines Avandia with a sulfonylurea.

The diabetes treatments Avandia/Avandamet continued to perform very strongly, with overall sales of £1.3 billion, up 18%. In the USA, sales grew 14% to £977 million. Avandia/Avandamet are also establishing strong positions in Europe, with sales rising 52% to £157 million, helped by the launch of Avandamet . Sales in International markets rose 13% to £195 million. Two major outcome studies involving Avandia are due to report by the end of 2006. ADOPT investigates first line use of Avandia in type 2 diabetes and DREAM the earlier use of Avandia to delay or prevent disease progression.

Across all markets in International, the key products driving growth were Seretide, which grew 16% to record sales of £283 million, Avandia/Avandamet, which grew 13% to £195 million and the vaccines franchise, which recorded growth of 10% and achieved sales of £459 million.

Major growth drivers were Seretide, GSK's largest selling product in Europe, with growth of 16%, the Avandia/Avandamet franchise, which grew 52%, HIV up 8% and the vaccines franchise, up 12%.

Sales growth of existing products and launch of new products are key drivers of GSK's business performance. The strong growth seen from key products such as Seretide/Advair, Avandia/Avandamet and from GSK's vaccines business is expected to continue in 2006.

23.    The Form 20-F for the year ended December 31, 2005 was signed by defendants Garnier and Heslop.

24.    On April 27, 2006, the Company announced its results for the first quarter ended March 31, 2006, and made the following statements regarding Avandia:

Key growth drivers performed strongly with sales totaling £2.2 billion (+22%):

. . .

-Avandia products (+24% to £384 million)

Sales of Avandia products rose 24% to £384 million. US sales were up 20% to £281 million. Going forward, US sales are expected to benefit from an increase in Avandia manufacturing capacity from April and the reintroduction of Avandamet to this market in early H2 2006. European Avandia/Avandamet sales rose very strongly in the quarter (+59% to £51 million). International sales were up 17% to £52 million.

25.    On July 26, 2006, the Company announced its results for the second

quarter ended June 30, 2006, and stated the following with regard to Avandia:

Strong performance of pharmaceutical products with sales up 10% to £5 billion:

. . .

-Avandia family of products for diabetes (+32% to £477 million) – US Avandamet relaunched in Q2; Avaglim (Avandaryl) approved in Europe in June

**Avandia – strong sales outlook with US re-supply and new 1st line Avandamet indication**

The Avandia family of products for the treatment of type 2 diabetes continued to perform strongly with growth of 32% in the quarter (to £477 million). Reported US sales growth (+33% to £356 million) benefited from the re-supply of Avandia and Avandamet to the market which took place in the quarter. In July, the company restarted promotion of Avandamet, with a new 1st line treatment indication. Avandamet is the only TZD combination production to have a 1st line indication.

Avandia products also performed very strongly in Europe (+36% to £54 million) with sales of Avandamet more than doubling in the quarter. In addition, Avaglim (Avandaryl), GSK's new combination of Avandia and Amaryl, was approved for use in Europe in June.

(emphasis added).

26.     Moreover, the Company made the following statement regarding Avandia's effect on the Company's profits: "GlaxoSmithKline also reported second-quarter profits of $2.43 billion, a 14 percent increase over the comparable period last year. Company officials credited strong sales for its diabetes drug, Avandia and Avandamet, and its asthma drug, Advair, for the increase."

27.     On July 26, 2006, Heslop also made the following statement regarding Avandia: "Glaxo also saw some restocking of diabetes pills Avandia and Avandamet in the first half, as well as 91 million pounds from asset disposals, while restructuring costs were relatively light and were likely to rise in future months."

28.     On July 26, 2006, Garnier made the following statements regarding Avandia: "Using diabetes drug Avandia as a treatment for Alzheimer's disease could be a huge opportunity for GlaxoSmithKline Plc. . . If this succeeds, Avandia XR could be the most important asset in our pipeline."

29.     In addition, on July 30, 2006, the Company made the following statements:

> Among the mor e exciting projects is a new diabetes treatment, and a trial of a version of Avandia, the company's current diabetes blockbuster, as a treatment for Alzheimer's disease.
>
> "If this works out, this is absolutely huge," said Garnier. "These are tremendous opportunities for the company."

30.     On October 26, 2006, the Company announced its results for the third quarter ended September 30, 2006, and made the following statements regarding Avandia:

> Pharmaceutical sales up 7% to £4.9 billion, led by US performance (up 14%):
> …

10

-Avandia family +11% to £378 million

**Avandia family sales up 11%; DREAM study shows reduced risk of progression to type 2 diabetes**

The Avandia family of products, for the treatment of type 2 diabetes, continues to perform well with sales up 11% to £378 million in the quarter.

In September, results of the landmark DREAM study were presented to the European Association for the Study of Diabetes. These data demonstrated that Avandia reduced the risk of developing type 2 diabetes by 62% relative to placebo, among people at high risk of developing type 2 diabetes. This highly statistically significant reduction of 62% (p<0.0001) was additive to standard counselling on healthy eating and exercise, and is the first evidence that Avandia can reduce the risk of progression from pre-diabetes to type 2 diabetes in high-risk patients.

(emphasis added).

31.    On November 8, 2006, the Company made the following statements about

Avandia:

NEW YORK, Nov 8 (Reuters) – GlaxoSmithKline Plc will study combining its diabetes drug Avandia with a new class of DPP-4 medicines but does not believe its established drug is under threat, its chief executive said on Wednesday.

Garnier argued Avandia was still extremely effective at controlling blood sugar levels and predicted the biggest losers would be old medicines like metformin and sulfonylurea.

"I think the products that are gradually going to slow down and lose out are the older medications that still represent today roughly 60 percent of the units sold in this market," he said.

32.    On February 6, 2007, following reports that a New Zealand study revealed

that Avandia may have a higher risk of hip and other bone fractures, the Company stated:

"We are carefully reviewing this latest study in the context of the ADOPT study, which

showed no evidence of hip and spine fractures associated with osteoporosis."

33.    On February 8, 2007, the Company announced its preliminary results for

the year ended December 31, 2006 and made these statements regarding Avandia:

> Pharmaceutical sales also up 9% to £20.1 billion, with strong growth from
> all major products:
> …
> -Avandia product group +25% to £1.6 billion
>
> **Avandia product group sales over £1.6 billion with strong growth
> across all regions**
>
> Sales of Avandia products, for the treatment of type 2 diabetes, grew 24%
> to £1.2 billion in the USA.  In Europe, sales grew 40% to £217 million
> driven by the increasing use of Avandamet.  Sales in International markets
> rose 19% to £234 million.
>
> In December, GSK presented data from the landmark ADOPT study,
> which demonstrated that Avandia is more effective than metformin, or a
> sulphonylurea, in long-term blood sugar control in type 2 diabetes.  These
> data are in addition to those recently presented from the DREAM study,
> which showed that Avandia can reduce the risk of progression to type 2
> diabetes.  Data from both these studies are expected to be filed with
> regulatory agencies during the first half of 2007.
>
> (emphasis added).

34.    On February 8, 2007, Garnier stated:  "Avandia for diabetes, will represent

less of an engine in [the] future."

35.    On February 21, 2007, in response to the disclosure of a clinical study

which highlighted that more female patients who took Avandia experienced fractures as

compared to females taking other drugs, the Company stated: "the majority of fractures

in female patients who took Avandia were in the upper arm, hand or foot, while the

incidence of fractures of the hip or spine was low and similar among the three drugs

being tested."

12

36.     On March 2, 2007, the Company filed its annual report with the SEC on

Form 20-F for the year ended December 31, 2006, in which GSK made the following

statements regarding Avandia:

> Your company delivered a strong financial performance in 2006 . . . This
> performance was driven by sales of key pharmaceutical products including
> Seretide/Advair for asthma and chronic obstructive pulmonary disease
> (COPD), the Avandia group of products for diabetes, Coreg for heart
> disease, Lamictal for epilepsy and bipolar disorder, Valtrex for herpes, and
> our vaccines.
>
> At 30th September 2006, GSK held second position in the world
> pharmaceutical market with a market share of 6.3%, behind Pfizer with a
> market share of 8%. GSK had six of the world's top 60 pharmaceutical
> products. These were Avandia, Lamictal , Seretide/Advair, Valtrex ,
> Wellbutrin and Zofran .
>
> GSK's ability in 2006 to deliver continued pharmaceutical turnover
> growth was primarily due to an exceptionally broad product portfolio of
> high-value growth products coupled with sales and marketing excellence.
> These growth products include Seretide/Advair, the Avandia product
> group, Vaccines, Lamictal, Valtrex, Coreg, Requip, Avodart and Boniva.
>
> The Avandia product group achieved in 2006 a market share by value in
> oral anti-diabetics of 37% in the USA and 19% in Europe, up 2 and 5
> percentage points, respectively.
>
> In December, GSK presented data from the landmark ADOPT study,
> which demonstrated that Avandia is more effective than metformin, or a
> sulphonylurea, in long-term blood sugar control in type 2 diabetes. These
> data are in addition to those recently presented from the DREAM study,
> which showed that Avandia can reduce the risk of progression to type 2
> diabetes.  Data from both these studies are expected to be filed with
> regulatory agencies during the first half of 2007.
>
> Sales in Europe contributed 27% of pharmaceutical turnover and grew
> 1%, to over £5.5 billion, with strong sales from Seretide,
> Avandia/Avandamet and vaccines offsetting the impact of generic
> competition to a number of products and continued price cuts resulting
> from government healthcare reforms.
>
> Major growth drivers were Seretide, GSK's largest selling product in
> Europe, with growth of 10%, Avandia/Avandamet which grew 39%, and
> the vaccines franchise, up 20%.

13

> Sales of the Avandia product group increased by 24% reflecting the re-
> supply of product following supply disruption at the Cidra plant in Puerto
> Rico in 2005 and price increases.

> Across all markets in International, the key products driving growth were
> Seretide , which grew 9% to record sales of £310 million, the Avandia
> range of products which grew 17% to £234 million, HIV products which
> grew 8% and the vaccines franchise, which recorded growth of 13% and
> achieved sales of £518 million.

> Sales growth of existing products and launch of new products are key
> drivers of GSK's business performance. The sales growth seen from key
> products such as Seretide/Advair, the Avandia group of products,
> Vaccines, Lamictal, Valtrex, Coreg and the high potential products,
> Requip, Avodart and Boniva is expected to continue in 2007.

37.    The form 20-F for the year ended December 31, 2006, was signed by

defendants Garnier and Heslop.

38.    On April 25, 2007, the Company announced its results for the first quarter

ended March 31, 2007 and made the following statements regarding Avandia:

> Sales of the Avandia product group, for the treatment of type 2 diabetes,
> grew 19% to £414 million.  Strong growth was reported in all regions with
> sales in the USA up 17% to £294 million; in Europe up 12% to £57
> million; and in International markets up 37% to £63 million.

39.    The statements referenced above in ¶¶20-38 were materially false and

misleading because they failed to adequately disclose that the Company had conducted a

meta-analysis in September 2005, and supplemented that analysis in August 2006, which

indicated that Avandia could increase the risk of heart attacks and heart-related deaths in

Avandia users.

## VI.    THE TRUTH BEGINS TO EMERGE

40.    On May 21, 2007, the New England Journal of Medicine published an

article entitled: "Effect of Rosiglitazone on the Risk of Myocardial Infarction and Death

from Cardiovascular Causes." In that article, Dr. Steven E. Nissen, M.D., a Cleveland

Clinic cardiologist concluded:

> In the rosiglitazone group [the generic name for Advandia], as compared with the control group, the odds ratio for myocardial infarction was 1.43 . . . and the odds ratio for death from cardiovascular causes was 1.64.

> Rosiglitazone was associated with a significant increase in the risk of myocardial infarction and with an increase in the risk of death from cardiovascular causes that had borderline significance. Our study was limited by a lack of access to original source data, which would have enabled time-to-event analysis. Despite these limitations, patients and providers should consider the potential for serious adverse cardiovascular effects of treatment with rosiglitazone for type 2 diabetes.

41.    On May 21, 2007, the price of GSK securities the price of GSK securities

declined $4.53 per share, or 7.8%, to close at $53.18 per share, on unusually heavy

trading volume.

42.    The results of the meta-analysis conducted by Dr. Nissen and published in

the New England Journal of Medicine was not new to GSK. In fact, GSK had conducted

a meta-analysis with similar results as early as September 2005.

43.    The fact that GSK had conducted a meta-analysis was first widely

disclosed by the FDA. On May 21, 2007, the FDA issued a press release concerning

safety issues related to Avandia. In that release, the FDA warned:

> **FDA Issues Safety Alert on Avandia**

> The U.S. Food and Drug Adminstration (FDA) is aware of a potential safety issue related to Avandia (rosiglitazone), a drug approved to treat type 2 diabetes. Safety data from controlled clinical trials have shown that there is a potentially significant increase in the risk of heart attack and heart-related deaths in patients taking Avandia.

> Recently, the manufacturer of Avandia provided FDA with a pooled analysis (meta analysis) of 42 randomized, controlled clinical trials in which Avandia was compared to either placebo or other anti-diabetic therapies in patients with type 2 diabetes. *The pooled analysis suggested*

*that patients receiving short-term (most studies were 6-months duration)
treatment with Avandia may have a 30-40 percent greater risk of heart
attack and other heart-related adverse events than patients treated with
placebo or other anti-diabetic therapy.* These data, if confirmed, would
be of significant concern since patients with diabetes are already at an
increased risk of heart disease.

44.    On May 23, 2007, the Wall Street Journal reported:

An analysis linking the widely used diabetes drug **Avandia** to higher risk
of heart attacks represents a serious blow to GlaxoSmithKline PLC and
underscores how outside critics have been empowered to challenge big-
selling drugs after the outcry over the withdrawn painkiller Vioxx.

Glaxo performed its own meta-analysis, which also showed a potential
danger. It shared an early version of it with the FDA in September 2005
and a more complete one in August 2006.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

45.    During the Class Period, as detailed herein, defendants engaged in a

scheme to deceive the market and a course of conduct that artificially inflated GSK's

stock price and operated as a fraud or deceit on purchasers of GSK securities by failing to

adequately disclose a material fact regarding GSK's diabetes drug, Avandia. Defendants

achieved this by failing to adequately disclose an important meta-analysis which revealed

the potentially dangerous effect of its key diabetes drug, Avandia. Later, however, when

a meta-analysis conducted by a third party, with similar results to GSK's own meta-

analysis, the price of GSK securities declined precipitously as the prior artificial inflation

came out of GSK stock price. As a result of their purchases of GSK securities during the

Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*,

damages under the federal securities laws.

16

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

46.    At all relevant times, the market for GSK securities was an efficient market for the following reasons, among others:

(a)    The Company's securities met the requirements for public listing and were listed and actively traded on the NYSE, a highly efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)    The Company regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

47.    As a result, the market for the Company's securities promptly digested current information with respect to GSK from all publicly available sources and reflected such information in the price of the Company's securities. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the securities of GSK at artificially inflated prices and a presumption of reliance applies.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

48.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere

17

herein in detail, defendants, by virtue of their receipt of information reflecting the true

facts regarding GSK, their control over, and/or receipt and/or modification of GSK's

allegedly materially misleading misstatements and/or their associations with the

Company which made them privy to confidential proprietary information concerning

GSK, participated in the fraudulent scheme alleged herein.

49.     Defendants knew and/or recklessly disregarded the falsity and misleading

nature of the information which they caused to be disseminated to the investing public.

The ongoing fraudulent scheme described in this complaint could not have been

perpetrated over a substantial period of time, as has occurred, without the knowledge and

complicity of the personnel at the highest level of the Company, including the Individual

Defendants.

## X.    NO SAFE HARBOR

50.     The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in

this complaint.  The specific statements pleaded herein were not identified as "forward-

looking statements" when made.  To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-

looking statements. Alternatively, to the extent that the statutory safe harbor does apply

to any forward-looking statements pleaded herein, defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements

was made, the particular speaker knew that the particular forward looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer of GSK who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
### For Violation of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

51.    Plaintiff incorporates ¶¶1-50 by reference.

52.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to adequately disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.    Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GSK securities during the Class Period.

54.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GSK securities. Plaintiff and the Class would not have purchased GSK securities at the prices they paid, or at all,

if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

55.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of GSK securities during the Class Period.

**SECOND CLAIM FOR RELIEF**
**For Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

56.     Plaintiff incorporates ¶¶1-50 by reference.

57.     The Individual Defendants acted as controlling persons of GSK within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to

have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.    As set forth above, GSK and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of GSK's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 11, 2007

KAPLAN FOX & KILSHEIMER LLP

By:_____
Frederic S. Fox (FF 9102)
Hae Sung Nam (HN 9474)
Donald R. Hall (DH 0273)
Aviah Cohen Pierson (AP 8221)
805 Third Avenue, 22nd Floor
New York, New York 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

*Attorneys for Plaintiff Leon D. Borochoff*

21

**KAPLANFOX**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, LEON D. BOROCHOFF, hereby certify and swear as follows:

1.  I have reviewed the attached Complaint against **GlaxoSmithKline PLC** alleging violations of the securities laws and authorize its filing;

2.  I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3.  I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter: _____

The following is a description of my transactions during the class period specified in the Complaint in the securities of **GlaxoSmithKline PLC**:

| Security | Transaction | Trade Date | Price Per Share |
|---|---|---|---|
| GSK ADR | Purchase | May 16, 2007 | $56.92 |

4.  I did not purchase shares of GlaxoSmithKline PLC at the direction of my counsel or in order to participate in any private action under the federal securities laws;

5.  I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Date: JUNE 7, 2007

_Leon D Borochoff_

LEON D. BOROCHOFF