# EXHIBIT B

1

```
         57PHCAPA
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 2
 3    ANTHONY CAPONE, et al.,
 3
 4                  Plaintiffs,
 4
 5           v.                              05 Civ. 4186 (JES)
 5
 6    R&G FINANCIAL CORPORATION, et al.,
 6
 7                  Defendants.
 7
 8    ------------------------------x
 8
 9
 9                                       New York, N.Y.
10                                       July 25, 2005
10                                       2:20 p.m.
11
11    Before:
12
12                        HON. JOHN E. SPRIZZO
13
13                                       District Judge
14
15
16

17
18
19
20
21
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

2

57PHCAPA

```
 1                          APPEARANCES
 1
 2   BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
 2        Attorneys for City of Philadelphia
 3        and Detroit General
 3   BY:  MAX W. BERGER
 4        GERALD H. SILK
 4
 5   BARRACK RODOS & BACINE
 5        Attorneys for City of Philadelphia, Board of Pensions
 6        and Retirement
 6   BY:  LEONARD BARRACK
 7        REGINA CALCATERRA
 7
 8   MILBERG WEISS BERSHAD & SCHULMAN
 8        Attorneys for The Sonkin Group
 9   BY:  ANDREI RADO
 9
10   ZWERLING SCHACHTER & ZWERLING
10        Attorneys for Henry L. King and James Finn
11   BY:  JEFFREY C. ZWERLING
11
12   LERACH COUGHLIN
12        Attorneys for West Virginia Investment Management Board
13        and Wayne County Employees' Retirement System
13   BY:  SAMUEL RUDMAN
14        DAVID ROSENFELD
15   SULLIVAN & CROMWELL
15        Attorneys for R&G Corporation
16   BY:  MAITE AQUINO
16
17   STULL STULL & BRODY
17        Attorneys for Katsanis Group
18   BY:  PATRICK SLYNE
18
19
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57PHCAPA

1           (In open court)

2           THE DEPUTY CLERK:   Capone.

3           THE COURT:   Whose motion is it first?   Who wants to go

4      first?

5           MR. BERGER:   I will go first.   Matthew Berger,

6      Bernstein Litowitz Berger & Grossmann, counsel for the City of

7      Detroit pension systems.

8           Your Honor, we are moving for lead plaintiff -- good

9      afternoon, your Honor -- together with the City of Philadelphia

10     Pension System, represented here by Leonard Barrack and Regina

11     Calcaterra, right over here seated next to my partner Jerry

12     Silk.

13          Your Honor, there are five competing motions for lead

14     plaintiff.  As your Honor recognized at the June 23rd

15     conference, a lead plaintiff appointment turns upon who has the

16     greatest economic stake in the transaction under the Reform

17     Act.

18          Here, the class consists of investors who were

19     fraudulently induced to purchase, or at least we allege,

20     fraudulently induced to purchase R&G stock during the period

21     April of '03 through April of '05.

22          Most courts in the Southern District and elsewhere

23     evaluate a movant's financial interest by examining what are

24     called the Olston factors -- objective criteria established by

25     the Eastern District of New York court in the Olston Securities

4

57PHCAPA

1    Litigation.

2            These factors look at the number of shares purchased

3    during the class period, the number of net shares purchased,

4    offset by sales during the class period -- that is what they

5    are referring to there -- the total net funds expended, in

6    other words, whether a lead plaintiff/movant actually spent

7    more purchasing shares than they received selling shares, and

8    then, of course, the approximate losses suffered under either

9    FIFO or LIFO methods.

10           Most recently Judge Scheindlin used these factors,

11   although she calls them the Lax factors, in the appointment of

12   a lead plaintiff group in the eSpeed litigation.  It was a July

13   13, '05 --

14           THE COURT:  I saw the opinion.

15           Did they use the LIFO method there?

16           MR. BERGER:  They used the LIFO method, but I think

17   most importantly for our purposes here, your Honor, is she

18   explicitly adopts -- it is the most recent decision where

19   another judge in this court adopts a review of what I call the

20   Olston factors, what she calls the Lax factors -- they are the

21   same thing -- in evaluating the interest, who has the greatest

22   economic interest or greatest economic stake in the litigation.

23           THE COURT:  Assuming that the requirements of the

24   class action are met, because that is also part of it.

25           MR. BERGER:  Yes.  Clearly, your Honor.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

5

57PHCAPA

1          So if you've looked at that -- I have the decision
2     with me.

3              THE COURT:  I already read it.

4              MR. BERGER:  So under Olston and the Lax criteria, the
5     group of the City of Philadelphia and the City of Detroit
6     pension funds have by far the largest interest in the relief
7     sought.

8          Moreover, in terms of adequacy, these are two
9     multi-billion dollar public pension funds, each with over $3
10    billion under management, and they've retained, in all modesty,
11    very experienced securities litigation counsel.  The Barrack
12    firm and our firm just recently concluded the WorldCom
13    litigation in this court, which, as your Honor knows, is the
14    largest securities fraud settlement ever.

15         Three of the movants, the King and Finn group, the
16    Katsanis group, and the Sonkin group, have individuals with
17    only nominal losses and by any measure are not movants with the
18    largest financial interest.

19         I would like to go through the Olston and Lax factors
20    with respect to the remaining movant, the West Virginia group.
21    By doing that I think would demonstrate clearly why under those
22    factors Philadelphia and Detroit clearly have the largest
23    financial interest.

24         The most important factor is whether the movant is a
25    net buyer or seller of stock during the class period, measured

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

6

57PHCAPA

1    by the number of net shares and the total net funds expended

2    during the class period.  And what relevance does that have?

3            Courts recognize that someone who buys stock during

4    the class period or buys more stock than he sells during the

5    class period is purchasing stock that is inflated by a fraud,

6    and the courts likewise recognize that anyone who sells stock

7    or sells more stock during the class period is benefiting by

8    the fraud, because obviously they are selling at inflated

9    prices.

10           Courts have said, and I am quoting now, A net seller

11   has arguably profited more from the fraud than it has been

12   injured because it sold stock inflated by the fraud.

13           We cite these cases.

14           Courts have gone so far as to say net sellers are

15   totally out of the running as designated lead plaintiffs.  In

16   fact, in the Cable and Wireless Securities Litigation, the

17   court in Virginia rejected West Virginia as a lead plaintiff

18   precisely because it was a net seller.  Other courts are clear

19   that a net seller's losses are illusory because they clearly

20   benefit from the fraud.

21           Here, the West Virginia group is a net seller again.

22   They sold 4,650 more shares than they purchased during the

23   class period.  They received 132,000 more for selling the R&G

24   stock than it spent to purchase it.  In fact, West Virginia

25   alone received over $366,000 more.  They reaped over $2.7

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

7

57PHCAPA

1    million in proceeds from the sales at inflated prices during

2    the class period.  They sold stock, or a tremendous amount of

3    stock during the class period at $27, $29 a share.  And after

4    the fraud was disclosed at the end of the class period, the

5    stock was down to roughly $15 a share.

6            In contrast, Philadelphia and Detroit General

7    purchased 23,570 more shares than they sold during the class

8    period.  They expended over $1.1 million more than they

9    received for those sales.  And measuring the absolute losses on

10   either the FIFO or LIFO method, which is only one of the

11   factors, the losses are virtually indistinguishable.  They

12   range from $840,000 or $850,000 for the Philadelphia and

13   Detroit group to $880,000 or $890,000 under either one of those

14   methods for the West Virginia group.

15           Therefore, it is clear that Philadelphia and Detroit

16   have the largest interest in the relief sought together and

17   separately.

18           If you look at them separately, it is the same thing.

19   If your Honor agrees with the authority which considers whether

20   you are a net seller or a purchaser and what advantages you

21   receive as a net seller, both monetarily and in terms of the

22   number of shares that you sold during the class period while

23   the fraud was still in effect, clearly both, each Philadelphia

24   and Detroit, have the largest interest.

25           West Virginia raises in their papers some peripheral

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

8

57PHCAPA

1    issues.  They don't cite to Olston, but they raise some

2    peripheral issues, such as when the briefs were filed, and not

3    being filed until after 5:00 at night.

4         I just simply say, your Honor, that neither West

5    Virginia or Philadelphia filed a complaint in this action and

6    were completely unaware of the conference on, I think it was

7    June 23rd.  Received no notice of it, and it didn't appear on

8    Pacer until after the papers were due.  So that is the reason.

9    Of course, we apologize, and I think we explained that in our

10   letter to your Honor.

11        West Virginia also says --

12        THE COURT:  I don't hold to those deadlines as being

13   significant.

14        MR. BERGER:  Thank you, your Honor.

15        Just a couple more points.  I could address them if

16   they are relevant to your Honor.

17        THE COURT:  I would rather hear from them and hear

18   what they have to say.

19        MR. BERGER:  Thank you very much, your Honor.

20        THE COURT:  Go ahead.

21        MR. RUDMAN:  Good afternoon, your Honor.  Samuel

22   Rudman, from Lerach Coughlin, for West Virginia Investment

23   Management Board and Wayne County Employees' Retirement System,

24   who have collective losses of $891,000, approximately.

25        It should come as no surprise to the court that we

                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

57PHCAPA

1    believe our clients represent the largest financial interest.

2              THE COURT:  Are you a net seller or a net buyer?

3              MR. RUDMAN:  Yes, I am a net seller.

4              THE COURT:  Where does this $890,000 worth of damages

5    come from?

6              MR. RUDMAN:  All the parties here agree that the FIFO

7    methodology is to be used to calculate the losses.

8              Under a FIFO methodology, that is, taking any class

9    period sales and netting them against, first, any pre-class

10   period holdings and not netting them against class period

11   purchases until you run out of your pre-class period position,

12   we have losses of $891,000.

13             All the parties here agree, your Honor, that that is

14   the methodology to use.  FIFO.

15             In all of the cases that have examined the Olston

16   factors -- and, coincidentally, Olston cited the Lax case for

17   those factors, which is why I believe Judge Scheindlin referred

18   to it as the Lax factors.  All of the cases that have

19   eliminated net sellers or called their gains illusory or said

20   they are somehow inadequate, I believe the vast majority of

21   cases have looked at it from a LIFO basis or looked at simply

22   the activity that occurred in trading during the class period.

23             If you agree that you have to apply FIFO, and we

24   believe you have to apply FIFO, and Mr. Berger certainly argues

25   for FIFO, then it strikes us as odd that you would say someone

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

57PHCAPA

1    is a net seller.

2            THE COURT:  Forget about the question of net seller or

3    net buyer.  To the extent that you bought before the class

4    period at an inflated price, whether you bought in the

5    pre-class period or during the class period, you paid the

6    inflationary price, but you recouped that inflation by selling

7    at an inflated price, you could have no damages.

8            MR. RUDMAN:  You can't tell here today how much money

9    they made, what they paid for it beforehand, or how much profit

10   they made.

11           THE COURT:  But I would think you would be able to

12   show me that.

13           MR. RUDMAN:  I could after I have discovery and

14   determine what the appropriate damages --

15           THE COURT:  You are supposed to know that now.  You

16   are seeking to be lead plaintiff.  You are claiming you have

17   the larger loss.

18           MR. RUDMAN:  Your Honor, if you want us to find out

19   what they bought and exactly how much money we made on those

20   trades --

21           THE COURT:  You are stressing the difference in these

22   two methods and I'm saying to you that you are not really

23   demonstrating to me why it makes a difference here --

24           MR. RUDMAN:  I don't understand --

25           THE COURT:  -- except in academic terms.  I am talking

57PHCAPA

1    about real terms, real interest.

2            MR. RUDMAN:  In real terms.  When you get to the end

3    of the case, your Honor, and there is a plan about a settlement

4    for this case, like every other settlement there has been, the

5    losses that are going to be calculated -- I have a notice here

6    from the Bristol-Myers case where Detroit General --

7            THE COURT:  Tell me why conceptually does it matter

8    whether you buy for $15 a share pre-class period or during the

9    class period if you sell it for $18.

10           MR. RUDMAN:  Conceptually I don't think it matters,

11   because what happened with --

12           THE COURT:  You are the one that is drawing this great

13   distinction between net profits and sales during the class

14   period and you are saying I shouldn't use that method.  I am

15   saying it doesn't seem to make any difference to me.

16           MR. RUDMAN:  I am not drawing a distinction, Judge.

17   I'm saying there is a class period.  There is a chain of

18   purchases, like all institutional investors have a chain of

19   purchases.  They are looking at the class period and saying you

20   sold more during the class period than you bought so you're a

21   net seller.  I'm looking at the chain of events and saying --

22           THE COURT:  I don't think I am going to resolve this

23   case based upon the academic notion that you are either a net

24   seller or a net buyer.  What I am really concerned about is

25   whether that makes a difference.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

12

57PHCAPA

```
 1            It doesn't make any difference to me whether or not
 2    you are a net seller or you are not a net seller during the
 3    class action period if you have recouped your damages or your
 4    inflationary damages by sales at an inflated price during the
 5    class period.
 6            MR. RUDMAN:   In the Shearing Plow case, where
 7    Mr. Barrack is the lead counsel for the Florida State Board of
 8    Administration, on class certification -- and keep in mind,
 9    your Honor, that a lot of these decisions that cite a net
10    seller are lead plaintiff decisions where the court doesn't
11    have a full record on them.
12            But in two class certification issues where net
13    sellers were challenged as having made money, and most notably
14    in the Shearing Plow case where the Florida State Board of

15    Administration was a rather large net seller, the court there
16    rejected that attack on the net seller and held the claim is
17    based on losses that resulted from purchases of Shearing Plow
18    stock during the class period.  Any capital gains made with
19    respect to the sale of shares purchased before the class period
20    are irrelevant.  And specifically noted in that case, your
21    Honor, that under the FIFO methodology, the sales that you
22    made --
23            THE COURT:   That would be irrelevant in any event if
24    it is before the class period.
25            MR. RUDMAN:   No.  FSBA is exactly the same as --
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

57PHCAPA

1          THE COURT:  Wait.  If you bought and sold pre-class

2    period --

3          MR. RUDMAN:  That is not --

4          THE COURT:  -- that has got to be necessarily

5    irrelevant to a class action.

6          MR. RUDMAN:  Judge, I'm sorry if I am stating it in a

7    confusing way.  That is not what took place in the Shearing

8    Plow case.

9          The FSBA, Florida State Board of Administration, was

10   exactly situated the same way that West Virginia Investment

11   Management Board is here today, and our class certification was

12   certified and the court held two things.  One, under FIFO, the

13   term net seller becomes irrelevant because any sales during the

14   class period of pre-class-period-held shares are irrelevant for

15   the purpose of determining losses, and, secondly, specifically

16   held that any capital gains --

17         THE COURT:  Why?

18         MR. RUDMAN:  Because if you are calculating first-in,

19   first-out, if you bought something before the fraud occurred

20   and if you sold it during the class period, the class is only

21   looking at what you bought during the class period or sold

22   during the class period with respect to things that you bought

23   and sold.

24         THE COURT:  When did your class period begin?

25         MR. RUDMAN:  The class runs roughly from April of '03

                   SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

14

57PHCAPA

1    to April of '05.

2            THE COURT:  What was the event that triggers the

3    beginning of the class?

4            MR. RUDMAN:  The event, I believe, Judge, that R&G

5    indicated they are going to restate their financial statements

6    for a certain period of time, and the beginning of the class

7    period would be the announcement of financial results.  From

8    the beginning of that period of time that they have announced

9    they are going to restate their financials until a point where

10   they indicated they were going to restate --

11           THE COURT:  There has to be some false statement or

12   some material omission that for one reason or another could be

13   the predicate for an assumption that the market has been

14   inflated, and I am just asking you what that is here.

15           MR. RUDMAN:  Here it is an announcement that they are

16   going to restate their financials, and the stock dropped on

17   that announcement.

18           THE COURT:  That triggers the end of the class period.

19           MR. RUDMAN:  Right.

20           THE COURT:  What triggers the beginning of the class

21   period?

22           MR. RUDMAN:  The beginning was in the end statement

23   they said we are going to restate our financials for -- and I

24   may be speaking out of turn -- I believe it was 2002 through,

25   or 2003 through 2004.  Right?  So people go back and draft a

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

15

57PHCAPA

 1    class period that encapsulates all the financial statements

 2    during that period of time.  That could change, by the way,

 3    because R&G, to my knowledge, hasn't restated their financials

 4    yet.  They are going to do that at some point in the future,

 5    and this April '03 to '05 period could increase.

 6                THE COURT:  What is the event that caused the

 7    inflation in the marketplace?

 8                I take it this is a fraud on the market case.

 9                MR. RUDMAN:  It is a fraud on the market case.

10                THE COURT:  Tell me what nondisclosure caused the

11    stock to be inflated.

12                MR. RUDMAN:  The actions all allege, your Honor, that

13    they were issuing materially false and misleading financial

14    statements --

15                THE COURT:  Before or after the class period?


16                MR. RUDMAN:  During the class period.

17                THE COURT:  But nothing before.

18                MR. RUDMAN:  Right now nothing, but that could change

19    in the future.

20                THE COURT:  Right now nothing?

21                MR. RUDMAN:  I'm saying the cases on file, Judge, go

22    from April to April based on what the company disclosed now.

23    They haven't restated their financial statements.  It is

24    possible they could say there are other years that were

25    affected.  We don't know.

57PHCAPA

1          As they stand right now, the cases are based on the

2     claim that they were issuing false and misleading financial

3     statements and results.

4          THE COURT:  What false statements caused the market to

5     be inflated during the class period?

6          MR. RUDMAN:  The company's financial statements which

7     were artificially inflated.

8          THE COURT:  In what way?  What did they say?

9          MR. RUDMAN:  Improperly valuing certain securities,

10    overstating the values.

11         THE COURT:  Was there a financial statement filed at

12    the time?

13         MR. RUDMAN:  Yes.  I think on April --

14         THE COURT:  What did they file, a prospectus?

15         MR. RUDMAN:  Earnings announcements, 10Qs and 10Ks.

16         THE COURT:  Which were filed when?

17         MR. RUDMAN:  All throughout the class period.  I am

18    assuming April 3rd is --

19         THE COURT:  But something had to begin the class

20    period.

21         MR. RUDMAN:  Yes.  It is an announcement on April 3rd

22    of an earnings announcement.

23         THE COURT:  You say that event caused an inflation in

24    the market.

25         MR. RUDMAN:  That is the beginning, right.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

57PHCAPA

 1          THE COURT:  That is the beginning.

 2          MR. RUDMAN:  Right now, as we stand here today.

 3          THE COURT:  So you are taking the position there was

 4  no inflation in the market prior to that time.

 5          MR. RUDMAN:  Well, right now I am, that's right.

 6          THE COURT:  Right now you are.

 7          MR. RUDMAN:  What if I learn --

 8          THE COURT:  But the whole theory behind your

 9  pre-purchase argument --

10          MR. RUDMAN:  You are making my argument, Judge,

11  because my second argument was going to be it is premature to

12  call the client a net seller or to look at all of this stuff

13  anyway because R&G hasn't restated their financials, and they

14  could restate other years and there could be a further decline

15  in the stock and the class period on an amended complaint could

16  look very different than the class period we are talking about

17  here.

18          THE COURT:  If it turns out there was an inflation pre

19  the class period or for some reason the class period goes back

20  and this inflation was in the stock even before the beginning

21  of the class period, then your previous purchases would be

22  highly relevant to the question as to whether they suffered any

23  damages.

24          MR. RUDMAN:  Sure it will.  So would any future

25  decline in the price of stock.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

18

57PHCAPA

 1            THE COURT:  Decline is easy.

 2            MR. RUDMAN:  Right.  All of that begs the question,

 3    Judge, doesn't it make sense to look at these things the way we

 4    would look at it at the end of the case.  Because when they

 5    come in here to settle the case or any other cases that have

 6    been before your Honor, they settle them --

 7            THE COURT:  We are not there yet.

 8            MR. RUDMAN:  We are not, but I am going to tell you

 9    why I think it is important, because when you settle them, you

10    use FIFO.  When we get to the end of this case, if the class

11    period remains the same and the claims come in, the class

12    period is this point in time.  The estimated claim for West

13    Virginia and Wayne County will be 891 and the estimated claim

14    for the City of Philadelphia and Detroit will be 840.

15            THE COURT:  I have no way of knowing that now.

16            MR. RUDMAN:  But that is how the numbers work.

17            THE COURT:  I have no way of knowing that now because

18    you have left open the possibility that the inflation may have

19    been in the market prior to the beginning of the class period.

20            MR. RUDMAN:  You asked me that question.

21            THE COURT:  I know, but you left it open.  You haven't

22    closed the door.  You haven't committed yourself to saying, no,

23    this is it.

24            MR. RUDMAN:  I am not sure how I would close the door,

25    Judge.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

19

57PHCAPA

 1          THE COURT:  You have to close the door.  One way you
 2  close the door is to say we are claiming no inflation in the
 3  stock prior to the beginning of the class period.
 4          MR. RUDMAN:  Well, no good --
 5          THE COURT:  That is the way you close the door.
 6          MR. RUDMAN:  Your Honor, no good plaintiff's lawyer
 7  would get up here and say with 100 percent certainty that he
 8  knows today based on what has taken place with R&G --
 9          THE COURT:  Then I just have to make a guess, don't I?
10          MR. RUDMAN:  -- that the class period doesn't go
11  back --
12          THE COURT:  Then I just have to make a guess.
13          MR. RUDMAN:  I don't think Mr. Burns wants to make
14  that representation.
15          THE COURT:  Then I have to make a guess as to how it
16  is going to come out in the end.
17          MR. RUDMAN:  You have to look at the class period that
18  is going to be pled.
19          All the parties agree that FIFO is the proper
20  methodology.  Under FIFO, these are our losses.  They say FIFO
21  is how you should apply the losses and they say it is because
22  you are a net seller.  They have to get out of that box by
23  saying, look at these other Olston factors, and that gets them
24  to looking at what took place during the four corners of the
25  class period.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

57PHCAPA

1            I say, just like Mr. Barrack did on behalf of the FSBA
2      in the Shearing Plow case, no, it is irrelevant to the shares
3      during the class period to the extent they match off against --
4            THE COURT:  But you see, FIFO and LIFO do not have a
5      lot of meaning until I determine when the inflation of the
6      stock period began.  Because if you bought in an inflated
7      market and you sold in an inflated market, you have no damage.
8            MR. RUDMAN:  Well, not necessarily.
9            THE COURT:  Whether it is FIFO, LIFO, or anything
10     else.
11           MR. RUDMAN:  Right.  Fair enough, your Honor.
12           THE COURT:  That is what I am saying.
13           MR. RUDMAN:  At the risk of going back over these
14     things again, those are our two positions on FIFO or LIFO.  We
15     respectfully submit that we have a larger loss.
16           THE COURT:  They have probably made a better showing
17     than you have in the sense that they at least have a
18     superficially persuasive argument that if you are a net seller
19     rather than a net buyer during the class period they ought to
20     be the lead plaintiffs.
21           MR. RUDMAN:  That argument I can't accept, your Honor,
22     because if you are going to --
23           THE COURT:  I have to make a guess as to who is going
24     to have the biggest interest, and I have no way of knowing that
25     at this moment because I don't know when the inflation of this

                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

57PHCAPA

1   stock began or what the discovery is going to show when it

2   began.  It may be a negative at some point.

3           MR. RUDMAN:  Fair enough, Judge.  Then you can look at

4   the dates that the parties are using to gauge their interest

5   and look at what the PSLRA tells you.

6           The PSLRA tells you to look at the financial interest

7   for the class period that's been pled on the day the motions

8   were made.  Here that is April '03 to April '05.  We can put

9   aside whatever is going to happen in the future.  If you look

10  at those dates and if you apply FIFO --

11          THE COURT:  Yes, but I'm saying whether I apply FIFO

12  or not, the only thing that is relevant to me is whether you

13  sell the shares that you bought before the class period,

14  first-in and first-out, I still have to know whether or not you

15  suffer damage on the sale of those shares because that depends

16  ultimately upon whether or not there was inflation in the stock

17  when you bought it.  If there was no inflation in the stock

18  when you bought it and then you sold it at an inflated price,

19  then you really don't have any damages; you have a profit.

20          MR. RUDMAN:  I think it is premature to make that kind

21  of analysis, your Honor.

22          THE COURT:  I think it is.  I am saying they make a

23  superficially better argument than you do, that's all.  I have

24  to guess at this stage.  It is a discretionary call for me.

25          MR. RUDMAN:  Fair enough, your Honor.

57PHCAPA

1          There were two other minor issues that we wanted to

2     make, although I think ultimately your decision of how FIFO

3     works out really turns on this case.

4          THE COURT:  I think you are making too much of this

5     FIFO, LIFO business because it really does depend upon which

6     shares, whether it be -- let's assume you're right, FIFO.

7     First bought, first-out.  I still have to know whether or not

8     you were damaged on the sale of those shares.

9          MR. RUDMAN:  You can't know that today.

10         THE COURT:  I know I can't know that today.  That is

11    why I find your argument on your damage very unpersuasive.

12         MR. RUDMAN:  Judge, but you just said if you apply

13    FIFO, under FIFO it wouldn't matter because I'm selling

14    something I bought before the class period.

15         THE COURT:  But I don't know to what extent you are

16    going to be claiming later on in this trial, or both of you

17    will be claiming later on in this trial that there was

18    inflation in this stock price prior to the beginning of the

19    class period.  If there were no inflation in the stock prior to

20    the class period, then on the first bunch of shares you sold

21    you made an enormous profit.  You were profiting from the

22    inflation in the market.

23         MR. RUDMAN:  I respectfully disagree, your Honor.

24         THE COURT:  I know you disagree, but I have to use my

25    discretion.

57PHCAPA

1          As I say, their method at least has the convenience of

2   being at least superficially persuasive in the sense that they

3   say it is a safe assumption that if you are a net purchaser

4   rather than a net seller, it is more likely that you suffered a

5   loss.

6          MR. RUDMAN:  I am not going to rehash what I just

7   said.  That is directly contrary --

8          THE COURT:  No, it is not directly contrary.

9          MR. RUDMAN:  It is directly contrary to the position

10  of two courts in class certification contexts.

11         THE COURT:  I don't think those courts were facing a

12  situation quite like this one.

13         MR. RUDMAN:  That is correct, because they were facing

14  a situation, after extensive class discovery and after they had

15  looked at and had a hearing on class certification --

16         THE COURT:  Was it a lead counsel determination or was

17  it class action determination?

18         MR. RUDMAN:  It was a class action determination.

19         THE COURT:  That is a big difference there.

20         You see, I don't have a lot of time to work out lead

21  counsel.  I have to resolve that one immediately.  If I'm

22  wrong, I could always change my mind later.

23         MR. RUDMAN:  Well, that is true.  Also, it is

24  impossible to know what the City of -- you are kind of looking

25  at the overall position.  It is impossible to know what the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

57PHCAPA

1    City of Philadelphia and Detroit --

2              THE COURT:  I am saying, they make a better prima

3    facie showing than you do by showing that they are a net

4    purchaser rather than a net seller.  That is all I am saying.

5              MR. RUDMAN:  We don't know what they did prior to the

6    class period.

7              THE COURT:  But prima facie it looks more logical to

8    accept their position than yours.  That is all I am saying.

9              MR. RUDMAN:  I understand.

10             We have two other related points, which, quite

11   frankly, if the net seller position isn't interesting you, I am

12   not sure these would either, but I am going to state them

13   anyway.

14             In our view, and I think we laid it out fairly well in

15   our papers, Detroit General has an issue with being a plaintiff

16   in too many lawsuits.  Detroit General itself hasn't been

17   named, but the person who signed the certification,

18   Mr. Stampur, has.  The PSLRA talks about officers who are

19   fiduciaries.

20             By our list, Detroit General was the lead plaintiff in

21   the last several years in the Levi Strauss, the Bristol-Meyers,

22   Gemstar.  They were appointed lead plaintiff in In Re Advanced

23   Marketing Services.

24             THE COURT:  Who is this, the general counsel for the

25   pension fund?

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

57PHCAPA

1          MR. RUDMAN:  The first one is the City of Detroit
2    General has been in three cases.  Mr. Stampur, the person who
3    signed the certification for Detroit General, is an executive
4    officer of that fund.  The fund itself was in three.  Mr.
5    Stampur signed a cert for a different fund in Advanced
6    Marketing Services.
7          THE COURT:  What is his position with respect to the
8    funds?
9          MR. RUDMAN:  He is an executive vice president.
10         THE COURT:  Why wouldn't he signed the complaint?
11         MR. RUDMAN:  Who said he wouldn't sign?  I am talking
12   about the statute says that if a fiduciary and officer is in
13   five cases in more than three years, he can be presumptively
14   barred from being a lead plaintiff.
15         THE COURT:  What case is that?
16         MR. RUDMAN:  It is in the cases that are in our brief,
17   all the lead plaintiff decisions knocking people out.
18         THE COURT:  I didn't know of that rule.
19         MR. RUDMAN:  It is a professional plaintiff bar in the
20   PSLRA.  It is set forth in our papers.
21         THE COURT:  He is not a professional plaintiff if he
22   is representing a fund.  I think that is probably talking about
23   an individual plaintiff.  I am sure that is what it is talking
24   about.
25         MR. RUDMAN:  We can argue that is why the provision is
                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

57PHCAPA

1    in the law.

2           THE COURT:  If he represents a fund and the fund gets

3    involved in 30 frauds, who else is going to sue on their

4    behalf?

5           MR. RUDMAN:  All right, Judge.  You know --

6           THE COURT:  Does he have a personal stake in this

7    action?

8           MR. RUDMAN:  No.

9           THE COURT:  Then to apply this professional plaintiff

10   rule is nonsense.  It is a silly argument.

11          MR. RUDMAN:  OK.

12          THE COURT:  I am sure what they are talking about is a

13   situation where you have Joe Mo or Joe Schwartz who brings 50

14   actions.  He looks like a professional plaintiff because he is

15   an individual shareholder.

16          MR. RUDMAN:  No.  There have been lots of cases, your

17   Honor.

18          THE COURT:  With funds?  I can't believe it.

19          MR. RUDMAN:  They are in my brief.  Look at our brief.

20          THE COURT:  Where a fund could be a professional

21   litigant?

22          MR. RUDMAN:  Yes.

23          THE COURT:  You are saying that you can defraud a fund

24   five times and get away with it.  If you defraud them ten

25   times, you get a pass on the last five.  Do you see how

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

27

57PHCAPA

 1   nonsensical that sounds?

 2         MR. RUDMAN:  Detroit Police and Fire has been knocked

 3   out several times on that basis, your Honor.

 4         THE COURT:  That doesn't make any sense.

 5         MR. RUDMAN:  Judge, you know something, I think there

 6   will be a lot of my clients that will be happy to hear you say

 7   that, and I have nothing further to say.

 8         THE COURT:  Who else wants to be heard?

 9         Who do you represent now?

10         MR. ZWERLING:  Movants King and Finn, your Honor.

11   Jeffrey Zwerling, Zwerling Schachter & Zwerling, and Jeffrey

12   Klafter representing movants King and Finn.

13         THE COURT:  You might be subject to a professional

14   plaintiff rule.

15         MR. ZWERLING:  We are not, your Honor.  I think our

16   movants have moved actually about twice in their lifetime.

17         We do not have the greatest financial interest in this

18   case.  Of course, if your Honor chooses not to appoint any of

19   the institutional investors, we are ready to serve, your Honor.

20         THE COURT:  You don't have much of an argument.

21         MR. ZWERLING:  Not much of an argument, but I would

22   point out to your Honor that it has been our position, and we

23   have made it in this court before, that however your Honor

24   chooses to assess the damages and, as Judge Scheindlin said in

25   her recent decision in eSpeed, it's our opinion that FIFO, if

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

28

57PHCAPA

1    you take the first-in, first-out and include sales that

2    occurred outside the relevant class period, which is how the

3    statute reads.  The statute asks for trades, on your

4    certification, trades and transactions within the class period,

5    that if you include purchases that occurred before the class

6    period that is before your Honor now, those are uninflated

7    shares and it mitigates --

8         THE COURT:  I agree with you if they are uninflated

9    shares, but I think you made a big profit, though, if you have.

10        MR. ZWERLING:  That is right.

11        THE COURT:  People who bought uninflated shares, then

12   you haven't really suffered a loss during the class period.

13        MR. ZWERLING:  That is correct.  As a matter of fact,

14   you have probably gained by the fraud.

15        THE COURT:  You were a beneficiary.

16        MR. ZWERLING:  Exactly correct, your Honor, in which

17   many cases have found that you would not be an adequate lead

18   plaintiff.

19        THE COURT:  All of these issues as to what the damages

20   actually are and how they should be determined, it is a little

21   premature for that.

22        MR. ZWERLING:  As your Honor said, it is a little bit

23   of guesswork.  Am I going to assume that this class period of

24   April 2003 to April 2005 is going to be the final and relevant

25   class period?

57PHCAPA

 1          THE COURT:  At some point it will be.  If the class

 2  notices go out, the likelihood of getting an amended class

 3  notice sent out is going to be very remote because of the time

 4  and expense involved.

 5          MR. ZWERLING:  That is correct, your Honor.

 6          THE COURT:  So I'm saying that at some point in time,

 7  after we resolve the class action question, we are going to

 8  have to resolve with finality when the claims -- you are going

 9  to have to commit yourself here as to whether you claim the

10  inflation was in the stock, because I can't have this

11  constantly changing, because every time it changes I will have

12  to send out a new class action notice.

13          MR. ZWERLING:  That is correct.

14          THE COURT:  And I don't want to do that.

15          MR. ZWERLING:  I don't think the plaintiff's bar does

16  either, your Honor.

17          THE COURT:  I am just saying, at least at this stage

18  of the game they make a more persuasive prima facie case by

19  arguing as a rule of thumb, if you want to call it that -- it

20  is always subject to change if it turns out the evidence is

21  different later.  But as a rule of thumb, that the net

22  purchaser as opposed to the net seller has a little bit of a

23  presumption in his favor that he is more likely to have

24  suffered a loss.

25          MR. ZWERLING:  We agree with that position, your

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

57PHCAPA

1    Honor.

2              THE COURT:   That is why I reach the decision I reach.

3              MR. BERGER:   Your Honor, may I be brief?

4              THE COURT:   You want to speak?  Go ahead.  I thought

5    you were too experienced for that.  Usually when you have just

6    won a motion, you sit down.  But if you want to speak, it is

7    OK.  What do you want to do, change my mind?

8              MR. BERGER:   That is OK, your Honor.  Thank you very

9    much.

10             THE COURT:   I always enjoy listening to you talk.  I

11   won't hold it against you.  So go ahead.  Say what you have to

12   say.

13             MR. BERGER:   The class period, your Honor, is going to

14   be, just for our purposes, the class period is going to be

15   established, not the ultimate class period, it is going to be

16   established by whoever your Honor appoints as lead plaintiff

17   and lead counsel at the filing of the amended complaint.  One

18   thing everyone agrees on right now is that the class period

19   that is before your Honor is what your Honor should be looking

20   at, and with respect to West Virginia --

21             THE COURT:   It is going to be a very important issue

22   in this case as to whether there was an inflation in the stock

23   prior to that time.

24             MR. BERGER:   Clearly, but right now no one is arguing

25   for that.  The one thing we do know is that West Virginia, for

                         SOUTHERN DISTRICT REPORTERS, P.C.

                                (212) 805-0300

57PHCAPA

1   example, sold 95,000 shares during this class period and

2   purchased 84,000 shares, reaping a profit on those transactions

3   of $366,000.  I just wanted to give your Honor some statistics

4   there.

5           The other thing I just wanted to mention --

6           THE COURT:  You don't know what they paid for the

7   stock pre-class period, I take it.

8           MR. BERGER:  No, we don't, your Honor, because

9   according to Judge Scheindlin it is not really relevant.

10          THE COURT:  If you took the first-in, first-out

11  method, it wouldn't be relevant, right?

12          MR. BERGER:  The only thing I wanted to mention is, I

13  think this argument with regard to Detroit is a disingenuous

14  argument.  I can address it.  I don't need to.

15          THE COURT:  You mean about being a professional

16  plaintiff?

17          MR. BERGER:  Yes, your Honor.

18          THE COURT:  It was not terribly persuasive.

19          Go ahead.

20          MR. SLYNE:  Your Honor, I represent today the Katsanis

21  group.  We, like the prior group, are an individual group.  We

22  don't have the largest loss, but if your Honor is inclined to

23  name more than one member of the class as lead plaintiff, I ask

24  your Honor to consider whether or not you would name an

25  individual as lead plaintiff.

57PHCAPA

1           It is an approach that was taken by Judge Brieant of

2      the Southern District and also cited by Judge Scheindlin in her

3      recent case in eSpeed.

4           Judge Brieant's reasoning was that adding an

5      individual investor to a lead plaintiff structure brings a

6      different perspective to the class representation.  Also, an


7      additional benefit is that assets can be pooled to assure

8      vigorous prosecution, litigation, and also the resources of the

9      firms can be pooled.

10           I ask your Honor, if you are inclined --

11           THE COURT:  Doesn't that sort of fly in the face of

12      the statute, though?

13           MR. SLYNE:  The statute does say members of the class

14      can be named as lead plaintiff --

15           THE COURT:  It is supposed to be with the largest

16      stake.

17           MR. SLYNE:  Sure.

18           THE COURT:  You throw in somebody with a small stake

19      to be lead in the litigation, you are not taking the statute

20      very well.  It is sort of cutting up a loaf of bread and giving

21      a little bit to make everybody happy.

22           MR. SLYNE:  If more than one plaintiff is named as

23      lead plaintiff, they then share the interest of --

24           THE COURT:  They have two already.

25           MR. SLYNE:  That is correct, both institutions.

33

57PHCAPA

1          THE COURT:  Suppose somebody has ten shares of stock,
2     just to sort of be fair.  That is not what the statute
3     contemplates.
4          MR. SLYNE:  I think that your Honor is correct that if
5     you get down to a certain level, that reasoning is true.
6          THE COURT:  Let's face the reality of this litigation.
7     Whether you are designated as a lead plaintiff or not, the
8     laboring oar here is going to be done by the firms with the
9     biggest stake.  They are the ones that will be doing the most
10    work.  You know that.


11         MR. SLYNE:  That might be true and it might not be
12    true.  It depends how committed their client is to the case as
13    the case moves forward.
14         THE COURT:  I have a feeling these firms are going to
15    be very committed to this case.  I don't think we need any more
16    help here.
17         MR. SLYNE:  Thank you, your Honor.
18         MR. RUDMAN:  Your Honor, I am Andrei Rado, from
19    Milberg Weiss.  A brief housekeeping matter.
20         We previously filed an MDL motion to transfer the
21    cases here from Puerto Rico.  That motion has been withdrawn
22    from the MDL's docket.
23         THE COURT:  So it is no longer before the panel.
24         MR. RADO:  That is right.
25         THE COURT:  So I won't get anymore goodies from the
                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

34

57PHCAPA

1    panel.

2           MR. RADO:  Not in this case.

3           THE COURT:  Thank God.  I have enough of them already.

4           MR. RUDMAN:  I do have to clarify that.

5           MR. KLAFTER:  The plaintiff withdrew the motion, but

6    the defendants moved to send all the cases to your Honor.

7           THE COURT:  So I still may get stuck with it.

8           MR. KLAFTER:  Correct.

9           MS. AQUINO:  Maite Aquino, Sullivan & Cromwell for the

10   defendants R&G Corporation.

11          Milberg Weiss did submit a motion to withdraw the

12   motion that was made to the MDL.  We responded to that,

13   suggesting that in light of all the briefing that was already

14   before the MDL seeking that the case in Puerto Rico be

15   transferred here that the MDL just treat that as a motion by us

16   to MDL the case, transfer the one case from Puerto Rico here.

17          We received notice today from the MDL that they had

18   taken the Milberg Weiss motion off the calendar.  So what we

19   intend to do is just file a motion to transfer in the district

20   court in Puerto Rico.

21          THE COURT:  Everybody wants to get their cases here.

22   I must have a charming personality if everybody wants to send

23   their cases here.  I am only making a joke.

24          MS. AQUINO:  Just to clarify, there is no motion

25   before the MDL now.  There will be a motion filed in the

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

57PHCAPA

1    district court in Puerto Rico.

2              THE COURT:  There will be none?

3              MS. AQUINO:  There will be a motion filed.

4              THE COURT:  I will wait with baited breath and see

5    what they do with me.

6              MS. AQUINO:  Thank you, your Honor.

7              THE COURT:  What about discovery?  When is discovery

8    going to be complete?  Do you want to do the class action

9    motion first or do you want to do the full-blown discovery?

10   What do you want to do?

11             Is there a motion to dismiss here?

12             MR. BERGER:  If our clients and firms are appointed,

13   your Honor, we would like to proceed.

14             THE COURT:  You have to file an amended complaint

15   first.

16             MR. BERGER:  File an amended complaint, do class

17   discovery, class certification, and motions to dismiss

18   simultaneously.

19             THE COURT:  Under the statute, theoretically, I am not

20   supposed to take any merits discovery until after I rule on the

21   motion to dismiss.

22             Is there going to be a motion to dismiss?

23             MS. AQUINO:  Your Honor, we will await an amended

24   consolidated complaint.

25             THE COURT:  There is always a motion to dismiss.

                     SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

57PHCAPA

1          When are you going to file the amended complaint?

2          MR. BERGER:  If our clients are appointed, your Honor,

3     we would propose to file the amended complaint within the next

4     45 to 60 days.

5          THE COURT:  All right.  Say by September 15th.  Is

6     that fair enough?

7          MR. BERGER:  That should be fine, your Honor.

8          THE COURT:  We will give you a conference date and

9     then we will fix a date for a motion to dismiss.  Meanwhile, I

10    think class action discovery can go forward.

11         MS. AQUINO:  Your Honor, I think we would suggest --

12         THE COURT:  Class action discovery can go forward.

13    Not merits discovery, but class action discovery to see whether

14    these are adequate representers of the class.  I am supposed to

15    resolve those motions promptly.

16         MR. BERGER:  Your Honor, our position would be, of

17    course, that it goes without saying that the City of

18    Philadelphia and the City of Detroit are adequate class

19    representatives.  But if the defendants want to take class

20    discovery in a limited context, it would certainly be OK with

21    us, and certainly we wouldn't want class discovery and class

22    certification to delay the rest of the proceeding.

23         THE COURT:  Is there going to be any dispute about --

24    is the class action representative here?

25         MR. BERGER:  We would hope that the class would be

57PHCAPA

```
 1    stipulated to rather than waste time on it.
 2            MS. AQUINO:  I think what we would suggest, your
 3    Honor, is that you allow the parties to discuss that among
 4    themselves.
 5            THE COURT:  Go ahead.  Be my guest.  We will see you
 6    on September 15th.
 7            THE DEPUTY CLERK:  September 15th is a trial day with
 8    already a 4:30 conference.  Perhaps Wednesday, September 14 at
 9    4:30.


10            THE COURT:  When are you going to file your amended
11    complaint?
12            MR. BERGER:  Your Honor, I think it really depends
13    upon, if the restatement is imminent, then we might be able to
14    avoid having to file an amended complaint and then file another
15    amended complaint or seek leave to file another amended
16    complaint if the restatement is going to occur within that
17    period of time.
18            Do you have any idea when?
19            MS. AQUINO:  I don't think I can provide any
20    information on that today.
21            THE COURT:  Why don't I fix the date September 15.
22    But give her a chance to read your complaint anyway.
23            So why don't we fix a date in September, October for
24    the next conference.
25            MR. BERGER:  October.  That would be fine, your Honor.
```

(212) 805-0300

38

57PHCAPA

 1              THE COURT:  Two weeks after you file the complaint,
 2    then she can tell me what she wants to do with it.
 3              THE DEPUTY CLERK:  Friday, October 7th at 3:00.
 4              THE COURT:  Friday, October 7 at 3:00.
 5              MR. BERGER:  Could we have until September 21 to file
 6    the amended complaint?
 7              THE COURT:  I don't really care, but I just want her
 8    to have enough time to read it.
 9              MR. BERGER:  September 21, I think that would give
10    them two weeks.
11              THE COURT:  Then she can let me know whether she wants
12    to move to dismiss or whether you want to proceed right to
13    discovery, and you can let me know whether you all agree upon
14    class action issues.  Because if you all agree, I can arrange a
15    conference at some point and we will get the notices out.
16              MS. AQUINO:  That is fine, your Honor.
17              MR. BERGER:  Your Honor will be issuing an order with
18    respect to the appointment?
19              THE COURT:  We can issue one.  If you prepare the
20    order, then you will all be fighting over it.  So I will just
21    issue it myself.
22              Have a good day.
23              (Adjourned)
24
25

                        SOUTHERN DISTRICT REPORTERS, P.C.

                              (212) 805-0300