EXHIBIT C

## *The Role Of Foreign Investors In Federal Securities Class Actions*

by

## Stuart M. Grant[1] and Diane Zilka[2]

### I.  INTRODUCTION

Falsified financial results, restated financial statements, aggressive accounting practices and failed audits are no longer strictly the stuff of American securities markets.  Increasingly, investors in other countries are reckoning with accounting and financial reporting scandals on their home turf that have reached proportions rivaling those of the worst fraudulent schemes uncovered in the late 1990's at such companies as Enron, Worldcom, Tyco International and Adelphia.  The financial and accounting misdeeds recently revealed at Parmalat Finanziaria, S.p.A., Royal Dutch/Shell Transport, Adecco Corporation and Royal Ahold Corporation, to name a few, have caused overseas regulators to ask hard questions about the integrity of their respective capital markets as investors in transnational transactions call out for more accountability and oversight.

A by-product of this wave of "globalized" securities fraud is the increasing willingness of investors, both institutional and individual, from countries other than the United States to take proactive measures to recoup losses that they and the funds under their management have suffered.  More and more, overseas investors are seeking redress in United States courts in federal securities class actions.[3]  These investors include individuals as well as financial institutions who have acquired debt or equity securities of foreign corporations that trade on United States securities markets and on foreign securities exchanges.

The benefits to overseas investors of proceeding in a United States forum include the uniformity of the securities laws; the availability of the class action device under Fed. R. Civ. P. 23 ("Rule 23"), which most countries outside the United States do not provide; the availability of contingent fee arrangements; the potential for a large jury verdict; the relatively wide-ranging discovery afforded by the Federal Rules of Civil Procedure; and the absence of fee-shifting/loser pay rules for attorneys' fees.

But the right to sue for fraud in United States courts is not automatic.  This article surveys the legal developments concerning the role of foreign investors in federal securities class actions.[4]  From the initial lead plaintiff proceedings, when a court must decide whether to appoint a foreign investor as a lead plaintiff, to efforts to dismiss foreign investors' claims for lack of subject matter jurisdiction, to motions for class certification where the class includes foreign investors, case law developments in these areas can serve as a road map for foreign victims of securities fraud in overcoming the legal hurdles that they may encounter when seeking redress in American courts.

### II.  THE FOREIGN INVESTOR AS LEAD PLAINTIFF

Following the enactment of the Private Securities Litigation Reform Act of 1995 (hereinafter, the "PSLRA")[5] which instituted the lead plaintiff selection process, foreign investors have increasingly sought to serve as lead plaintiffs in federal securities class actions.  The nationality of an investor who purchased shares of an American corporation on a domestic stock exchange, seeking appointment as lead plaintiff, should pose no problem to becoming lead plaintiff since there can be no dispute that a federal court can hear claims of alleged fraudulent conduct that implicates the United States securities markets.  Likewise, a foreign investor that purchased a foreign corporation's American Depository Receipts ("ADRs") traded on a domestic exchange should have no difficulties in serving as a lead plaintiff

This article first appeared in the **Securities Litigation & Enforcement Institute 2004, Corporate Law and Practice,** Course Handbook Series Number B-1442.

*Attorneys. Grant and Zilka are Managing Partner and Senior Counsel, respectively, in the law firm of Grant & Eisenhofer, P.A., a leading litigation boutique located in Wilmington, Delaware, representing shareholders in securities litigation and corporate governance matters nationally. ©2004, Stuart M. Grant.  All Rights Reserved.  No portion of this article may be distributed or reprinted without the express, prior written authorization of the authors.

since, again, the investor is claiming that an American securities exchange has been negatively affected by alleged fraudulent conduct, albeit involving a foreign company. Concerns arise when (1) a foreign investor who purchased securities of (2) a foreign corporation (3) that traded on a foreign securities exchange, seeks appointment as lead plaintiff. These plaintiffs are colloquially referred to as "foreign cubed," since they are foreign investors who have purchased foreign securities on foreign exchanges. However, courts have frequently demonstrated a willingness to grant lead plaintiff status to "foreign cubed" investors with varying permutations on the grounds therefore.

Recently, the Southern District of New York in In re Parmalat Securities Litigation appointed as co-lead plaintiffs a United Kingdom private institutional fund manager and a group of Italian institutional investors who purchased securities of the Italian dairy product company, Parmalat Finanziaria, S.p.A. ("Parmalat"), solely on overseas securities markets.[6] The court rejected arguments by competing lead plaintiff applicants, who included United States citizens, that the European institutional investors were atypical of the proposed class, which would include domestic and foreign investors who bought Parmalat securities here and abroad.[7] The court found sufficient facts were pleaded to suggest grounds for asserting subject matter jurisdiction, and noted that, in any event, a foreign lead plaintiff could possibly ameliorate alleged impediments to subject matter jurisdiction by adding a United States citizen as a named plaintiff, albeit not a lead plaintiff, to the amended consolidated complaint.[8]

In contrast, in Royal Ahold, the court's concerns about appointing as lead plaintiff a foreign investor who bought a foreign company's securities on foreign exchanges were, in part, grounded on what it viewed as insufficient facts to warrant its exercise of subject matter jurisdiction.[9] In Royal Ahold, Union Asset Management Holding AG and the General Retirement System of Detroit ("Union" and "Detroit General") sought to be appointed lead plaintiffs in the securities class actions filed after Koninklijke Ahold N.V. ("Royal Ahold") disclosed to the public that it had overstated its earnings, and that certain transactions in one of its units were legally suspect.[10] Union was Germany's third largest institutional investor, with fund assets under management of approximately $95 billion.[11]

On competing motions for appointment as lead plaintiff, the court found that Union/Detroit General's status as presumptive lead plaintiff was rebutted by the objections raised by competing lead plaintiff applicants. Specifically, the court found that Union would not serve as an adequate class representative because it would be distracted by litigating against defenses unique to it arising from its status as a foreign investor that purchased a foreign corporation's shares on a foreign exchange. Though the court observed no dispute about its jurisdiction over the claims of domestic investors, regardless of where they purchased the securities, or over claims of foreign investors who purchased Royal Ahold ADRs on a domestic exchange,[12] the court ruled that foreign purchasers of shares of Royal Ahold faced serious subject matter jurisdiction problems under what is known as the "conduct test."[13] The court found that, on the record before it, the defendants' conduct within the United States was insufficient to show that the court could exercise jurisdiction over the claims against them. The allegedly fraudulent statements on which the plaintiffs based much of their case were issued by Royal Ahold from the Netherlands. In addition, as the court noted, though it was unclear how much of the alleged fraud was carried out or directed from the Netherlands, a significant amount of activity by Royal Ahold's joint ventures, whose allegedly inflated financial results Royal Ahold reported on a consolidated basis, took place outside the United States.[14] The court found that Union, if appointed lead plaintiff, would thus likely have to devote a large portion of its time and efforts to proving it was *not* subject to the defense of lack of subject matter jurisdiction.[15] The court further held that, to the extent that the proposed class period encompassed alleged activity occurring entirely outside the United States, the presence of a jurisdictional defense would provide Union less incentive to develop these allegations on behalf of the class.[16]

In addition, the court found Union to not be an adequate class representative due to concerns about the res judicata effect of a judgment in favor of Royal Ahold. The court noted that foreign courts might not recognize or enforce such a decision from an American court which would allow foreign plaintiffs in the class to file suit against the defendant again in those foreign courts. Because a judgment might not be enforceable, it was possible that Union and other foreign purchasers might be

eliminated from the class at the certification stage.[17]

The court in the recent decision in In re Royal Dutch/Shell Transportation Securities Litigation similarly found deficiencies in the record before it sufficient to raise doubts about its jurisdiction over the proposed foreign lead plaintiff's claims and thus believed that the proposed lead plaintiff would not be an adequate class representative.[18] In Royal Dutch, securities class action lawsuits were filed after N.V. Koninklijke Nederlandsche Petroleum Maatschappij a/k/a Royal Dutch Petroleum Company ("Royal Dutch"), a Netherlands corporation with principal executive offices in The Hague, and The Shell Transport and Trading Company, PLC., Shell Petroleum N.V. and The Shell Petroleum Limited ("Shell Transport"), a British corporation with principal executive offices in London, England, disclosed that previously reported proven oil and gas reserves had been overstated. KBC Asset Management NV ("KBC-AM"), a Belgian investment advisor that had purchased Royal Dutch/Shell Transport stock on foreign exchanges on behalf of investment funds under its management, sought appointment as lead plaintiff. The court found that KBC-AM was the presumptive lead plaintiff. However, the court determined that the presumption was rebutted because KBC-AM might not be an adequate class representative due to its status as a foreign purchaser of the foreign entities' securities on foreign exchanges.[19] The court held that KBC-AM faced potential subject matter jurisdiction defenses that could become a material distraction. Applying the "conduct" test, the court saw no evidence in the record that significant or material acts of the defendants occurred in the United States and, thus, it was likely that KBC-AM would be required to devote a large portion of its time and efforts to prove that it is not subject to a defense of lack of subject matter jurisdiction.[20] As for res judicata concerns, the court believed it possible that KBC-AM and other foreign purchasers might be eliminated from the class because a judgment from the court would not serve their interests.[21]

In In re Cable & Wireless, PLC, Securities Litigation, the court took a compromise approach and appointed Ontario Teachers' Pension Plan ("OTPP"), a "foreign cubed" institutional investor, together with a domestic individual investor, as co-lead plaintiffs. Cable & Wireless, PLC ("C&W"), a British telecommunications company,

and certain of its senior executives allegedly inflated the price of C&W's common stock which traded on the London Stock Exchange, and C&W's ADRs which traded on the New York Stock Exchange, by issuing of a series of statements during the class period that the plaintiffs claimed contained false and misleading information.[22]

The court held that, standing alone, the domestic individual investor was not an ideal lead plaintiff: although he was a United States citizen who purchased ADRs from C&W and, as lead plaintiff, he would represent the interests of class members who were United States citizens that likewise purchased C&W ADRs, he did not represent any purchaser of C&W common stock on the London Stock Exchange.[23] The court, therefore, considered whether OTPP, which had purchased C & W shares on the London Stock Exchange, was a viable lead plaintiff candidate. The court analyzed the potential defenses that could be lodged against OTPP due to its status as a foreign investor, and found that a strong argument had been made in favor of subject matter jurisdiction, noting that a significant amount of the defendants' fraudulent activity allegedly occurred in the United States and that significant investment activity on behalf of OTPP had been conducted by U.S.-based investment managers.[24] Nevertheless, citing to cases which threw out claims of foreign investors who bought a non-U.S. company's shares on foreign exchanges but retained claims of United States investors,[25] the court exercised its discretion and appointed OTPP as co-lead plaintiff, along with a United States individual investor whose claims were not subject to jurisdictional defenses.[26]

Other opinions on lead plaintiff motions confirm that it is only the "foreign cubed" situation that presents a challenge for the foreign investor. For example, in In re Lernout & Hauspie Securities Litigation, the court appointed as lead plaintiffs a group of multilingual European individual investors who spoke German, Dutch and Italian as primary languages to represent domestic and foreign purchasers of shares of Lernout & Hauspie ("Lernout") that traded on NASDAQ during the class period.[27] Lernout was a Belgian corporation with executive offices in Burlington, Massachusetts whose allegedly false and misleading financial information caused the price of its common stock to trade at allegedly inflated prices.[28] Lernout came under bankruptcy court protection in both Belgium

and the United States.[29]  Investors brought federal securities claims against Lernout and two senior executives.

In appointing a group of previously unaffiliated foreign investors as lead plaintiffs, the court found that they had demonstrated, among other things, an ability to communicate with their U.S. counsel and a willingness to travel to the United States.[30]  A competing lead plaintiff applicant argued that the group would not be an adequate plaintiff because it faced a defense of lack of standing which would be unique to the group and cause it to be distracted from representing the other class members.  The court rejected the standing argument on the grounds that, even though one of the group's members had purchased Lernout stock on the EASDAQ (the former pan-European stock exchange), it amounted to less than half of its total Lernout stock purchases, and the other two individuals had purchased their Lernout stock only on NASDAQ.[31]

In Takeda v. Turbodyne Technologies, Inc., the court appointed a group of lead plaintiff applicants that included German citizens who purchased stock of Turbodyne Technologies, Inc. ("Turbodyne") on the Vancouver Stock Exchange.  The stock of Turbodyne, a Delaware corporation headquartered in California, was listed on both the EASDAQ and NASDAQ.[32]  The court noted that hundreds of German investors had been included in a larger group that initially sought lead plaintiff status and, thus, the geographic diversity of the sub-group was representative of the class as a whole.[33]  In addition, potential logistical difficulties due to the diversity of the group could be overcome because of the stakes involved and the availability of a variety of technological means of communications.[34]  The court also noted that such issues as logistical problems and the potentially divergent interests between class representatives and the rest of the class are more properly addressed at the class certification stage,[35] noting its view that certification of a class that includes foreign investors should not pose a problem since there is no per se rule against certifying a class comprised of foreign and American investors nor any rule against certifying a mix of foreign and American investors as class representatives.[36]  Additional concerns about the res judicata impact of a judgment in favor of defendants were found to be irrelevant at the lead plaintiff selection stage because the lead plaintiffs would clearly be bound by the judgment of the court.[37]

In fact, in granting lead plaintiff status to a group that combined foreign institutions and United States citizens, one court found the presence of foreign plaintiffs ameliorative in that it would "help create balance among the demographics of the lead plaintiff group members," and would improve the "diversity of experience."[38]

Though the foregoing reflects a paucity of reported decisions that provide any detailed analysis of the appropriate circumstances under which foreign investors can serve as lead plaintiffs, a number of decisions on motions to dismiss or for class certification involve plaintiffs who are neither United States residents nor investors of securities that trade on United States markets.[39]  These foreign investors obviously made it past the lead plaintiff application stage.  Implicit in the decisions on motions filed after the lead plaintiff stage, whether on challenges to the sufficiency of the pleadings or to class certification, is the view that the "foreignness" of the plaintiffs was not a barrier to their appointment as lead plaintiffs or to the case advancing to the next stage.

The decisions that have analyzed the propriety of appointing foreign investors as lead plaintiffs make clear that courts are willing to appoint foreign investors as part of a group that includes United States citizens and will even appoint foreign investors as lead plaintiffs with no United States citizen included as lead plaintiff, if the court gains comfort from the record before it that there will be sufficient grounds to assert subject matter jurisdiction over the foreign investors' claims if the defense is raised.  Also, there is no consensus on the effect that potential res judicata concerns about enforceability of an American court's judgment in foreign courts have on typicality considerations under Rule 23(a)(3).

### III. FOREIGN INVESTORS AS CLASS REPRESENTATIVES

Foreign investors have had increasing success in representing classes that include foreign investors in foreign corporations' securities listed on foreign exchanges.  There is little question that, irrespective of the citizenship of the named plaintiffs, a class can include non-U.S. residents or citizens investing in a foreign company's securities if they purchased those securities in United States securities exchanges.[40]  Courts have also certified classes comprised of U.S. citizens and non-U.S. citizens who purchased a

4

foreign company's securities that traded on United States exchanges and foreign exchanges. But, given the fact-intensive nature of the inquiry required on class certification motions, it is not surprising that courts have also refused to certify classes that include foreign investors.

For example, in In re Nortel Networks Corp. Securities Litigation, the court certified a class of purchasers of Nortel Networks Corporation ("Nortel") securities on the New York Stock Exchange and/or the Toronto Stock Exchange, and certified the Trustees of the Ontario Public Service Employees' Union Pension Trust Fund, a Canadian pension fund, as class representatives.[41] The court rejected the defendants' argument that the contacts of Nortel, a Canadian company, to the United States were insufficient to warrant certification of a class that included foreign investors in Nortel securities on the foreign exchange.[42] The court found that the defendants' activities in the United States satisfied the test for subject matter jurisdiction, including the alleged extension by the defendants of risky vendor financing deals to uncreditworthy U.S. customers to artificially boost reported revenues.[43] The court also noted its authority to certify a class while reserving the right to shape the class more precisely later as issues emerge during the litigation.[44]

Similarly, in In re Gaming Lottery Securities Litigation, the court certified Canadian citizens and United States citizens as representatives of a class comprised of American and Canadian purchasers of the stock of Gaming Lottery Corporation ("Gaming Lottery"), a Canadian company, on American and Canadian securities markets during the class period.[45] The court rejected the defendants' contention that the Canadian citizens were atypical of the class because the court lacked subject matter jurisdiction over their claims.[46] The plaintiffs had alleged that Gaming Lottery illegally operated a United States subsidiary, and incorporated the earnings of the subsidiary in its financial statements. The plaintiffs claimed that the operation of the subsidiary was sustainable only as long as Gaming Lottery continued to deceive the Washington State Gambling Commission about facts relevant to Gaming Lottery's acquisition of the subsidiary. The court found that this United States-based activity could be shown to have directly caused the Canadian plaintiffs' injuries because it was the false statements regarding the United States subsidiary that artificially inflated the price of Gaming Lottery

stock on both the NASDAQ and the Toronto Stock Exchange, directly causing injury abroad.[47] Also, on the question of subject matter jurisdiction, the court considered persuasive the evidence of a variety of economic activity tying Gaming Lottery to the United States, including the fact that, during the class period, the price of Gaming Lottery stock moved in tandem on the Toronto Stock Exchange and the NASDAQ due to the efficiencies of market pricing and the ever-present possibility of arbitrage.[48]

Courts have also certified classes that include foreign investors despite res judicata concerns raised by defendants.[49] Defendants, U.S. and foreign corporations alike, have argued that the class action device is not a superior means of adjudicating securities claims because they will face repeated lawsuits from individual class members in foreign courts that will not give preclusive effect to a class action judgment from an American court. While the res judicata effect of a class-wide resolution may be considered as a factor under Rule 23(b)(3),[50] a "possibility" of there not being res judicata does not mean that the class action device is not superior.[51] Defendants must demonstrate a "near certainty" that the class-wide judgment would not be recognized by foreign courts.[52]

For example, in In re Turkcell Iletisim Hizmetler, A.S. Securities Litigation, the court certified a class that included foreign investors, in part, because the court could not conclude from the competing experts' affidavits that a Turkish court would give no weight to a judgment out of the Southern District of New York, noting that, "having availed itself of the benefits of American capital markets, [the foreign corporate defendant] cannot evade the private enforcement mechanism intended to ensure the efficient operation of those markets. Any holding to the contrary would effectively shield many foreign corporations listed in the United States from civil liability."[53]

In Cromer Finance, Ltd. v. Berger, the court certified a class that included foreign investors, and certified two foreign firms as class representatives, in part because evidence from the plaintiffs' and the defendant's experts was inconclusive of the preclusive effect of a class action judgment in foreign courts.[54] Similarly, in In re Lloyd's American Trust Fund Litigation, the court certified a class whose members were situated worldwide in a breach of fiduciary duty case against Citibank,

N.A., despite evidence indicating that the defendant could be sued again by the class members in their own country, because the court could fashion a proof-of-claim mechanism that would likely bind participating class members and thereby discourage re-litigation.[55]

Likewise, in Jordan v. Global Natural Resources, Inc., the court ruled that foreign shareholders could opt out of a securities class action, and would not be required to opt in, where the defendant had not borne its burden of demonstrating a substantial probability of subsequent foreign suits and consequent enforcement of adverse judgments against assets held abroad.[56]    And, in In re U.S. Financial Securities Litigation, after considering competing evidence from the parties, the court certified the foreign plaintiffs as class representatives of a class of debenture holders situated worldwide, rejecting the defendant's res judicata argument in part because the defendant failed to demonstrate that it would face numerous lawsuits in foreign courts despite a class-wide judgment from the U.S. court.[57]

Decisions on the res judicata considerations arising in the class certification stage have almost uniformly rejected construing the Second Circuit decision, Bersch v. Drexel Firestone, Inc., as authority for the proposition that res judicata concerns prohibit certification of a class that includes foreign members.[58]  In Bersch, the Second Circuit dismissed federal securities claims of foreign purchasers who bought securities of a Canadian financial services corporation outside of the United States, on grounds that the court lacked subject matter jurisdiction.[59]  The Court then had to decide whether, under the principles of pendent jurisdiction, to allow the action to proceed as a class action on behalf of the foreign members of the class on the common law claims.  The record included uncontroverted affidavits evidencing that five foreign jurisdictions would not recognize a judgment in favor of a defendant, even when their citizens had received class action notice.[60]  Based on this factor, among others, the court excluded non-United States residents or citizens from the class.

## IV. SUBJECT MATTER JURISDICTION OVER FOREIGN INVESTORS' SECURITIES CLAIMS

As many courts have noted, the Securities Exchange Act of 1934 is silent as to its extraterritorial application.[61]  Two jurisdictional tests have emerged to determine whether a United States court should devote its resources to a transnational securities fraud claim.  These tests are known as the "effects test" and the "conduct test."

Under the effects test, a court must determine whether acts or omissions outside the United States have had a substantial adverse effect in the United States.[62]  Courts have defined a "substantial adverse effect" as fraud which has adversely affected specific United States investors or parties.[63]

The conduct test, which is more widely employed in determining whether subject matter jurisdiction exists over foreign investors' federal securities claims against foreign defendants, considers "whether the fraudulent conduct that forms the alleged violation occurred in the United States."[64]  Where non-United States defendants have undertaken significant steps in the United States to further a fraudulent scheme, a court can exercise jurisdiction over claims arising from that conduct even if the final transaction occurs overseas and involves only foreign investors.[65]    The test developed in recognition of the principle that "Congress does not want 'the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'"[66]

The Courts of Appeals that have adopted the conduct test are split as to how to apply it. The most restrictive views of the conduct test are in the Second, Fifth and District of Columbia Circuits, which hold that subject matter jurisdiction over foreign acts of securities fraud exists only if the United States-based conduct was more than just "preparatory," and the defendant's acts, or culpable failures to act, within the United States directly caused the foreign investors' losses.[67]

The Third, Seventh, Eighth, and Ninth Circuits have articulated a more relaxed standard which generally requires some lesser degree of conduct than the "direct causation" test used by the Second, Fifth, and District of Columbia Circuits.  The Third Circuit employs the most relaxed standard, finding subject matter jurisdiction where at least some conduct occurs in the United States.[68]  The Seventh Circuit holds that "[w]hen the conduct occurring in the United States is material to the successful completion of the alleged scheme, [subject matter] jurisdiction is asserted."[69]  The Eighth Circuit's interpretation of the conduct test is somewhat

similar.[70]   The Ninth Circuit has also similarly interpreted the conduct test, finding subject matter jurisdiction exists where the United States-based conduct is "significant with respect to the alleged violation . . . and furthered the fraudulent scheme."[71] Although the Fourth Circuit has not yet recognized the conduct test, the District Court for the Eastern District of Virginia recently adopted the approach to the conduct test employed by the Seventh, Eighth, and Ninth Circuits.[72]

The Second Circuit has held that the effects and conduct tests need "not be applied separately and distinctly from each other" and that, in fact, "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court."[73] Satisfaction of either test may independently establish subject matter jurisdiction over a transnational securities fraud claim.[74]   As the District Court for the Southern District of New York stated, to require a foreign plaintiff to demonstrate that sufficient grounds exist to assert jurisdiction under both tests "would be to allow the 'admixture' of the conduct and/or effects tests set forth by the Second Circuit to be held hostage by Plaintiff's inability to affirmatively allege domestic effects.   Such a conclusion is inimical to the concerns governing the application of federal securities laws to foreign securities transactions in the first place."[75]   Even if the conduct test is met, however, in the Second Circuit, if "the surrounding circumstances show that no relevant interest of the United States [is] implicated," jurisdiction might not be established without "some additional factor tipping the scales in favor of our jurisdiction."[76]

The Court's inquiry on a motion to dismiss for lack of subject matter jurisdiction is a very fact-specific exercise.[77]   For example, in In re Cable & Wireless, PLC, Securities Litigation, the court ruled that it had jurisdiction over the securities claims.[78] Ontario Teachers Pension Plan ("OTPP"), a Canadian corporation comprised of a group of investors, brought a class action on behalf of all purchasers of common stock of Cable & Wireless ("C&W"), a British telecommunications corporation, claiming C&W and certain of its officers issued false and misleading statements regarding the company's August 6, 1999 sale of One 2 One, a mobile telecommunications subsidiary, to Deutsch Telecom.

The plaintiffs alleged that the defendants, among other things, misrepresented C&W's financial obligations to One 2 One, including United Kingdom tax obligations, and failed to disclose a £1.5 billion escrow obligation owed to Deutsch Telecom to cover any taxes assessed by the United Kingdom.   The plaintiffs also alleged that C&W's escrow obligation deprived the company of two-thirds of its cash, which the defendants failed to disclose to its investors.[79]   When C&W disclosed on December 9, 2002 its obligation to place in escrow the previously undisclosed £1.5 billion, the price of the C&W common stock, traded on the London Stock Exchange, fell and the price of the company's ADRs which traded on the New York Stock Exchange also fell.[80]   The plaintiffs also alleged that the defendants engaged in sham capacity swap transactions to purchase and sell the right to use fiber-optic lines, which resulted in an artificial inflation of C&W's earnings.[81]

Focusing on the allegedly sham fiber-optic swap transactions, the District Court for the Eastern District of Virginia held that it had subject matter jurisdiction over the claims of the foreign purchasers who bought C&W securities on a foreign exchange.[82]   The court found that the plaintiffs sufficiently pled that a significant amount of allegedly fraudulent conduct occurred in the United States, and that this alleged conduct was material to the entire fraud.   First, the alleged conduct was significant, in that it involved swap transactions worth hundreds of millions of dollars.   Second, although most of the alleged fraudulent acts that the plaintiffs claimed that the defendants engaged in did occur in the United Kingdom, and the defendants were all either United Kingdom entities or citizens, a substantial part of the entire alleged fraudulent scheme to allegedly artificially inflate C&W's profit earnings occurred in the United States.   The Complaint alleged that C&W's revenue and earnings reported in C&W's SEC filings and in other public statements and reports were materially overstated for at least two years because the defendants allegedly included hundreds of millions of dollars in fictitious revenue from the capacity swap transactions. The plaintiffs also alleged that the defendants overstated C&W's income by amortizing the expenses from the purchase side of the swaps while immediately recognizing the revenue on the sale side of the swap. This was all conduct that allegedly occurred in the United States,

specifically at C&W's headquarters in the Eastern District of Virginia.[83] On those facts, the complaint withstood the motion to dismiss.

Similarly, in In re Vivendi Universal, S.A. Securities Litigation, the plaintiffs, purchasers of common stock or American Depository Shares of Vivendi Universal, S.A. ("Vivendi") brought a claim under Section 10(b) of the Securities Exchange Act of 1934, among other claims, as a class action against Vivendi and two of its senior executives.[84] Vivendi is a French corporation not registered to do business in the United States and the two individual defendants were French citizens. During the class period, Vivendi filed Forms 20-F and 6-K with the Securities and Exchange Commission and made statements to investors here and abroad, which the plaintiffs alleged contained false and misleading information that artificially inflated the price of Vivendi's common stock and ADRs, which the plaintiffs claimed was crucial to Vivendi's acquisition spree and growth strategy.[85]

The defendants moved to dismiss the Section 10(b) claim for lack of subject matter jurisdiction, claiming, among other things, that the creation and dissemination of allegedly fraudulent statements and financial data, was initiated, organized and approved by Vivendi corporate executives in France.[86] The defendants also argued that Vivendi's filings with the Securities and Exchange Commission and other materials disseminated to shareholders in the United States was insufficient to confer jurisdiction upon the claims of foreign purchasers, and that Vivendi's vast domestic presence by virtue of its numerous acquisitions in the United States was irrelevant to evaluating the subject matter jurisdiction over the claims of investors who bought their shares in foreign markets.[87]

The Court rejected those arguments finding sufficient grounds to assert subject matter jurisdiction based on the allegations that Vivendi undertook a scheme to acquire numerous well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, and that to successfully accomplish this plan, it took on a $21 billion debt while fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debt.[88] Further, the plaintiffs alleged that the individual defendants who were alleged principal actors in this scheme spent half of their time in the United States from the middle through the end of the class period specifically to increase investments by United States investors in Vivendi.[89] The court found that it was reasonable to infer from the decision by the former CEO and CFO to move to the United States, allegedly to better direct corporate operations and more effectively promote misleading perceptions on Wall Street, that the alleged fraud on the American exchange was a "substantial" or "significant contributing cause" of [foreign investor's] decision[s] to purchase [Vivendi's] stock" abroad.[90]

The fact that a foreign corporate defendant carries on substantial business operations in the United States may not be, in itself, sufficient to confer subject-matter jurisdiction under the securities laws.[91] Further, though SEC filings that include substantial misrepresentations may be a predicate for subject matter jurisdiction,[92] the filing of documents with the SEC, standing alone may not be sufficient to exercise subject matter jurisdiction over foreign investors' claims against foreign defendants in United States courts.[93] To establish subject matter jurisdiction over foreign investors' securities claims, foreign plaintiffs should allege facts showing that a foreign company's filings with the SEC are "a substantial or significant contributing cause of the decision to purchase stock."[94] Indeed, a number of courts have found that SEC filings, coupled with other conduct in the United States, form the basis for exercising jurisdiction.

For example, in Itoba v. LEP Group PLC, a British-based issuer of stock was found to be subject to United States securities fraud laws based upon its filing of a Form 20-F with the SEC that allegedly contained materially false financial information.[95] A single foreign plaintiff purchased the subject shares on the London Stock Exchange (which shares also traded on the NASDAQ) on behalf of its American parent company.[96] The court held that the SEC filings were more than incidental or preparatory to the alleged fraudulent conduct, they were central to the fraud, finding that the issuer's uncorrected nondisclosure played as much a role in the plaintiff's purchases as the price listing on the London Exchange and NASDAQ.[97] In so finding, however, the court also observed that the plaintiff's United States-based parent company had financed the challenged securities transactions and the

"deleterious" effect of the fraud was borne mostly by the thousands of American shareholders of the parent company.[98]

Similarly, in Yung v. Integrated Transportation Network Group, BDO International, a Hong Kong accounting firm and its affiliates ("BDO"), moved to dismiss for lack of subject matter jurisdiction.[99] BDO audited the SEC filings of Integrated Transportation Network Group, Inc. ("ITNG"), an American company with operations in China, whose shares were purchased in Hong Kong by the plaintiffs, two Hong Kong residents.[100] The magistrate judge found that there was sufficient activity in the United States to satisfy the conduct test.[101] Jurisdiction was based not only on the fact that ITNG's allegedly false SEC filings were a central part of the fraud, but on such additional factors as ITNG's incorporation in the United States, the fact that it was headquartered here, the reference to United States securities laws in ITNG's purchase agreements with the plaintiffs, and email and telephone communications to the plaintiffs from the United States directly and actively exhorting them to complete their investment in ITNG.[102]

The court found likewise in Cromer Finance Ltd. v. Berger.[103] In Cromer, two non-U.S. entities brought a securities class action on behalf of the investors in an off-shore investment fund against, among other defendants, the Bermuda accounting firms that served as the fund's administrators or auditors. The defendant Michael Berger ("Berger"), through his wholly-owned company, Manhattan Capital Management, Inc. ("MCM"), served as the fund's investment manager and advisor. The plaintiffs claimed that the fund began to lose money almost as soon as it began trading operations. They alleged that to cover up those losses, Berger caused false monthly statements to be sent to the investors showing profitable performance by the fund. The plaintiffs also alleged that the Bermuda-based fund administrators disseminated to the investors materially inflated net asset value ("NAV") calculations, and that the Bermuda-based auditor defendants prepared false audit opinions on the fund's financial statements.[104] The court held that it had subject matter jurisdiction over the Bermuda-based defendants under the conduct test because the fraud was run from the United States, and it was the decisions made in the United States that led directly to the investors' losses.[105] The fraud was allegedly conceived and executed by Berger in New York and

the scheme was implemented through Berger's company, MCM, a Delaware corporation with its principal place of business in New York. The falsified monthly financial statements were sent offshore to the defendant Bermuda-based administrators and auditors, and then re-transmitted back into the United States and abroad to prospective investors, current shareholders and their agents. The fund's offering memorandum was directed specifically to U.S. tax-exempt entities. Berger's investment strategy was to primarily short sell United States technology companies that traded on American securities exchanges. The fund's securities transactions were cleared in New York and the fund's assets were in a custodian account in New York.[106] In addition, the Bermuda defendants made trips to New York for business meetings with Berger and other corporate defendants' personnel, and were in regular communication with Berger for various matters relating to the fund's business and NAV calculations.[107]

In contrast, courts adjudicating individual cases and proposed class actions brought by foreign investors against foreign defendants have rejected securities claims when the alleged conduct occurred outside of the United States, and to the extent such conduct was fraudulent, when the conduct was not the "direct cause" of the plaintiffs' losses. For example, in Nikko Asset Management Co., Ltd. v. UBS AG, the plaintiffs, all Japanese entities, brought federal securities claims (on their own behalf only), claiming that they were defrauded in connection with their purchase in Japan of two issuances of "credit linked" yen-denominated notes sold to them by UBS Japan, another Japanese entity, to the detriment of Japanese investors.[108] The notes were designed to transfer a risk of loss in Enron-related transactions. The securities claim was based on UBS Japan's alleged failure to warn the plaintiffs of what the UBS affiliates allegedly knew of Enron's impending financial crisis. The notes at issue were part of a larger program undertaken by UBS, whereby UBS entities issued many types of debt securities in the United States and elsewhere, with varying terms and conditions. The allegedly fraudulent conduct in the United States focused on the UBS affiliates' knowledge, purportedly obtained in the United States through dealings with Enron, that Enron's financial statements were false, which UBS Japan then allegedly failed to disclose to the plaintiffs.[109] There was no allegation that any

structuring, marketing or transactional activity in the United States in connection with the notes that Nikko bought from UBS Japan.[110]  The court found that the UBS program of issuing various debt securities like the notes bought by the plaintiffs was an example of "non-fraudulent preparatory activity" and, as such, insufficient to create jurisdiction.[111]  The court also ruled that the plaintiffs' losses were not "directly caused" by any fraudulent conduct in the United States, as the plaintiffs, in making their investment decisions, had no contacts with Enron in any way.  Therefore, Enron's financial fraud was at most an indirect cause of the plaintiffs' losses.[112]

Similarly, in Froese v. Staff, the court found that the "direct cause" of the financial losses claimed by the plaintiff, a German citizen and resident, in connection with his purchase on the German exchanges of shares of Hugo Boss AG, a German corporation, was the alleged fraudulent statements that were conceived, engineered and published in Germany, and not any activity in the United States which the plaintiffs claimed led to the misrepresentations.[113]  The court also held that there was an insignificant effect on the United States securities markets because the few investors situated in the United States - none of whom were plaintiffs - likely bought their shares on foreign exchanges.[114]

The court likewise found in Tri-Star Farm Ltd. v. Marconi PLC that it lacked subject matter jurisdiction over foreign investors' claims for injuries suffered in connection with the purchases of a foreign company's shares on foreign exchanges.  Tri-Star was a class action on behalf of purchasers of the ordinary shares and ADRs of Marconi PLC ("Marconi"), a United Kingdom corporation.  During the class period, Marconi had 2.76 billion ordinary shares outstanding.  Holders of only 0.15% of those shares were residents of the United States.  Marconi's ADRs were registered with the SEC and traded in the United States on the NASDAQ market.  During the class period, ADRs accounted for approximately 1% of Marconi's total issued share capital. Virtually all holders of Marconi ADRs were United States residents.[115]  The defendants argued that the court lacked subject matter jurisdiction over the claims of the foreign plaintiff and any other foreign purchasers of Marconi ordinary shares on the London Stock Exchange because their claims were predicated on the purchase of the securities of a foreign company on a foreign exchange and based on the conduct of foreign citizens in a foreign country.[116]

The plaintiffs countered that the defendants engaged in extensive fraud-related conduct in the United States.  The plaintiffs primarily pointed to the alleged false and misleading statements contained in two Form 6-Ks that Marconi filed with the SEC during the class period which falsely assured investors that Marconi would withstand economic downturns in the telecommunications equipment industry.  The plaintiffs claimed that these misrepresentations significantly advanced the defendants' fraudulent scheme to mislead investors.[117]  When Marconi disclosed its true financial condition, the price of both the ordinary shares and the ADRs dropped by almost fifty percent.[118]

The court granted the defendants' motion to dismiss for lack of subject matter jurisdiction on the grounds that the alleged fraudulent scheme was conceived in the United Kingdom by British citizens, it involved ordinary shares in a British corporation traded on a foreign exchange, and foreign citizens were responsible for the alleged wrongful misrepresentations and omissions.[119]  The only fraudulent conduct alleged to have taken place in the United States was the inclusion of some of the purported fraudulent misrepresentations and omissions in forms Marconi filed with the SEC and the dissemination of the statements published in the British press in the United States.  The court found that those alleged acts were insubstantial in comparison to the conduct that purportedly occurred in the United Kingdom and could not have played a significant role in furtherance of any fraud perpetrated against the foreign investors.[120]

The Marconi court also rejected the plaintiffs' argument that foreign investors relied on the fact that a substantial amount of Marconi's sales and revenues were generated from its United States businesses and that the defendants' failure to disclose serious problems in Marconi's United States businesses caused them to purchase their shares at a price they would not have otherwise paid.  The court found that Marconi's United States business operations were not themselves fraudulent.  Rather, the fraud arose from the representations that the defendants made or did not make about those operations.  It held: "Simply making fraudulent statements about what is happening in the United States does not make those statements 'United

States conduct' for purposes of the conduct test. Nor does it make the underlying activity itself fraudulent."[121]

For similar reasons, the District Court for the District of Columbia found that it lacked jurisdiction over the foreign investors' claims in In re The Baan Company Securities Litigation.[122] In Baan, the plaintiffs brought a securities fraud action on behalf of purchasers of securities of Baan Company, N.V. ("Baan"), a Netherlands corporation with offices in the Netherlands and Reston, Virginia. Baan's securities traded on the NASDAQ, the Amsterdam stock exchange, and the Frankfurt stock exchange, as well as other stock exchanges in Germany. The plaintiffs claimed that Baan and the other defendants issued false statements and violated revenue recognition accounting principles in: (a) Forms 20-F and 6-K that Baan filed with the SEC; (b) in press releases and statements on Baan's website; and (c) in news articles, some of which included quotes from Baan's officers, but only some of which were published in the United States.[123]

The defendants' motions to dismiss for lack of subject matter jurisdiction were granted as to those plaintiffs who neither resided in the United States nor purchased their Baan stock in the United States, rejecting the plaintiffs' assertion that Baan's failure to adhere to GAAP, its dissemination of false information in the United States, and the misconduct used by Baan to fraudulently boost reported sales and revenues evidenced that the fraud took place in the United States. The court found that, under the conduct test, the only fraudulent actions alleged in the complaint that took place in the United States were Baan's filing of forms with the SEC, and perhaps Baan's press releases, which were insufficient grounds to support jurisdiction.[124] And, under the effects test, the fact that Baan securities traded in the United States exchange only indicated there might be greater and more pervasive generalized effects in the United States, not that the effects were related to the claims of the foreign plaintiffs.[125]

## V. CONCLUSION

Federal courts have been fully open to foreign investors who purchase shares in U.S. corporations as well as to foreign investors who buy foreign corporations' shares on U.S. exchanges. In those situations, foreigners appear to be treated substantially the same as domestic investors when it

comes to lead plaintiff and class membership. It is only the "foreign cubed" investors that appear to give U.S. courts pause. The main issue for "foreign cubed" investors is subject matter jurisdiction, which goes beyond whether there is ultimately jurisdiction, but whether they can serve as lead plaintiffs and whether a class that includes "foreign cubed" investors can be certified.

This concern over subject matter jurisdiction may well explain the divergence in outcomes in Parmalat, Cable & Wireless, Royal Ahold and Royal Dutch. While the different treatment afforded those "foreign cubed" investors who moved for appointment as lead plaintiffs could reflect the courts' differing beliefs on the law concerning the extraterritorial reach of the United States courts' jurisdiction over securities claims, it is more likely that the difference is due to the disparity in the type of facts in the record before each of the courts during the lead plaintiff appointment process.

In Parmalat, detailed facts showing the significant role that United States entities played in the fraud were before the court. These included: the conduct of a New York law firm, described as the center of Parmalat's financial scheme, which created documents and managed offshore transactions on behalf of Parmalat that figured prominently in the fraudulent scheme; the presence in the United States of Parmalat executives who, with the direct participation of United States-based banking institutions, distributed false and misleading financial information about Parmalat which helped Parmalat raise approximately $1.5 billion to fund its acquisitions in the United States and elsewhere; the alleged participation of U.S. banks in the fraudulent scheme to inflate Parmalat's financial results; and, the creation of a Delaware corporation used as a conduit by another defendant, one of the United States' largest banking institutions, to funnel money to Parmalat. Therefore, having been presented with detailed facts, the court appeared not to be overly concerned about subject matter jurisdiction so as to prevent the "foreign cubed" investors from becoming lead plaintiffs.

Similarly, in Cable & Wireless, the complaint alleged that hundreds of millions of dollars worth of improper transactions, which defendants used to artificially inflate the company's reported income, revenue and earnings over a two year period, took

place in the United States, and that those underlying domestic transactions were substantial or material to the defendants' larger scheme. The court also pointed to the fact that a significant amount of the proposed foreign lead plaintiff's investments in Cable & Wireless were made by its U.S. investment managers. Based on these allegations, the court appeared to be sufficiently comfortable to make the "foreign cubed" investor a co-lead plaintiff.

Conversely, in Royal Dutch, the court found no evidence in the record before it that significant or material acts occurred in the United States. It was also not clear to the court in Royal Ahold how much of the alleged fraud was conducted in, or directed from the Netherlands, but from the allegations before it, the court observed that a significant amount of activity, involving the company's foreign joint ventures, formed the basis for company's artificially inflated financial results.

Having sufficient facts in the record at the time of the lead plaintiff motions presents some interesting problems. The selection of lead plaintiff begins early in the process, immediately after the complaint has been filed and before any discovery has taken place. A United States investor in a case involving securities issued here and abroad might be more interested in filing the first complaint to try to gain a toehold in the litigation than in shoring up allegations that will form the basis for a court to find that it has subject matter jurisdiction over the claims of the foreign members of the class. If the foreign lead plaintiff applicant does not file its own complaint and simply moves for lead plaintiff status, as the rules allow, it is relying on the allegations as they stand at that point and takes the chance that the United States plaintiff took an appropriately "global" perspective in its pleading.

Perhaps the lesson from Parmalat, Cable & Wireless, Royal Ahold and Royal Dutch for a "foreign cubed" investor seeking to be named lead plaintiff is to file its own complaint at the time it files its lead plaintiff motion that alleges facts sufficient to provide a basis for the court to believe that it can exert jurisdiction over the foreign investors' claims.

Once a "foreign cubed" investor gets past the lead plaintiff hurdle, its rights to pursue the claims in a United States court will still depend, in part, on whether the complaint alleges sufficient facts for the court to exercise subject matter jurisdiction. Once again, a carefully crafted complaint fine-tuned to the jurisdiction's own statement of the "conduct" test can make the difference. If applicable, the complaint should include allegations of fraud on U.S. securities markets in addition to the allegations describing conduct in the United States that furthered the fraud overseas. To be safe, the "foreign cubed" investor might consider joining as a plaintiff a class member, whether a U.S. citizen or not, who purchased the securities at issue on a United States securities market. And, even when it appears that the securities at issue were largely sold in foreign securities markets, a foreign investor might consider joining as a plaintiff a United States citizen who purchased the subject securities overseas, as the court would likely have little doubt that it can hear claims of fraud impacting United States citizens. Including a United States resident or citizen as a plaintiff and then moving to certify both the foreign plaintiff and domestic plaintiff as class representatives might also prove more palatable to a United States court that believes the interests of all class members, here and abroad, would be better served with this mixture of representatives. But even the "foreign cubed" investor that goes it alone can, under the right circumstances, have its day in a United States court, especially as more and more securities transactions go "global," and the reach of fraud arising therefrom shows no territorial bounds.

## ENDNOTES

[1] Mr. Grant is a shareholder in the Wilmington, Delaware litigation boutique Grant & Eisenhofer P.A. His practice focuses on the representation of institutional investors in securities and corporate governance litigation. In the past five years, Mr. Grant's firm has been lead counsel to institutional investors in securities actions involving Oxford Health Plans, Waste Management, Total Renal Care, CellStar, Safety-Kleen, Breed Technologies, Just for Feet, BankAmerica, Siebel Systems, Hollinger, Parmalat, Redback Networks, Stone & Webster, Styling Technologies, DaimlerChrysler, Hayes-Lemmerz, Tyco International, Global Crossing and Dollar General. Mr. Grant is an Adjunct Professor teaching Securities Litigation at Widener University School of Law.

[2] Ms. Zilka is senior counsel in the Wilmington, Delaware litigation boutique Grant & Eisenhofer P.A.

[3] Unless otherwise noted, the decisional law discussed in this article addresses claims under Sections 10(b) and

20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

[4] This article does not discuss defenses to pleadings based on lack of personal jurisdiction, *forum non conveniens*, venue or international comity. It does not discuss discovery issues arising in transnational securities cases or decisions on summary judgment or at trial.

[5] 15 U.S.C. § 78u-4(a)(3). Under the PSLRA, a court must appoint as lead plaintiff "the member or members of the purported plaintiff class" that the court finds "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The statute creates a rebuttable presumption that the most adequate plaintiff is the person or group of persons that (1) has filed the complaint or made a motion for appointment in response to a notice to class members about the pendency of the suit; (2) has the "largest financial interest in the relief sought by the class;" and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The presumption may be rebutted by proof from another class member that the presumptively most adequate plaintiff either (1) will not fairly and adequately protect the interests of the class; or (2) is subject to "unique defenses" that make that plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

[6] In re Parmalat Sec. Litig., No. 1:04-cv-00030 (S.D.N.Y. May 25, 2004) (Amended Order granting lead plaintiff motion and appointing the authors' law firm, Grant & Eisenhofer P.A., co-lead counsel).

[7] In re Parmalat Sec. Litig., No. 1:04-cv-00030 (S.D.N.Y. May 21, 2004) (hearing transcript at 29:4-30:20).

[8] Id. at 15:21-16:18, 17:3-17:22, 31:6-31:16, 41:15-41:23. See also In re Initial Public Offering Sec. Litig., 214 F.R.D. 117, 123 (S.D.N.Y. 2002) (leave granted to join new named plaintiffs after lead plaintiffs had been appointed).

[9] In re Royal Ahold N.V. Sec. & ERISA Litig., 219 F.R.D. 343 (D. Md. 2003).

[10] Royal Ahold, 219 F.R.D. at 347.

[11] Id. at 350-351.

[12] Id. at 351. In reaching that conclusion, the court applied what is known as the "effects" test, under which "a court has jurisdiction where illegal activity abroad causes a substantial adverse effect within the United States, either on American investors or on American securities markets." Id. See Kauthar SDN BHD v.

Sternberg, 149 F.3d 659, 665 (7th Cir. 1998); Robinson v. TCI/US West Communications Inc., 117 F.3d 900, 905 (5th Cir. 1997); Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991). The subject matter jurisdiction defense to foreign investors' federal securities law claims is discussed, infra.

[13] Royal Ahold, 219 F.R.D. at 351. The "conduct" test examines whether conduct within the United States played a part in the perpetration of securities fraud on investors outside the country. A discussion of the subject matter jurisdiction defense to foreign investors' federal securities law claims is discussed, infra.

[14] Royal Ahold, 219 F.R.D. at 352.

[15] Id.

[16] Id.

[17] Id.

[18] In re Royal Dutch/Shell Transp. Sec. Litig., No. 04-374 (JWB), slip op. (D.N.J. June 30, 2004).

[19] Id. at 35-36.

[20] Id.

21. Id. at 36-37.

[22] In re Cable & Wireless, PLC, Sec. Litig., 217 F.R.D. 372, 374 (E.D. Va. 2003).

[23] Cable & Wireless, 217 F.R.D. at 376. (OTPP was selected as co-lead plaintiff also because it was an institutional investor which the court stated would ensure that institutional investors in the class were represented, thus meeting the PSLRA's intent to involve institutional investors in the prosecution of securities class actions.)

[24] Id. at 377.

[25] Id. (citing Tri-Star Farms Ltd. v. Marconi, PLC, 225 F. Supp. 2d 567, 573 n.7 (W.D. Pa. 2002); In re Baan Co. Sec. Litig., 103 F. Supp.2d 1, 10-11, 25 (D.D.C. 2000) (both holding that foreign buyers of shares in a foreign company or on a foreign exchange failed to allege sufficient facts to establish subject matter jurisdiction over federal securities claims.)

[26] Cable & Wireless, 217 F.R.D. at 377.

[27] In re Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d 39, 45 (D. Mass. 2001).

[28] Lernout & Hauspie, 138 F. Supp. 2d at 42.

[29] Id.

13

[30] Lernout & Hauspie, 138 F. Supp. 2d at 45.

[31] Id. at 46.

[32] Takeda v. Turbodyne Technologies, Inc., 67 F. Supp. 2d 1129 (C.D. Cal. 1999).

[33] Id. at 1137.

[34] Id. Accord Newman v. Eagle Bldg. Techs., 209 F.R.D. 499, 505 (S.D. Fla. 2002) (in securities class action involving a U.S. corporation whose shares traded on a U.S. exchange, two European banking entities were appointed as part of a lead plaintiff group that also included four United States residents, finding that the geographical location of the group's members irrelevant in light of today's travel and communication methods). See also Bell v. Ascendant Solutions, Inc., No. 3:01-CV-0166-P, 2002 U.S. Dist. LEXIS 6850, at *16-17 (N.D. Tex. Apr. 17, 2002) (in class action involving a U.S. corporation whose stock was listed on a domestic stock market, court found appointing a United States resident as part of a lead plaintiff group, that also included an Israeli corporation and an individual German resident, "sensible and useful" because it might be inconvenient for the foreign citizens to appear for hearings or meetings in the United States). But see In re Baan Co. Sec. Litig., 271 F. Supp. 2d 3, 13 (D.D.C. 2002) (geographic and linguistic barriers were among the reasons to deny lead plaintiff role to a German citizen even though he purchased his stock on the NASDAQ), and In re Network Assocs., Inc. Sec. Litig., 76 F. Supp. 2d 1017, 1030 (N.D. Cal. 1999) (two foreign organizations denied lead plaintiff status on the grounds that they were not adequate representatives in part due to the distances involved and some differences in business culture which would impede their ability to manage and to control American lawyers conducting litigation in California).

[35] Takeda, 67 F. Supp. 2d at 1138.

36. Id.

[37] Id. at 1139. (The court also held that, in the lead plaintiff proceedings, it simply lacked sufficient information to judge the propriety of certifying the class that would include German investors and whether a foreign court would recognize and enforce a judgment from the California federal court.) Id. at 1138.

[38] Bell, No. 3:01 CV 0166, 2002 U.S. Dist. LEXIS 6850, at *16-17 (N.D. Tex. Apr. 17, 2002).

[39] See e.g., In re Nortel Networks Corp. Sec. Litig., No. 01 CV 1855 (RMB), 2003 U.S. Dist. LEXIS 15702 (S.D.N.Y. Sept. 5, 2003) (certifying Ontario Public Service Employees' Union Pension Trust Fund as class representative, having previously appointed the Canadian

pension trust fund as lead plaintiff); Froese v. Staff, No. 02 CV 5744 (RO), 2003 WL 21523979 (S.D.N.Y. July 7, 2003) (granting motion to dismiss complaint of sole lead plaintiff, a German citizen who bought shares in a German corporation on a German stock exchange); Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 479-480 (S.D.N.Y. 2001) (denying motions to dismiss a complaint of two lead plaintiffs, a British Virgin Islands registered investment corporation and a Netherlands Antilles corporation).

[40] See In re Ashanti Goldfields Sec. Litig., 2004 U.S. Dist. LEXIS 5165, *57-*58 (E.D.N.Y. Mar. 30, 2004) (Plaintiffs' originally proposed class definition included non-U.S. residents or citizens who bought securities of Ashanti Goldfields Company Limited ("Ashanti"), a Ghana corporation, on foreign exchanges but, in seeking class certification, plaintiffs dropped those foreign investors from the class they sought to represent. The court certified plaintiffs as representatives of all investors, including foreign citizens, who bought Ashanti Goldfields securities solely on U.S. securities markets, finding no question that it had subject matter jurisdiction over those class members' claims.).

[41] Nortel, 2003 U.S. Dist. LEXIS 15702, at *4.

[42] Id. at *19-20.

[43] Id. at *23-24.

[44] Id. at *24.

[45] In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62 (S.D.N.Y. 1999).

[46] Gaming Lottery, 58 F. Supp. 2d at 73-74.

[47] Id.

[48] Id. at 74-75. See also Krangel v. Golden Rule Resources, Ltd., 194 F.R.D. 501, 506 (E.D. Pa. 2000) (The Court certified a Canadian citizen as one of three class representatives of a settlement class that included Canadian investors in a Canadian company's stock on the grounds that inclusion of that foreign plaintiff allowed the court to exercise jurisdiction over the foreign class members.). In contrast, at least one court refused to certify a class that included foreign investors who purchased securities on foreign markets specifically because it found no basis in the record before it to assert subject matter jurisdiction over the claims of those investors. Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 107-08 (S.D.N.Y. 1993).

[49] See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 209 F.R.D. 353, 360-61 (S.D.N.Y. 2002); Cromer Fin.

Ltd. v. Berger, 205 F.R.D. 113, 134-135 (S.D.N.Y. 2001); In re Lloyd's Am. Trust Fund Litig., No. 92 CV 1262 (RWS) 1998 U.S. Dist. LEXIS 1199, at *42-46 (S.D.N.Y. Feb. 4, 1998); Jordan v. Global Natural Resources, Inc., 104 F.R.D. 447, 448 (S.D. Ohio 1984); In re U.S. Fin. Sec. Litig., 69 F.R.D. 24, 50 (S.D. Cal. 1975). But see In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 300-301 (D. Del. 2003) (excluding foreign investors who bought their shares on foreign exchanges from the class finding that the class action device was not superior if the class included foreign investors because, among other reasons, enforcing a damage award to foreign investors raises res judicata concerns).

[50] Cromer, 205 F.R.D. at 134.

[51] Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 996 (2d Cir. 1975); Cromer, 205 F.R.D. at 134.

[52] Bersch, 519 F.2d at 996; Cromer, 205 F.R.D. at 134. See also In re Cable & Wireless, PLC, Sec. Litig., No. 02 CV 1860 (GBL), 2004 WL 1374423, at *14-15 (E.D. Va. June 15, 2004) (rejecting foreign defendants' argument that, because a possibility exists that a British court might not recognize a class action judgment entered by the U.S. court, the U.S. court lacked subject matter jurisdiction).

[53] In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 209 F.R.D. 353, 360-361 (S.D.N.Y. 2002).

[54] Cromer, 205 F.R.D. at 134-135.

[55] Lloyd's, 1998 U.S. Dist. LEXIS 1199, at *42-46.

[56] Jordan, 104 F.R.D. at 448.

[57] In re U.S. Fin. Sec. Litig., 69 F.R.D. 24, 50 (S.D. Cal. 1975).

[58] Bersch, 519 F.2d 974.

[59] Id. at 993.

[60] Id. at 996-997.    See CL-Alexanders Laing & Cruickshank v. Goldfeld, 127 F.R.D. 454, 459-460 (S.D.N.Y. 1989) (court denied certification of a proposed class of twenty-five British residents, on a number of grounds, one of which was the uncontroverted evidence that a British court would not recognize a foreign judgment in a United States "opt-out" class action, rejecting plaintiffs' suggestion of an "opt-in" procedure as an inappropriate alternative in a federal securities class action generally, and in that case specifically, since it, in essence, demonstrated that joinder of all class members was not impossible).

[61] Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 121 (2d Cir. 1995); Alfadda v. Fenn, 935 F. 2d 475, 478 (2d Cir.

1991).

[62] See Robinson v. TCI/US West Communications, Inc., 117 F.3d 900, 905 (5th Cir. 1997); Des Brisay v. Goldfield Corp., 549 F.2d 133 (9th Cir. 1977); Bersch, 519 F.2d at 993.  In Bersch, the defendant made three separate offerings of shares of an international sales and financial service organization, in which offerings were to take place outside the United States and were not to be offered to any United States citizens, although a number of American citizens had purchased shares in the offerings.  The court explained that it must assume that there was some mailing of prospectuses into the United States and some reliance upon them.  519 F.2d at 991. The Court further held that the overseas dispatch of misleading statements to American residents constituted a satisfaction of the effects test.  Id.

[63] Cable & Wireless, 2004 WL 1374423, at *6.

[64] Robinson, 117 F.3d at 905 (finding subject matter jurisdiction under the conduct test); Alfadda, 935 F.2d at 478 (same).

[65] Alfadda, 935 F.2d at 478-479.

[66] Itoba, 54 F.3d at 122 (quoting Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983); IIT v. Vencap, Ltd., 519 F.2d 1001, 1017 (2d Cir. 1975)). Accord Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 125 (2d Cir. 1998), cert. denied, 525 U.S. 1139 (1999); SEC v. Kasser, 548 F.2d 109, 116 (3d Cir. 1977).  As the Seventh Circuit observed, this interest is "amplified by the fact that we live in an increasingly global financial community." Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 667 (7th Cir. 1998).

[67] Alfadda, 935 F.2d at 478; Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir. 1975); Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 31 (D.C. Cir. 1987) ("Jurisdiction will lie in American courts where the domestic conduct comprises all the elements of a defendant's conduct necessary to establish a violation of section 10(b) and Rule 10b-5."); Robinson, 117 F.3d at 905 ("Where . . . the alleged fraud is in connection with a sale of securities to a foreigner outside the United States, the federal securities laws apply only if acts or culpable failures to act within the United States directly caused the plaintiff's loss."). See also Psimenos, 722 F.2d at 1045 ( "[Thus], foreign plaintiffs' suits under anti-fraud provisions of the securities laws [will] be heard only when substantial acts in furtherance of the fraud were committed within the United States . . . activities which are 'merely preparatory' will not support jurisdiction in and of themselves.").

[68] See Kasser, 548 F.2d at 114. The District Court for the Western District of Pennsylvania stated, in dictum, that Kasser does not mean that any conduct within the United States will suffice. Tri-Star Farm Ltd. v. Marconi PLC, 225 F. Supp. 2d 567, 576 (W.D. Pa. 2002). Rather, the language of Kasser indicates that the level of domestic conduct must, at the very least, be significant and material to the fraud and not "merely preparatory." Tri-Star, 225 F. Supp. 2d at 576 (citing Kasser, 548 F.2d at 115 & n.25, 116). Kasser involved such United States activities as various negotiations within the United States; execution of a key investment contract at issue in the United States; incorporation of some of the defendant companies in the United States; and maintenance in the United States of records by American and foreign corporations that were crucial to the consummation of the fraud. 548 F.2d at 111, 115.

[69] Kauthar, 149 F.3d at 666-667 (To find jurisdiction over securities law claims, the domestic conduct need not itself satisfy the elements of a securities violation but it must directly cause the plaintiff's alleged loss in that it forms a substantial part of the alleged fraud and is material to its success.).

[70] Travis v. Anthes Imperial Ltd., 473 F.2d 515, 524 (8th Cir. 1973) ("[Subject matter jurisdiction] attaches whenever there has been significant conduct with respect to the alleged violations in the United States. And this is true even though the securities are foreign ones that had not been purchased on an American exchange.").

[71] Grunenthal GmbH v. Hotz, 712 F.2d 421, 425 (9th Cir. 1983) (quoting Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F.2d 409, 420 (8th Cir. 1979)).

[72] In re Cable & Wireless, PLC, Sec. Litig., No. 02 CV 1860 (GBL) 2004 WL 1374423, at *12.

[73] Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 122 (2d Cir. 1995); Euro Trade & Forfaiting, Inc. v. Vowell, No. 00 CV 8431 (LAP), 2002 U.S. Dist. LEXIS 385, at *21 (S.D.N.Y. Mar. 29, 2002) (finding no basis to assert subject matter jurisdiction under either test).

[74] Tri-Star Farm Ltd. v. Marconi, PLC, 225 F. Supp. 2d 567, 573 (W.D. Pa. 2002). See SEC v. Princeton Econ. Int'l Ltd. 84 F. Supp. 2d 452, 454 (S.D.N.Y. 2000) (court found jurisdiction without even considering the effects of a defendant's alleged fraud). But see, e.g., Kauthar, 149 F.3d at 665 & 665 n.8 (Seventh Circuit held that joint assessment of conduct and effects is appropriate because it permits a more comprehensive assessment of the overall transactional situation when measuring the degree of United States involvement in the subject transaction, and in so doing, the court found bases for jurisdiction under the conduct test even though there was insufficient evidence of any effect on domestic interests.); Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 129 (2d Cir. 1998), cert. denied, 525 U.S. 1139 (1999) (Jurisdiction can be found, under conduct test, over a predominantly foreign securities transaction when, in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the United States, harm to a United States party, or activity by a United States person or entity meriting redress.).

[75] Yung v. Lee, No. 00 CV 3965 (DAB), 2002 U.S. Dist. LEXIS 16655, at *4-5 (S.D.N.Y. Sept. 5, 2002) (finding subject matter jurisdiction only under conduct test).

[76] Europe & Overseas, 147 F.3d at 129. For example, in Leonard v. Garantia Banking Ltd., 1999 WL 944802 (S.D.N.Y. Oct.19, 1999), aff'd, 213 F.3d 626 (2d Cir. 2000), a resident of Brazil brought securities claims against a Bahamian bank and his account manager/investment advisor, a Brazilian resident, claiming fraud in the management of his investment account. The court employed the conduct test and found jurisdiction existed because allegedly improper transactions involved trades of ADRs on the New York Stock Exchange which transactions accounted for a significant portion of the total transactions in the account. The court further held that any "tipping of the scales" by a "slight additional factor of economic activity in the United States" which might be required by Europe & Overseas was present in the plaintiffs' use of United States banks and wire-transfer systems to transfer money to his Brazilian account.

[77] Challenges to subject matter jurisdiction are typically first raised in motions to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. In that posture, a court need only ask whether the complaint on its face "is drawn so as to seek recovery under the federal law or the Constitution. If so, [the court should] assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 467 (S.D.N.Y. 2001) (citation omitted). The court should accept as true all material factual allegations in the complaint but refrain from drawing from the pleadings inferences favorable to the party asserting jurisdiction. Id. at 467 (citations omitted). A court can evaluate a Rule 12(b)(1) motion by evaluating facts outside of the pleadings, and where the jurisdiction issue is so intertwined with the merits that its resolution depends on resolution of the merits, the court should apply the standard for a motion for summary judgment and dismiss only where no triable issue of fact exists. Id. (citation omitted). See also Europe & Overseas, 147 F.3d at 121 n.1 (2d Cir. 1998); SEC v. Princeton Econ. Int'l Ltd., 84 F. Supp. 2d 452, 453-54

(S.D.N.Y. 2000).

[78] In re Cable & Wireless, PLC, Sec. Litig., No. 02 CV 1860 (GBL), 2004 WL 1374423 (E.D. Va. June 15, 2004).

[79] Id. at *2-3.

[80] Id. at *3.

[81] Id. at *3.

[82] Cable & Wireless, 2004 WL 1374423, at *11.

[83] Cable & Wireless, 2004 WL 1374423, *12-13.

[84] In re Vivendi Universal, S.A. Sec. Litig., No. 02 CV 5571 (HB), 2003 WL 22489764 (S.D.N.Y. Nov. 3, 2003).

[85] Vivendi, 2003 WL 22489764, at *2-4.

[86] Id. at *5.

[87] Id.

[88] Id. at *6.

[89] Id.

[90] Vivendi, 2003 WL 22489764 at *6 (citing Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 122 (2d Cir. 1995)). See also Paraschos v. YBM Magnex Int'l Inc., No. 98 CV 6444, 2000 U.S. Dist. LEXIS 3829, at *5-9 (E. D. Pa. Mar. 28, 2000) (In a class action on behalf of investors in common stock of YBM Magnex International, Inc. ("YBM") asserting securities fraud claims arising from an alleged scheme to use YBM as a front for money laundering of organized crime activities in Eastern Europe, the court applied the more lenient Third Circuit test and found that it had subject matter jurisdiction over claims of Canadian plaintiffs who invested in the Canadian company's stock that traded solely on Canadian stock exchanges and which filed financial statements only with Canadian securities regulators, because most if not all of the defendants' conduct allegedly took place in the United States, including the misrepresentations concerning YBM and the fraudulent audits. Id. at *13-14. The court further held that even under the stricter reading of the conduct test, the plaintiffs sufficiently pleaded domestic conduct because the fraud in the U.S. was part of an elaborate scheme which indicates that the defendants' conduct was more than mere preparation. Id. at *14-15.

[91] See, e.g., In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 10 n.14 (D.D.C. 2000) (The court found that, although the fact that the defendant conducted a great deal of business in the United States "would be important to the issue of personal jurisdiction, [it is] irrelevant to subject matter jurisdiction. The conduct test requires that the fraudulent activity take place in the United States, and the fact that defendants conducted other activity in the United States is not significant."); Interbrew, 23 F. Supp. 2d 425, 432 (S.D.N.Y. 1998) (The court rejected foreign plaintiff's argument that the link connecting the parties to the United States was the issuing company's substantial operations in the United States, operations which the plaintiff claimed were a significant factor in its decision to invest in that company.).

[92] See Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983) (citing Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1337 (2d Cir. 1972)).

[93] See, e.g., Baan Co., 103 F. Supp. 2d at 10 (no subject matter jurisdiction found in part because foreign plaintiffs failed to specifically allege that they relied on fraudulent SEC filings when purchasing stock); McNamara v. Bre-X Minerals Ltd., 32 F. Supp. 2d 920, 924-925 (E.D. Tex. 1999) (no jurisdiction where foreign plaintiffs did not allege that they relied on filings with the SEC); Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993) (filing of SEC reports and the dissemination of some materials to United States shareholders were merely incidental to the authorship, preparation and dissemination of the allegedly false information, all of which occurred in Canada); Kaufman v. Campeau Corp., 744 F. Supp. 808, 810 (S.D. Ohio 1990) (no jurisdiction where foreign plaintiffs did not allege that they relied on filings with the SEC); Interbrew, 23 F. Supp. 2d at 430-32 (although the plaintiff had relied on allegedly misleading SEC filings, the court found that, under the conduct test, it lacked subject matter jurisdiction over the defendant).

[94] Baan Co., 103 F. Supp. 2d at 10.

[95] Itoba Ltd. v. LEP Group PLC, 54 F.3d 118 (2d Cir. 1995)).

[96] Itoba, 54 F. 3d at 122.

[97] Id. at 123-124.

[98] Id.

[99] Yung v. Integrated Transp. Network Group, No. 00 CV 3965 (DAB), 2001 U.S. Dist. LEXIS 24715 (S.D.N.Y. Sept. 4, 2001), aff'd sub nom. Yung v. Lee, 2002 U.S. Dist. LEXIS 16655, at *4-5 (S.D.N.Y. Sept. 5, 2002) (court ratified magistrate judge's recommendation denying motion to dismiss for lack of subject matter jurisdiction, and granting dismissal under forum non conveniens).

[100] Id. at *4-5.

[101] Id. at *21.

[102] Id, at *21, 25-26.  Courts have characterized the making of telephone calls or the sending of investment information to the United States as either conduct or effects in the United States.  See Europe & Overseas Commodity Traders S.A. v. Banque Paribas London, 147 F.3d 118, 128 & n.13 (2d Civ. 1998).

[103] Cromer Fin., Ltd. v. Berger, 137 F. Supp. 2d 452 (S.D.N.Y. 2001).

[104] Cromer, 137 F. Supp. 2d at 463-465.

[105] Id. at 480.  The court also gave a nod to the "effects" test, noting that American residents who had invested in the fund through offshore vehicles received their monthly NAV statements in the United States, either directly or through their investment managers.  Id. at 481 (citing Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1338 (2d Cir. 1972) (analyzing the effect in the United States by looking at beneficial owner rather than off-shore vehicle used to purchase securities)).

[106] Cromer, 137 F. Supp. 2d at 480.

[107] Id. at 480-81.  On similar facts, courts in other circuits have found, under the conduct test, that they had subject matter jurisdiction.  See, e.g., Starlight Int'l v. Herlihy, 13 F. Supp. 2d 1178, 1183-1184 (D. Kan. 1998) (conduct that "directly facilitated" the alleged fraud included the transfer by the moving non-U.S. based defendants of nearly $3 million of the Panamanian plaintiff's funds using United States banking facilities into a New York bank account for the alleged purpose of furthering their financial conspiracy with the other defendants, and the fact that over the next fifteen months, the moving defendants traveled to the United States and employed U.S. mail and wires with the other defendants directly relating to the plaintiff's investments); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 667 (7th Cir. 1998) (The court had jurisdiction over the foreign plaintiff's securities law claims because the United States was allegedly the base of operations from which the foreign defendants launched their fraudulent scheme which they effectuated by, among other things, preparing misleading documents in the United States, sending them to the plaintiff by wire and mail in the United States, telephoning the plaintiff from the United States to solicit interest in the investment at issue, holding meetings and telephone calls in the United States to discuss the deceptive information in the investment materials and to plan the scheme, and having the plaintiff wire its payment for the securities at issue to a United States bank account.).

[108] Nikko Asset Mgmt. Co. v. UBS AG, 303 F. Supp. 2d 456 (S.D.N.Y. 2004).

[109] Nikko, 303 F. Supp. 2d at 466.

[110] Id.

[111] Nikko, 303 F. Supp. 2d at 467.

[112] Id.

[113] Froese v. Staff, No. 02 CV 5744 (RD), 2003 WL 21523979, at *2-3 (S.D.N.Y. July 7, 2003).

[114] Froese, 2003 WL 21523979, at *2-3.

[115] Tri-Star Farm Ltd. v. Marconi, PLC, 225 F. Supp. 2d 567, 570 (W.D. Pa. 2002).

[116] Tri-Star, 225 F. Supp. 2d at 572.

[117] Id.

[118] Id. at 571.

[119] Id. at 577.

[120] Tri-Star, 225 F. Supp. 2d at 577-578.

[121] Id. at 578.

[122] In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1 (D.D.C. 2000).

[123] Baan Co., 103 F. Supp. 2d at 6.

[124] Id. at 9-10.

[125] Id. at 11.