# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

*LEON D. BOROCHOFF*, on behalf of himself
and all others similarly situated,

Plaintiff,

v.

*GLAXOSMITHKLINE PLC, DR. JEAN-PIERRE
GARNIER, and JULIAN HESLOP*,

Defendants.

No. 07 Civ. 5574 (LLS)
ECF CASE

## REPLY OF THE INSTITUTIONAL INVESTOR GROUP TO
## OPPOSITIONS TO ITS MOTION FOR APPOINTMENT AS
## LEAD PLAINTIFF AND FOR APPROVAL OF ITS SELECTION OF COUNSEL

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer (JE-5503)
Geoffrey C. Jarvis (GJ-7040)
485 Lexington Avenue
29th Floor
New York, NY 10017
Tel:      (646) 722-8500
Fax:      (646) 722-8501

MOTLEY RICE LLC
Joseph F. Rice
Ann K. Ritter
P. O. Box 1792 (29465)
28 Bridgeside Blvd.
Mount Pleasant, SC 29465
Tel:      (843) 216-9000
Fax:      (843) 216-9450

*Counsel for The Institutional Investor Group and Proposed Lead Counsel for the Class*

Dated:  September 7, 2007

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.   THE INSTITUTIONAL INVESTOR GROUP IS THE PRESUMPTIVE LEAD
     PLAINTIFF........................................................................................................ 3

II.  THE COMPETING MOVANTS HAVE NOT REBUTTED THE STATUTORY
     PRESUMPTION IN FAVOR OF THE INSTITUTIONAL INVESTOR GROUP ........ 5

     A.   The Institutional Investor Group Is Not Subject To a Unique Defense,
          Rending It Atypical................................................................................. 6

          1.   The Court Has Subject Matter Jurisdiction Over Foreign
               Losses Caused By Glaxo's Fraud ............................................. 6

               (a)   The Conduct Test....................................................... 6

               (b)   Glaxo's Fraud Resulted From Substantial Conduct
                     That Occurred Here In The United States.................... 8

                     (i)    Overview Of Glaxo's Fraud Regarding The
                            Safety Of Its Diabetes Drug Avandia ............... 8

                     (ii)   Substantial Acts In Furtherance Of The Fraud
                            Occurred In The United States......................... 10

                     (iii)  Glaxo Has A Substantial Presence In The
                            United States And A Majority Of Its Senior
                            Executives Who Were Involved With The
                            Avandia Fraud Reside Here ............................ 12

                     (iv)   Numerous False Statements Related To
                            Avandia Emanated From The United States.................. 13

               (c)   The Cases Tallahassee Relies On Are
                     Readily Distinguishable ............................................. 15

          2.   The Institutional Investor Group Is Not Subject To A Unique
               Res Judicata Defense Under *Vivendi* ..................................... 17

(a)  *Vivendi* Is Irrelevant Here Because The Institutional Investor Group Is Present Before, And Subject To, The Jurisdiction Of This Court And Is Not An Absent Class Member .................. 17

(b)  The Issues Decided In *Vivendi* Are Also Irrelevant Here Because Res Judicata Is Not A "Unique" Defense To The Institutional Investor Group ........................................................ 19

(c)  *Vivendi* Was Wrongly Decided .................................................... 21

B.  Tallahassee's Kitchen Sink Attempts To Prove That The Institutional Investor Group Is Inadequate Lack Substance And Fail To Rebut The Statutory Presumption In The Institutional Investor Group's Favor .................. 25

1.  The Institutional Investor Group Is A Proper Group Containing The Institutional Investor With The Largest Financial Interest .................... 25

2.  The Institutional Investor Group's Authority, Standing, and Financial Interests Are Not Seriously In Dispute .................................................. 26

3.  Institutional Investor Group Member Metzler Is Not A Professional Plaintiff .......................................................................................... 29

III.  THE COMPETING MOTIONS SHOULD BE DENIED ............................................. 30

CONCLUSION ............................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*In re Able Labs. Sec. Litig.,*
  425 F. Supp. 2d 562 (D.N.J. 2006) ............................................................ 29

*Alfadda v. Fenn,*
  935 F.2d 475 (2d Cir. 1991) ...................................................................... 7

*In re Alstom SA Sec. Litig.,*
  406 F. Supp. 2d 346 (S.D.N.Y. 2005) ......................................................... 6

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,*
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) .......................................................... 25

*Baffa v. Donaldson, Lufkin & Jennrette Sec. Corp.,*
  222 F.3d 52 (2d Cir. 2000) ........................................................................ 19

*In re Bausch & Lomb Inc. Sec. Litig.,*
  No. 06-CV-6294T, 2007 U.S. Dist. LEXIS 50979 (S.D.N.Y. July 13, 2007) ............ 16, 17

*Bersch v. Drexel Firestone, Inc.,*
  519 F.2d 974 (2d Cir. 1975) ....................................................................... 7, 21

*In re Cable & Wireless, PLC, Sec. Litig.,*
  321 F. Supp. 2d 749 (E.D. Va. 2004) ......................................................... 20, 23

*Capone v. MBIA Inc.,*
  No. 05-3514 (S.D.N.Y. July 25, 2005) ........................................................ 5, 30

*Casper v. Cunard Line, Ltd.,*
  560 F. Supp. 240 (E.D. Pa. 1983) .............................................................. 23, 24

*In re Comdisco Sec. Litig.,*
  150 F. Supp. 2d 943 (N.D. Ill. 2001) .......................................................... 30

*Cromer Fin. Ltd. v. Berger,*
  137 F. Supp. 2d 452 (S.D.N.Y. 2001) ......................................................... 7

*Cromer Finance Ltd. v. Berger,*
  205 F.R.D. 113 (S.D.N.Y. 2001) ................................................................ 20, 22, 23, 24

*D'Hondt v. Digi Int'l, Inc.,*
  No. 97-5 (JRT/RLE), 1997 U.S. Dist. LEXIS 17700 (D. Minn. April 3 1997) ............... 16

*In re DaimlerChrysler AG Sec. Litig.,*
  216 F.R.D. 291 (D. Del. 2003) ................................................................... 24, 29

*In re eSpeed, Inc. Sec. Litig.*,
    232 F.R.D. 95 (S.D.N.Y. 2005) ......................................................................... 4, 25, 29

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
    147 F.3d 118 (2d Cir. 1998) .............................................................................. 7

*EZRA Charitable Trust v. Rent-Way, Inc.*,
    218 F.R.D. 101 (W.D. Pa. 2003) ...................................................................... 29

*Fischler v. Amsouth Bancorporation*,
    No. 96-1567-Civ-T-17A, 1997 U.S. Dist. LEXIS 2875 (M.D. Fla. Feb. 6, 1997) ........... 16

*Frietsch v. Refco, Inc.*,
    No. 92 C 6844, 1994 WL 10014 (N.D. Ill. Jan. 13, 1994) .............................................. 23

*Gluck v. CellStar Corp.*,
    976 F. Supp. 542 (N.D. Tex. 1997) ................................................................... 16

*In re Initial Public Offerings Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................................ 24

*Itoba Ltd. v. LEP Group PLC*,
    54 F.3d 118 (2d Cir. 1995) ................................................................................ 7

*Jordan v. Global Natural Res.*,
    102 F.R.D. 45 (S.D. Ohio 1984) ...................................................................... 23, 24

*In re Lloyd's Am. Trust Fund Litig.*,
    No. 96-1262(RWS), 1998 U.S. Dist. LEXIS 1199 (S.D.N.Y. Feb. 6, 1998) .................. 20

*Mass. Laborers' Annuity Fund v. Encysive Pharm., Inc.*,
    No. 06-3022 (S.D. Tex. Mar. 20, 2007) ............................................................... 19

*In re McKesson HBOC, Inc. Sec. Litig.*,
    97 F. Supp. 2d 993 (N.D. Cal. 1999) ................................................................. 30-31

*In re Mills Corp. Sec. Litig.*,
    No. Civ. A. 1:06-77 (GEL), 2006 WL 2035391 (E.D. Va. May 30, 2006) ..................... 30

*In re Molson Coors Brewing Co. Sec. Litig.*,
    233 F.R.D. 147 (D. Del. 2005) ......................................................................... 20, 29

*In re Nortel Networks Corp. Sec. Litig.*,
    No. 01 Civ. 1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) ..................................... 6

*In re NTL, Inc. Sec. Litig.*,
    No. 02-3013, 2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) .............................................. 19

*Olsen v. New York Cmty. Bankcorp,*
    233 F.R.D. 101 (E.D.N.Y. 2005) .............................................................................. 25, 29

*In re Parmalat Sec. Litig.,*
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................................................................. 7

*In re Party City Sec. Litig.,*
    189 F.R.D. 91 (D.N.J. 1999) ........................................................................................ 16

*Psimenos v. E.F. Hutton & Co.,*
    722 F.2d 1041 (2d Cir. 1983) ......................................................................................... 7

*Roth v. Knight Trading Group, Inc.,*
    228 F. Supp. 2d 524 (D.N.J. 2002) .............................................................................. 29

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
    219 F.R.D. 343 (D. Md. 2003) ........................................................................... 15, 16, 20

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
    351 F. Supp. 2d 334 (D. Md. 2004) ......................................................................... 15, 16

*In re Royal Dutch/Shell Transp. Sec. Litig.,*
    380 F. Supp. 2d 509 (D.N.J. 2005) ......................................................................... 16, 23

*Smith v. Suprema Specialties, Inc.,*
    206 F. Supp. 2d 627 (D.N.J. 2002) .............................................................................. 29

*Takeda v. Turbodyne Techs., Inc.,*
    67 F. Supp. 2d 1129 (C.D. Cal. 1999) ..................................................................... 18, 19

*In re The Goodyear Tire & Rubber Co. Sec. Litig.,*
    No. 5:03 CV 2166, 2004 WL 3314943 (N.D. Ohio May 12, 2004) ................................ 29

*Trief v. Dun & Bradstreet Corp.,*
    144 F.R.D. 193 (S.D.N.Y. 2000) .................................................................................. 17

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,*
    209 F.R.D. 353 (S.D.N.Y. 2002) ............................................................................. 17, 22

*In re Vivendi Universal S.A., Sec. Litig.,*
    242 F.R.D. 76 (S.D.N.Y. 2007) ............................................................................. passim

*Weinberg v. Atlas Air Worldwide Holdings, Inc.,*
    216 F.R.D. 248 (S.D.N.Y. 2003) ............................................................................. 16, 29

*Weltz v. Lee,*
    199 F.R.D. 129 (S.D.N.Y. 2001) .................................................................................. 25

*In re Williams Sec. Litig.*,
  02-CV-72-H(M), slip op. (N.D. Okla. July 8, 2002) .................................................. 27, 28

## Statutes & Administrative Codes

15 U.S.C. § 78u-4(a) .......................................................................................................... 3, 27, 29

The Institutional Investor Group, comprised of INDEXCHANGE Investment AG ("INDEXCHANGE"), Deka Investment GmbH ("Deka"), Metzler Investment GmbH ("Metzler"), and Internationale Kapitalanlagegesellschaft mbH ("INKA") (collectively referred to as the "Institutional Investor Group"), submits this Reply to the Oppositions to Its Motion to be Appointed Lead Plaintiff and for Approval of Its Selection of Counsel filed by the City of Tallahassee Pension Plan ("Tallahassee"); and Avon Pension Fund and the North Yorkshire Pension Fund (collectively, the "UK Group").

## INTRODUCTION

The Institutional Investor Group, with $28.1 million in losses[1] – nearly $23 million greater than the losses of either of the competing movants – has the largest financial interest in the outcome of this litigation and is the presumptive Lead Plaintiff as set forth in the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which governs this action. Neither the UK Group nor Tallahassee has rebutted the statutory presumption in favor of the Institutional Investor Group.

Contrary to Tallahassee's argument, this Court does have subject matter jurisdiction over the losses that foreign class members suffered on foreign exchanges as a result of GlaxoSmithKline PLC's ("Glaxo") fraud here. Glaxo performed substantial acts and omissions in the United States in furtherance of the fraud. These acts and omissions are set out in the Complaint that Tallahassee's own counsel filed, and are further demonstrated by the conduct that occurred here on United States soil, as set forth herein.

---

[1] The Institutional Investor Group, in reviewing their loss numbers, discovered an error in the loss calculation for group member INKA. Instead of $4.84 million, INKA's loss is $3.857 million. *See* Declaration of Geoffrey C. Jarvis ("Jarvis Decl."), Ex. K (INKA loss calculation). The error was the result of a data mistake. As a result, the Institutional Investor Group's loss is $28,140,450. The change is immaterial since the next highest claimed loss – the UK Group – is still nearly $23 million less than the loss suffered by the Institutional Investor Group.

Tallahassee's post-motion argument to the contrary is nothing more than a self-serving argument proffered by counsel who is obviously more interested in securing its own appointment than benefiting the Class that counsel purportedly seeks to represent. Indeed, Tallahassee illustrates its inadequacy by propounding an argument that is belied by its counsel's very own complaint and that would preclude it from seeking to represent a substantial portion of the class that was harmed by Glaxo's fraud.

Nor is the Institutional Investor Group subject to a unique res judicata defense under *In re Vivendi Universal S.A., Sec. Litig.*, 242 F.R.D. 76 (S.D.N.Y. 2007), as the UK Group contends. The *Vivendi* decision dealt with class certification issues concerning absent class members. The members of the Institutional Investor Group are not absent class members. They are before the Court and, as their Declaration attests, will be bound by any judgment issued in this case. *See* Jarvis Decl., Ex. A. Moreover, any purported issue over the res judicata effect of this Court's ultimate class certification ruling is not "unique" to the Institutional Investor Group. Any movant appointed Lead Plaintiff would be bound to litigate issues relating to the many foreign purchasers of Glaxo securities. Those issues are common to the Class as a whole and involve proving the facts and legal theories central to the case.

Finally, Tallahassee's "kitchen sink" attempts to show that the Institutional Investor Group is somehow inadequate are wholly unconvincing. The Institutional Investor Group is a proper, small, cohesive group, which the PSLRA, by its terms, allows. Moreover, the members of the Institutional Investor Group have submitted a Joint Declaration detailing their commitment to this litigation, their decision to serve together before the Lead Plaintiff motions were filed, and their abilities to vigorously prosecute this case. *Id.* The Joint Declaration makes clear that each member of the Institutional Investor Group has the authority and standing to sue to recover the

losses presented as their funds' managers and attorneys-in-fact.  *Id.*  Similarly, Tallahassee's attack on the validity of the Institutional Investor Group's financial information lacks any basis whatsoever because all information required by the PSLRA was provided.  Finally, its desperate attack on Institutional Investor Group member Metzler is specious because this very Court has held that a member of a group who has served as a lead plaintiff more than five time in the last three years will not be disqualified as a "professional plaintiff" if other members of the group have not.

Because the Institutional Investor Group is the presumptive Lead Plaintiff and no evidence to rebut the presumption exists, its motion should be granted and the motions of the UK Group and Tallahassee should not even be reached.  In addition, both competing motions are defective in their own right.  Among other things, both Tallahassee and the UK Group seek the appointment of a net seller, which, as this Court has previously stated without ambiguity, is not an adequate representative of a class of purchasers.  Therefore, the Institutional Investor Group respectfully requests that the Court grant its Motion for Appointment as Lead Plaintiff and Approval of Its Selection of Lead Counsel, and deny the motions of the UK Group and Tallahassee.

## ARGUMENT

## I.    THE INSTITUTIONAL INVESTOR GROUP IS THE PRESUMPTIVE LEAD PLAINTIFF

The Institutional Investor Group has, by far, the largest financial interest in this case and "otherwise satisfies" the adequacy and typicality requirements of Federal Rule of Civil Procedure 23 within the meaning of the PSLRA.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  It is, therefore, the presumptive Lead Plaintiff.  As numerous courts have explained, Congress provided a clear path in the PSLRA to district courts concerning how competing lead plaintiff

motions should be considered:  the process is sequential, not comparative.  *See, e.g., In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 98 (S.D.N.Y. 2005) ("The [lead plaintiff] process repeats itself until a candidate succeeds in both the first [presumptive lead plaintiff] and second [the presumption is not rebutted] phases of inquiry.").  Once the Court identifies which movant has the largest financial interest in the relief sought, that movant is the presumptive lead plaintiff if it has made a preliminary showing that its claims are based on the same facts and legal theories as the class it seeks to represent and it is committed to the zealous prosecution of the case, free from conflict.

In this case, the Institutional Investor Group is the presumptive lead plaintiff.  The Institutional Investor Group made a preliminary showing under the PSLRA that it is prima facie adequate and typical.  Opening Mem. at 9-12.  Moreover, it is indisputable that the Institutional Investor Group has the largest financial interest.

| | |
|---|---|
| **INSTITUTIONAL INVESTOR GROUP** | $28.14 million[2] |
| INDEXCHANGE Investment | $10.90 million |
| Deka Investment | $6.11 million |
| Metzler Investment | $7.28 million |
| Internationale Kapitalanlagegesellschaft | $3.86 million |
| **The City of Tallahassee Pension Plan** | $104,990 |
| **UK GROUP** | $5.322 million[3] |
| Avon Pension Fund, Administered by | $2.694 million |
| Bath & North East Somerset Council | $2.628 million |
| North Yorkshire County Council, Administering Authority for the North Yorkshire Pension Fund | |

---

[2] As explained *supra* at n.1, the Institutional Investor Group's loss number declined slightly because of an error discovered in the calculation for group member INKA.  *See* Institutional Investor Group Opening a Mem. at 9 and Decl. of Sidney S. Liebesman (Dkt. 7, 8).  The Institutional Investor Group's $28 million loss was computed, as disclosed in the opening memorandum, using the first-in-first-out ("FIFO") method of accounting, the same accounting method Tallahassee used to calculate its losses and that the UK Group, as explained below, used to calculate one member of its group's losses.

[3] Surprisingly, the UK Group's reported loss number is based upon the use of two independent methods for determining a loss – one for Avon and a second for North Yorkshire.  Avon's number is calculated using a "net" methodology, while North Yorkshire's loss number is determined using FIFO.  UK Group apparently used FIFO for North Yorkshire because under a "net" methodology it had a gain of $661,000.  This attempt to deceive the Court

As shown in the chart above, during the Class Period the funds on whose behalf the Institutional Investor Group is moving suffered losses of approximately $28.14 million. In contrast, Tallahassee asserts that it suffered a loss of $104,990 (*see* Tallahassee Initial Mem. at 4 (Dkt. 10)), less than 0.4% of the loss suffered by the Institutional Investor Group.  The UK Group claims that its fund suffered a loss of only $5.3 million (*see* UK Group Opening Mem. at 4 (Dkt. 13)), less than 19% of the Institutional Investor Group's loss.  Indeed, each individual member of the Institutional Investor Group suffered a loss that is exponentially greater than Tallahassee's claimed loss of less than $105,000.  Three of the four members of the Institutional Investor Group – INDEXCHANGE, Metzler, and Deka – each suffered individual losses greater than the UK Group.[4]  *See id.*  Neither the UK Group nor Tallahassee claims that they have suffered a greater loss than the Institutional Investor Group, nor can they.[5]

## II.    THE COMPETING MOVANTS HAVE NOT REBUTTED THE STATUTORY PRESUMPTION IN FAVOR OF THE INSTITUTIONAL INVESTOR GROUP

Because the Institutional Investor Group is the presumptive lead plaintiff, the competing movants, not surprisingly, raise a number of arguments in an attempt to discredit the Institutional Investor Group and displace it as the most adequate plaintiff.  None of the arguments has merit.

---

and other lead plaintiff applicants by using, without any disclosure, differing methods for calculating the loss of the UK Group's members renders the UK Group an inadequate lead plaintiff.  The Institutional Investor Group had not discovered the UK Group's inconsistent methodologies initially because its loss chart listed each funds' opening position, which typically is only done when FIFO accounting is used.

[4] As noted in the Institutional Investor Group's opposition memorandum and discussed further herein, both Tallahassee and the North Yorkshire Pension Fund are net sellers, which this Court has said are "not . . . adequate representative[s] of a class of purchasers." *Capone v. MBIA Inc.*, No. 05 Civ. 3514, slip op. at 4 (S.D.N.Y. July 26, 2005) (Stanton, J.).  When North Yorkshire Pension Fund's and Tallahassee's claimed losses are disregarded (as they must be under this Court's ruling in *MBIA* because they are net sellers), the disparity of financial interests between the Institutional Investor Group and the other two movants is even more glaring.

[5] Both the UK Group and Tallahassee effectively concede that the Institutional Investor Group is the presumptive Lead Plaintiff because their opposition memoranda are devoted to attempts to climb the ladder by claiming that the Institutional Investor Group is subject to a unique defense or is inadequate.  As shown below, these attempts fail.

A.   **The Institutional Investor Group Is Not Subject To a Unique Defense, Rending It Atypical**

1.   **The Court Has Subject Matter Jurisdiction Over Foreign Losses Caused By Glaxo's Fraud**

Tallahassee claims that the Institutional Investor Group is subject to a "unique" subject matter jurisdiction defense and is thus "atypical" because its members are foreign investors whose losses were sustained in Glaxo stock traded on the London Stock Exchange ("LSE"). The reason that Tallahassee makes this argument, after finding itself resoundingly in last place in terms of financial interest, is obvious: Tallahassee must convince this Court to deny the motions of both the Institutional Investor Group and the UK Group for this Court to even entertain Tallahassee's candidacy. Tallahassee's craven attempt to abandon a significant portion of the putative Class after lead plaintiff motions were filed is obviously a litigation tactic designed to help its counsel get appointed – to the detriment of the Class that counsel is purportedly seeking to represent. As a result, Tallahassee's argument renders Tallahassee itself inadequate, even were it not a net seller with the lowest claimed loss. In any event, as shown below, under the well-established "conduct" test for determining subject matter jurisdiction under the federal securities laws, Glaxo's extensive fraud-related activities in the United States clearly establish the existence of subject matter jurisdiction.[6]

(a)   **The Conduct Test**

Under the conduct test, foreign investors may bring federal securities claims for losses suffered on foreign markets when "'substantial acts in furtherance of the fraud were committed

---

[6] Courts in this district have found the exercise of subject matter jurisdiction proper over what Tallahassee refers to as "F-cubed plaintiffs." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 396-397 (S.D.N.Y. 2005) (finding subject matter jurisdiction proper and declining to dismiss the claims of foreign securities purchasers who suffered losses in foreign markets with respect to those claims where the conduct of a French company defendant alleged to be fraudulent occurred in the United States); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2003 WL 22077464, at *8 (S.D.N.Y. Sept. 8, 2003) (finding subject matter jurisdiction proper and certifying foreign institutional investor who suffered losses on foreign market in case against foreign defendant).

within the United States.'" *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 511 (S.D.N.Y. 2005) (quoting *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir. 1983)). The conduct in the United States cannot be "merely preparatory," *see Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 987 (2d Cir. 1975), but rather must involve "substantial acts in furtherance of the fraud." *See Psimenos*, 722 F.2d at 1045. However, conduct in the United States that is not itself fraudulent and that merely consists of "ordinary business transactions" can nevertheless satisfy the conduct test if it is material to completion of the fraud. *Alfadda v. Fenn*, 935 F.2d 475, 478-79 (2d Cir. 1991); *Psimenos*, 722 F.2d at 1046. When "defendants have undertaken significant steps in the United States in furtherance of a fraudulent scheme, United States courts have jurisdiction over suits arising from that conduct, even if the final transaction occurs outside the United States and involves only foreign investors." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 480 (S.D.N.Y. 2001). "Inherent in the conduct test is the principle that Congress does not want 'the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'" *Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995) (quoting *Psimenos*, 722 F.2d at 1045) (other citations omitted).

Finally, courts have found that Securities and Exchange Commission ("SEC") filings, coupled with other conduct in the United States, form the basis for exercising subject matter jurisdiction. *See, e.g., Itoba*, 54 F.3d at 123-24. Thus, "[t]he Second Circuit has found jurisdiction over a 'predominantly foreign' securities transaction where, 'in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress.'" *Id.* (citing *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 130 (2d Cir. 1998)).

**(b)    Glaxo's Fraud Resulted From Substantial Conduct That Occurred Here In The United States**

Although Glaxo is incorporated in the United Kingdom, as shown below, the facts in this case overwhelmingly demonstrate that *most* of the fraudulent conduct concerning Avandia took place in the United States: Avandia was developed and researched in the United States; testing took place in the United States; high ranking Glaxo executives involved with the research, development, and promotion of Avandia were citizens of the United States and participated in the conference calls in which false or misleading statements about Avandia were made; and Glaxo made false or misleading statements in its filings with the SEC and in press releases issued from within the United States.

**(i)    Overview Of Glaxo's Fraud Regarding The Safety Of Its Diabetes Drug Avandia**

This case concerns Glaxo's misrepresentations about the safety and commercial viability of its blockbuster drug, Avandia, a drug for the treatment of type-2 diabetes that received FDA approval on May 25, 1999, making the United States the drug's first market. *See* www.accessdata.fda.gov/scripts/cder/drugsatfda.    As the complaint filed by Tallahassee's counsel for a small, individual investor explains, throughout the Class Period Glaxo was aware of test results showing that Avandia caused an increased risk of heart attack, but failed to disclose this information to Glaxo investors. Compl. ¶¶ 3, 6.[7]    Instead, Glaxo repeatedly touted

---

[7] Cites to "Compl." refer to the initial Complaint in this case. Tallahassee's counsel claims in the initial complaint in this case (filed on behalf of a plaintiff other than Tallahassee) that the action was brought on behalf of "a class consisting of *all* persons who purchased the securities of Glaxo" during the class period. Compl. ¶ 15 (emphasis added); *see also* Tallahassee Opening Mem. at 2-3 (Dkt. 10) (stating that the action "was commenced on behalf of *all* persons who purchased Glaxo securities" and that test results disclosed to the FDA "were never adequately disclosed to the investing *public*") (emphasis added). Glaxo was defined in Tallahassee's counsel's complaint as GlaxoSmithKline PLC, *not* the Glaxo American Depositary Shares ("ADSs") that trade on the New York Stock Exchange ("NYSE") under the symbol GSK. Compl. intro. (Dkt. 1). Indeed, Tallahassee's own Certification confirms that all securities of GLAXO are intended to be included: the Certification says it lists all transactions Tallahasee made in GLAXO securities during the Class Period. That "GLAXO" referred to GlaxoSmithKline PLC is also evident given that Tallahassee itself did not purchase ADSs under the ticker symbol GSK. According to

the alleged safety of the drug, positive study results concerning the drug (without mentioning the increased risk of heart attack), and the significant contribution Avandia made to Glaxo's bottom line and would likely continue to make as further studies of Avandia, showing its alleged benefits, were completed. Compl. ¶¶ 20-38; *see also* Conference Call Transcripts, dated October 27, 2005, February 8, 2006, April 27, 2006, July 26, 2006, October 26, 2006, February 8, 2007, and April 25, 2007[8]; Press Releases dated February 1, 2006, June 10, 2006, July 11, 2006, December 4, 2006, and two on May 21, 2007.[9]

On May 21, 2007 (the end of the Class Period), Cleveland Clinic's renowned cardiologist, Dr. Steven Nissen, published an article in the New England Journal of Medicine ("NEJM") concerning the results of a meta-analysis he conducted showing that Avandia caused an increased risk of heart attacks. It was not until then that Glaxo's investors became aware of this danger. On the same day, as a result of a statement released by the FDA, the market learned for the first time that Glaxo itself had conducted a meta-analysis that showed a 30-40% increased risk of heart attack. *See* http://www.fda.gov/bbs/topics/news/2007/new01636.html. On this news, Glaxo's ADSs on the NYSE plunged $4.53 per share, or 7.8%, to close at $53.18 per share. Compl., ¶ 5. The damage on the LSE was even more substantial, as shares plunged 93p per share.[10] With a market capitalization loss of over $12.5 billion on the NYSE and nearly £5.5

---

Tallahasee's counsel, Tallahassee bought GSK shares sold on the Over-The-Counter ("OTC") exchange. GLAXO stock on the OTC trades under the symbol GLAXF.

[8] Each of the Conference Call Transcripts referenced herein are located at www.gsk.com/media/speeches-presentations.htm.

[9] Each of the Press Releases referenced herein are located at www.gsk.com/media/archive.htm.

[10] The drop on the LSE occurred over a two day period, with the highest volume on May 22, 2007 because of the time difference. The London market did not have an entire trading day until May 22, 2007 to digest the disclosures, especially since information from GLAXO was emanating from the United States. *See* GLAXO Press Releases dated May 21, 2007 emanating from Philadelphia, PA. According to Bloomberg, GLAXF stock dropped approximately $1.36 per share on May 21, 2007 from the prior trading day's close on volume of 600 shares. Because Bloomberg does not indicate the float of GLAXF stock available for trading on the OTC exchange, the loss of market capitalization in GSK securities due to the effect on the OTC exchange was not able to be calculated.

billion on the LSE, over \$23.5 billion[11] of Glaxo's market capitalization was wiped out in a single day. As a result of the news that Avandia causes an increased risk of heart attack, Avandia's market immediately shrank, with new prescriptions dropping 40% in the United States and total prescriptions dropping nearly 10%. *See* http://www.usatoday.com/news/health/2007-06-18-avandia_N.htm.

Further, on June 6, 2007, the FDA announced plans to place a "black box" warning on Avandia because of concerns over heart failures associated with the drug. *See* Pharmacology Watch, "Avandia, Risk of Congestive Heart Failure Significant Safety Risk," July 26, 2007. A "black box" warning is the strongest that the FDA issues (short of removing a drug from the market) and invariably results in a steep decline in the sales of a drug to which the warning is applied.

**(ii)    Substantial Acts In Furtherance Of The Fraud
Occurred In The United States**

Avandia was developed and brought to market in 1999 by the predecessor company to Glaxo, SmithKline Beecham PLC ("SmithKline").[12]  Glaxo's activities in the United States, particularly with regard to Avandia, reflect Avandia's significant contribution to Glaxo's operating results and bottom line. Compl. ¶¶ 20-38. Until news of Avandia's increased risk of heart attack surfaced, Avandia was Glaxo's second largest revenue producer and contributed over 15% of Glaxo's worldwide operating profits. *See* May 22, 2007 Bear Stearns Research Note. (Jarvis Decl., Ex. F) The vast majority of Avandia sales – nearly 75% – occur in the United States. *See* February 6 2007, Glaxo Earnings Release. (Jarvis Decl., Ex. G)

---

[11] Using May 21, 2007 currency exchange rate of 1.9714.

[12] SmithKline employee James Z. Huang, who was based in the United States, was responsible for the product launch and marketing efforts. *See* http://www.anesiva.com/wt/page/j_huang.

As a result of Avandia's having been launched here, and the importance of the United States market for Avandia to Glaxo, the Company's research and marketing efforts regarding Avandia have been focused here in the United States. These efforts include the conduct that led to the fraud alleged in this action and the dissemination of fraudulent and misleading statements that will be at issue in this case. As the initial complaint makes clear (filed by Tallahassee's counsel), and as Dr. Moncef Slaoui, Chairman of Glaxo's R&D ("Slaoui") ultimately explained to Congress (*see* June 6, 2007 Statement of Slaoui),[13] Glaxo, whose R&D headquarters are in North Carolina, performed numerous research studies on Avandia. Compl. ¶¶ 3-4, 6. From a meta-analysis Glaxo performed, Glaxo knew as early as September 2005 that Avandia increased the risk of heart attack, yet Glaxo failed to disclose this fact. *See* June 6, 2007 Statement of Slaoui; *see also* Compl. at ¶ 6.

Despite Glaxo's internal data showing the risks of Avandia, Glaxo did not inform the market of the risk and delayed presenting this information to the FDA. It was not until May 2006 that Glaxo submitted the results of its meta-analysis to the FDA and it was not until July 2007 that it made the public aware of what it had known for more than two years as a result of its United States based research. *See* June 6, 2007 Statement of Slaoui. Additionally, the FDA has revealed that Glaxo not only delayed presenting the study to the FDA, but did not analyze and present it in the "generally accepted way," thereby further delaying the inevitable public disclosure of Avandia's true risks. *See* June 6, 2007 statement of Dr. Andrew C. von Eschenbach, FDA Commissioner.[14]

---

[13] The references herein to the various statements and testimony before the Congressional House Oversight Committee on June 6, 2007 may be found at www.oversight.house.gov/story.asp?ID=1325.

[14] Conduct before the Class Period that was based in the United States will likely also be relevant to proof of scienter in this case. As investors learned from the testimony presented to Congress on Avandia after the NEJM article was published this past May, Glaxo had been on notice of potential undisclosed cardiac problems since 1999. *See* June 6, 2007 Statements of Rep. Henry A. Waxman; Slaoui; Dr. Andrew C. von Eschenbach, FDA Commissioner; and

### (iii) Glaxo Has A Substantial Presence In The United States And A Majority Of Its Senior Executives Who Were Involved With The Avandia Fraud Reside Here

SmithKline had a substantial presence in Philadelphia, PA and Glaxo Wellcome had a presence in Research Triangle Park, NC, both of which locations Glaxo has maintained since the merger with SmithKline in 2000. During the Class Period, Glaxo earned nearly 50% of its pharmaceutical revenues in the United States (*see* February 8, 2007 Glaxo Earnings Release, Jarvis Decl, Ex. G), and thus Glaxo's most important business functions – pharmaceutical operations and research – are headquartered and conducted in the United States in Philadelphia, PA and Research Triangle Park, NC, respectively. *See* http://us.Glaxo.com/docs-pdf/community/Glaxo_usa_fact_sheet_2007.pdf. Additionally, Glaxo's Consumer Products headquarters is located in Pittsburgh, PA and Glaxo has Investor Relations Offices located in Philadelphia, PA. *See id.*

In fact, the *majority* of Glaxo's Corporate Executive Team list United States business addresses. These executives include: (1) named Defendant Chief Executive Officer Dr. Jean-Pierre Garnier, who claims French and American citizenship and lists his business address as Philadelphia, PA; (2) David Stout, President of Pharmaceutical Operations, who was a frequent speaker about Avandia in Class Period conference calls, is an American citizen, and lists his business address as Philadelphia, PA; (3) Dr. Moncef Slaoui, Glaxo's Executive Director and Chairman of Research and Development who testified before Congress about Avandia this past

---

Dr. John Buse. During the FDA approval process, the trials submitted by GLAXO had raised questions about Avandia's cardiac risks and the reviewer recommended that a post-marketing study addressing these risks be performed. *See* June 6, 2007 Statement of Rep. Henry A. Waxman. GLAXO never performed the recommended study, instead performing studies focused on marketing questions. *See* June 6, 2007 Statement of Dr. Bruce M. Psaty. Similarly, GLAXO suppressed criticism of Avandia by Dr. John Buse, a medical researcher from the University of North Carolina, who had questioned Avandia's cardiac safety. *See* June 6, 2007, Statement of Dr. John Buse. In a heavy-handed fashion, though not known to the market until the Congressional hearings this summer, Glaxo threatened the doctor with legal action, and contacted his superior, attacking the doctor's credibility. *See* Letter from Dr. Buse to GLAXO and June 6, 2007 Statement of Dr. John Buse.

summer and who lists his business address as King of Prussia, PA; (4) John Clarke, President of Consumer Healthcare who lists his business address as Philadelphia, PA; (5) William C. Louv, Chief Information Officer, who is an American citizen and lists his business address as Philadelphia, PA; (6) Daniel J. Phelan, Senior Vice President for Human Resources, who is an American citizen and lists his business address as Philadelphia, PA; (7) David Pulman, President of Global Manufacturing and Supply, who lists his business address as Research Triangle Park, NC; and (8) Christopher Viehbacher, President of US Pharmaceuticals, who lists his business address as Research Triangle Park, NC. *See* Glaxo Schedule 13D dated February 15, 2007. (Jarvis Decl., Ex. H)

### (iv)    Numerous False Statements Related To Avandia Emanated From The United States

Notwithstanding Glaxo's knowledge of the increased risk of heart attack that its own meta-analysis revealed, Glaxo repeatedly assured the market throughout the Class Period, in conference calls, press releases, and SEC filings, that Avandia was safe, that Glaxo was committed to transparency, and that the Company was bullish on Avandia and on its expected increasing contribution to the Company's financial results. Compl. ¶¶ 20-38; http://www.gsk.com/responsibility/cr-review-2006/downloads/CR-Report-2006.pdf; Conference Call Transcripts dated October 27, 2005, February 8, 2006, April 27, 2006, July 26, 2006, October 26, 2006, February 8, 2007, and April 25, 2007; Press Releases dated June 11, 2005, February 1, 2006, June 10, 2006, July 11, 2006, December 4, 2006, and two on May 21, 2007. *See*, *supra*, n.8-9. For example, on June 11, 2005, GSK issued a press release from San Diego, California, suggesting that not only was Avandia safe and effective, but that it actually *reduced the risks* to patients with cardiovascular disease. *See* Press Release dated June 11, 2005 ("New research presented today . . . suggests that Avandia . . . may also reduce blood pressure . . . .")

(Jarvis Decl., Ex. D). Similarly, in a December 4, 2006 Press Release, issued out of Philadelphia (among other locations), GSK praised the results of recent outcome studies involving Avandia, and compared Avandia favorably with other drug treatments in terms of the low number of incidents of serious congestive heart failure events. *See* Press Release dated December 4, 2007 (Jarvis Decl., Ex. E). Glaxo's false statements also included false and misleading statements in conference calls with analysts by Chief Executive Officer Jean-Pierre Garnier and President of Pharmaceutical Operations David Stout, both of whom are United States citizens and list GSK's Philadelphia headquarters as their business address.[15]

Glaxo also filed false and misleading annual reports with the SEC here in the United States, which are relied upon by investors worldwide, that touted the safety and effectiveness of Avandia (and its growth prospects) while failing to reveal the significant cardiovascular risks known to GSK.[16] Additionally, the Avandia labels that GSK published during the Class Period,

---

[15] *See also* February 8, 2007 Earnings Conf. Call (Stout: "[T]he really important news for 2006 was the release of two very important outcomes trials.... Just to remind you of what the results of that trial were, I think we exceeded everyone's expectations, in some cases even our own, where we beat metformin on performance and we tied them on cardiovascular safety."); October 26, 2006 Earnings Conf. Call (Stout: "[N]othing is more compelling than outcomes data, and we are now starting to get the output from our investment of six years ago in the big landmark outcomes trials. At the end of the day, it's the outcomes that are most important to physicians and to patients"; Garnier: "We are really bullish on Avandia. . . . This is not a product that is going to stall anytime soon."); April 27, 2006 Earnings Conf. Call (JP Morgan, Question: "[O]n Avandia how much of an Achilles heel do you think the 1% risk of the CHS is heart failure given the profile of the product ... and how much do you think it will hold back the product's success when you have new entrants come into the market?" Stout, Answer: "[W]e think in terms of overall performance, what's really going to drive usage in the future won't be the limitations of the CHF problem, but it's more going to be from the outcomes trials. If the outcomes trials come forward in a positive manner, that will be a compelling reason to actually use it earlier and more often in the treatment."). *See also* n.8.

[16] *See, e.g.,* 2006 Annual Report on Form 20-F filed with the SEC on March 2, 2007 ("Looking ahead, we expect new clinical data to help deliver growth from *Seretide/Advair* and the *Avandia* group of products . . .." and "In December, GSK presented data from the landmark ADOPT study, which demonstrated that *Avandia* is more effective than metformin, or a sulphonylurea, in long-term blood sugar control in type 2 diabetes. These data are in addition to those recently presented from the DREAM study, which showed that *Avandia* can reduce the risk of progression to type 2 diabetes. Data from both these studies are expected to be filed with regulatory agencies during the first half of 2007."); 2005 Annual Report on Form 20-F filed with the SEC on March 3, 2006 ("Sales in the USA grew 26% to £852 million. Encouragingly, *Avandia/ Avandamet* also grew very strongly in Europe and International markets with sales up 52% and 62%, respectively. Strong performance in these markets was driven by the growing acceptance amongst opinion leaders and physicians of the benefits of these new products in improving control for diabetic patients.")

which on their face show that they came from the United States, failed to disclose the increased risk of heart attack that Avandia users faced by taking the drug. *See* http://www.accessdata.fda.gov. Finally, GSK's purported defense to the safety risks raised regarding Avandia was launched and coordinated from it U.S. operational headquarters in Philadelphia.

### (c)    The Cases Tallahassee Relies On Are Readily Distinguishable

Tallahassee relies on two cases for support of its claim that issues regarding subject matter jurisdiction are relevant at the lead plaintiff stage: an unpublished slip opinion from the District of New Jersey, *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374 (D.N.J. June 30, 2004), and *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343 (D. Md. 2003). Both cases are facially distinguishable because, unlike here, neither foreign plaintiff presented the court with any credible basis to believe that the "conduct test" would be satisfied.

In *Royal Dutch/Shell*, for instance, the court noted that "there has been *no evidence* proffered that significant or material acts have occurred in the United States." Slip op. at 36 (emphasis added). It further recognized that "[b]oth Royal Dutch and Shell Petroleum N.V. are incorporated in the Netherlands and Shell is incorporated in England. Moreover, the information presented to the Court thus far indicates that the individual defendants resided abroad during the class period and all major decision making occurred outside of the United States." *Id.* n.19. Here, unlike *Royal Dutch/Shell*, the Institutional Investor Group has detailed, even at this early stage, Glaxo's conduct in the United States and the presence here of Glaxo employees who were speakers of the fraud and/or control persons, many of whom likely will be named as Defendants in a Consolidated Amended Complaint.

Similarly, in *Royal Ahold*, the presumptive lead plaintiff failed to present the court with a sufficient basis to conclude that subject matter jurisdiction would not be a major distraction to

foreign plaintiffs in the litigation. The *Royal Ahold* court noted that "[t]he allegedly fraudulent statements on which plaintiffs base much of their case, however, were issued by Royal Ahold from the Netherlands, and *it is not yet obvious how much of the alleged fraud was carried out or directed from there.*" 219 F.R.D. at 352 (emphasis added). Here, unlike in *Royal Ahold*, the Institutional Investor Group has provided strong evidence that *most* of the fraudulent conduct concerning Avandia took place in the United States. Therefore, the situation here is diametrically opposite the situation in *Royal Ahold*: the facts that have been uncovered, even at this early stage, show that the Consolidated Amended Complaint will primarily focus on Glaxo's conduct in the United States, not abroad.

Notably, the courts in both *Royal Ahold* and *Royal Dutch/Shell* ultimately denied the defendants' motions to dismiss the foreign investors' foreign loss claims for lack of subject matter jurisdiction. *See, In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 362 (D. Md. 2004); *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 539 (D.N.J. 2005). Had the plaintiffs in these cases presented sufficient evidence of such United States based conduct at the lead plaintiff stage, a different result would have surely been reached, as must be on the record before this Court.[17]

---

[17] Moreoover, most courts caution against the type of "wide ranging analysis under Rule 23" at the lead plaintiff stage that occurred in *Royal Dutch* and *Royal Ahold* to prevent exactly those type of speculative (and ultimately incorrect) conclusions from being drawn prior to development of a factual record. *See, e.g., In re Bausch & Lomb Inc. Sec. Litig.*, 06-CV-6294T, 2007 U.S. Dist. LEXIS 50979 at *16 (S.D.N.Y. July 13, 2007); *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003); *In re Party City Sec. Litig.*, 189 F.R.D. 91, 106 (D.N.J. 1999); *Fischler v. Amsouth Bancorporation,* No. 96-1567-Civ-T-17A, 1997 U.S. Dist. LEXIS 2875, at *7 (M.D. Fla. Feb. 6, 1997); *Gluck v. CellStar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997) (citing *D'Hondt v. Digi Int'l, Inc.*, No. 97-5 (JRT/RLE) 1997 U.S. Dist. LEXIS 17700, at *2 (D. Minn. April 3, 1997) ("If Congress had intended an aggressive inquiry by the Court, into the qualifications of a claimant to serve as a Lead Plaintiff, it was an intent that Congress chose not to express.")).

**2.    The Institutional Investor Group Is Not Subject To A Unique Res Judicata Defense Under *Vivendi***

The UK Group took a different, but equally deficient, tack in an attempt to argue that the Institutional Investor Group is subject to a unique defense rendering it atypical. The UK Group raised the specious argument that the Institutional Investor Group members are not proper lead plaintiffs because they are supposedly subject to a unique res judicata defense under Rule 23 pursuant to the decision rendered earlier this year in *In re Vivendi Universal, S.A. Securities Litigation*, 242 F.R.D. 76, 105 (S.D.N.Y. 2007). UK Group Mem. Opp'n at 8. According to the UK Group, *Vivendi* supports the proposition that the Institutional Investor Group, whose members are sophisticated German institutional investors, will not be able to satisfy Rule 23's superiority requirement because a German court would not give res judicata effect to a decision by this Court.[18] *Id.* For the reasons set forth below, this Court should reject the UK Group's res judicata argument.

**(a)    *Vivendi* Is Irrelevant Here Because The Institutional Investor Group Is Present Before, And Subject To, The Jurisdiction Of This Court And Is Not An Absent Class Member**

*Vivendi* involved a motion to certify a class of purchasers, both foreign and domestic, of stock and ADSs of Vivendi. 242 F.R.D. at 79.[19] The defendants there did *not* argue, as UK Group argues here, that the *lead plaintiffs* in the case (two French institutional investors) were inappropriate because *they* were subject to unique Rule 23 superiority defenses.[20] In fact, no part

---

[18] Tallahassee merely cites *Vivendi* in a footnote and baldly states that the Institutional Investor Group "*may* be subject to additional unique defenses." Tallahassee Mem. Opp'n at 4, n.5 (emphasis added).

[19] As in all attempts to raise a unique defense to preclude certification, "the unique defense principle is intended to protect class members *in their absence*, not defendants." *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 359 (S.D.N.Y. 1992) (emphasis added) (citing *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y. 2000)).

[20] Indeed, Rule 23's superiority requirement is never relevant in this Circuit to a court's determination of the appropriate lead plaintiff. *See In re Bausch & Lomb Inc. Sec. Litig.*, 06-CV-6294T, 2007 U.S. Dist. LEXIS 50979, at *16 ("Only two of [the Rule 23] factors – typicality and adequacy – are relevant to a motion for appointment as

of the court's decision addressed any issues or defenses concerning the appropriateness of lead plaintiffs under the PSLRA or Rule 23. Rather, the decision in *Vivendi* was solely based upon consideration of the res judicata effect of an American judgment on *absent* foreign class members.[21] Thus, the district court's decision in *Vivendi* is irrelevant to a lead plaintiff movant, like the Institutional Investor Group, which is *present* and unquestionably subject to the jurisdiction of this Court. *See* Institutional Investor Group Joint Decl. ¶ 16, Jarvis Decl., Ex. A (stating that all members of the Institutional Investor Group "understand that, as the Lead Plaintiff in this Action, each of us is subject to the jurisdiction and bound by all rulings of the Court, including rulings regarding any judgments"). For this reason alone, the UK Group's reliance on the *Vivendi* court's decision regarding the potential res judicata impact on *absent* foreign class members is misplaced.

*Vivendi*'s holding simply has no application to foreign lead plaintiffs who are present and voluntarily bound by the Court's judgments. Courts addressing the res judicata issue in the context of lead plaintiff determinations specifically have held that the issue whether absent foreign class members will be bound by a U.S. judgment is not relevant to the lead plaintiff determination. In *Takeda v. Turbodyne Techs., Inc.*, 67 F. Supp. 2d 1129, 1139 (C.D. Cal. 1999), the court explicitly held that "[c]oncerns respecting the res judicata impact of any judgment in favor of defendants, which have been the focus of decisional discussion of the difficulties inherent in certifying transnational classes, are not an issue with respect to the selection of Lead Plaintiffs, since those persons will clearly be bound by the judgment of the

---

lead plaintiff . . . and a wide ranging analysis under Rule 23 is not appropriate at this initial stage of the litigation and should be left for consideration of a motion for class certification.") (internal quotations and citations omitted).

[21] The *Vivendi* court held only that certain absent foreign class members (those from Germany and Austria) should be excluded from the certified class of purchasers from the U.S., France, England, and the Netherlands. 242 F.R.D. at 104-06. Here, the members of the Institutional Investor Group are present and bound by any order or judgment of this Court. *See* Institutional Investor Group Joint Decl. ¶ 16.

court." *See also Mass. Laborers' Annuity Fund v. Encysive Pharm., Inc.*, No. 06-3022, slip op. at 10 (S.D. Tex. Mar. 20, 2007) (rejecting the res judicata argument of a domestic investment group vying for lead plaintiff status because the foreign investor "affirmed that it and its funds will be bound by any judgment or other order in this case") (attached to Declaration of Sidney Liebesman, filed August 10, 2007, as Ex. D). Thus, the res judicata concerns raised by the UK Group are irrelevant in this context.

> **(b)    The Issues Decided In *Vivendi* Are Also Irrelevant Here Because Res Judicata Is Not A "Unique" Defense To The Institutional Investor Group**

In this Circuit, a "unique defense" will disqualify a class representative only when it threatens to dominate or subsume the claims of the other class members at trial, such that it will become the "focus of the litigation." *Baffa v. Donaldson, Lufkin & Jennrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000). "However, 'the rule barring certification of plaintiffs subject to unique defense is not rigidly applied in this Circuit'; it has generally been applied only where a full defense is available against an individual plaintiff's action." *In re NTL, Inc. Sec. Litig.*, No. 02-3013, 2006 WL 330113, at \*26 (S.D.N.Y. Feb. 14, 2006) (quoting *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 365 (S.D.N.Y. 2000) and *In re Frontier Ins. Group Sec. Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997)).

Under the circumstances present here, the Institutional Investor Group is not subject to a "unique" defense. As noted, the res judicata defense is not available against the Institutional Investor Group members because they are all present before, and subject to, the jurisdiction of this Court. *See Takeda*, 67 F. Supp. 2d at 1139 ("Concerns respecting the res judicata impact of any judgment in favor of defendants . . . are not an issue with respect to the selection of Lead Plaintiffs, since those persons will clearly be bound by the judgment of the court."); *Encysive*,

slip op. at 10 (lead plaintiff is bound by its statements that it is subject to the court's jurisdiction and judgments). Thus, the alleged res judicata issue is nothing more than a red herring.

That the res judicata issue plainly does not present a unique defense rendering the Institutional Investor Group atypical is evident also because the issue is common to the Class and will be an issue confronting any lead plaintiff in this action, without regard to the nationality of that plaintiff. *See In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147, 153 (D. Del. 2005) ("To the extent there is any res judicata question, it would apply to any and all members of the putative class."); *see also In re Royal Ahold*, 219 F.R.D. at 355 n.12 (indicating that lead plaintiff would still be expected to "vigorously represent" all members of the class, including foreign investors). This case involves a company that committed substantial acts in furtherance of a fraud here in the United States, which caused damages to investors both here and abroad. As a result, a substantial portion of the damage to the Class in this case was suffered by foreign investors because Glaxo's stock trades heavily on the LSE, at a daily volume that is much greater than the volume in Glaxo securities on the NYSE due to the simple fact that Glaxo is incorporated in the United Kingdom. Thus, any lead plaintiff will likely face the same *Vivendi*-styled res judicata defenses that the UK Group somehow deems "unique" and fatal to the Institutional Investor Group's Lead Plaintiff status.[22] The simple fact is that there are numerous potential foreign class members that are absent in this case (which by definition does not include

---

[22] Just as defendants have challenged the inclusion of German foreign purchasers in American class actions on *res judicata* grounds, English foreign purchasers – like the UK Group – have been subject to similar challenges. *See, e.g., Cromer Fin. Ltd. V. Berger*, 205 F.R.D. 113, 135 (S.D.N.Y. 2001) (court presented with arguments and affidavits regarding the enforceability of a securities class action judgment under English and Swiss law); *In re Lloyd's Am. Trust Fund Litig.*, No. 96-1262(RWS) 1998 U.S. Dist. LEXIS 1199, at **42-43 (S.D.N.Y., Feb. 6, 1998) (court was presented with affidavits from defendants' foreign counsel which concluded that France, England, South Africa, Canada and Switzerland would not enforce the American judgment and would permit foreign class members to sue a second time in their home jurisdictions if unsuccessful in American litigation); *In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749, 765 (E.D. Va. 2004) ("Defendants attached a declaration of Lord Grabiner QC, an English barrister [who] opined that there is a substantial risk that an English court would refuse to recognize a judgment entered in this action if a foreign class member were to later bring a similar proceeding in England.").

the lead plaintiffs),[23] but nothing at this stage makes either the members of the Institutional Investor Group or the UK Group somehow less capable of addressing in a future class certification proceeding any res judicata issues potentially affecting absent class members.

### (c)    *Vivendi* Was Wrongly Decided

Even if this Court were to find *Vivendi* somehow applicable to the circumstances of this case (which it should not), the Institutional Investor Group respectfully suggests that the Court should decline to follow it as it was wrongly decided and is a clear minority view, against the great weight of authority on this issue.  The *Vivendi* court's decision to exclude putative class members from Germany and Austria was made within the context of its analysis of the superiority of class action treatment pursuant to Rule 23(b)(3).  The decision was based entirely on the court's concerns about the recognition or enforceability of a U.S. judgment in various foreign countries.  The *Vivendi* court began with a discussion of the "near certainty" test articulated by Judge Friendly in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 996 (2d Cir. 1975). In *Bersch*, Judge Friendly concluded that a U.S. court should decline to enter a judgment only where there is a "near certainty" that it will not be enforceable by a foreign court: "[w]hile an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a *near certainty* . . . ." *Bersch*, 519 F.2d at 996 (emphasis added); *see Vivendi*, 242 F.R.D. at 92-93.

Characterizing the decisions made by the progeny of *Bersch* as "haphazard," 242 F.R.D. at 93, the *Vivendi* court criticized and rejected the traditional "near certainty" test (*id.* at 95 ("the Court does not find the 'near certainty' standard to be a particularly useful analytical tool.")) and articulated its own, novel, standard, as follows:  "Where plaintiffs are able to establish *a*

---

[23]  If one considers only the top 125 institutional investors in GLAXO alone, there are no less than eighteen diverse countries represented. *See* Jarvis Decl., Ex. M. (spreadsheet showing GLAXO's largest institutional investors).

*probability* that a foreign court will recognize the res judicata effect of a U.S. class action judgment, plaintiffs will have established this aspect of the superiority requirement." *Id.* at 95 (emphasis added). The court then fine-tuned it: "Where plaintiffs are unable to show that foreign court recognition is *more likely than not*, this factor weighs against a finding of superiority . . . ." *Id.* (emphasis added).

The court then applied its novel standard and concluded, based upon the competing affidavits submitted, that a U.S. judgment would, more likely than not, be accorded recognition in France, England, and the Netherlands, but not in Germany and Austria. *Id.* at 102-109. With respect to putative class members hailing from other countries, the court's opinion was silent.

The new test that was articulated and applied in *Vivendi* ought to be rejected here because it is based upon an incorrect legal standard and reaches an anomalous result. The "near certainty" test has been universally accepted for more than thirty years by district courts both within and without the Second Circuit. The mere possibility that a foreign court may not recognize or enforce an American judgment simply will not suffice because the presumption is explicitly placed in favor of class certification. For example, in *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353 (S.D.N.Y. 2002) the court held that "[t]he case law suggests that if there is *some* possibility that a class action judgment would be enforceable – or at least have some substantial effect – in the foreign jurisdiction at issue, then class certification is proper. . . . Based on the affidavits before us, we cannot conclude that a Turkish court would give *no* weight to a judgment of this court." *Id.* at 360 (certifying the class) (emphasis added).

Similarly, in *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113 (S.D.N.Y. 2001) the court held, "the res judicata effect of a class action is a factor that must be considered in evaluating the superiority of the class action device . . . . There is a distinction, however, between those

22

circumstances in which there is a 'possibility' that a foreign court may not recognize a judgment, and those in which there is 'near certainty' that it will not be recognized." *Id.* at 134-35 (certifying the class).[24]

Against this backdrop, it is clear that the *Vivendi* court's decision dramatically departed from the well-accepted "near certainty" test and substituted its own, inapplicable standard. The difference in results between the "near certainty" test and the *Vivendi* court's new "more likely than not" standard cannot be gainsaid. Under the traditional analysis, if the recognition *vel non* of a U.S. class action judgment by a foreign court was an open question in that foreign country, the result was uncontroversial – plaintiffs won the issue. *E.g., Cromer*, 205 F.R.D. at 135-36; *Frietsch*, 1994 WL 10014, at *11; *see also Casper*, 560 F. Supp. at 243 & n.2. In contrast, the *Vivendi* court's approach would necessitate an expensive, time consuming, country-by-country analysis rather than the eminently useable, bright line "near certainty" test. Courts would be required to sort through facts almost in equipoise, to predict the outcome of *res judicata* issues

---

[24] Courts in other jurisdictions routinely reach identical conclusions. *See, e.g., Frietsch v. Refco, Inc.*, No. 92 C 6844, 1994 WL 10014 at *11 (N.D. Ill. Jan. 13, 1994) (finding that neither "dueling affidavits" nor "the cases cited by defendants provides a basis for denying class certification"); *Jordan v. Global Natural Res.*, 102 F.R.D. 45, 52 (S.D. Ohio 1984) (holding that "[e]ven assuming the appropriateness of abstention, the standard for such abstention is 'near certainty'" and that defendant had not met that standard); *Casper v. Cunard Line, Ltd.*, 560 F. Supp. 240, 243 (E.D. Pa. 1983) ("'Near certainty' is the standard for abstention and defendant has failed to make such a showing."). This same "near certainty" test has been employed by courts across jurisdictions in the context of subject matter jurisdiction as well, further demonstrating the test's hegemony. *See, e.g., In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 547 (D.N.J. 2005) ("Defendants' res judicata arguments are unpersuasive. The probability alleged by Defendants of foreign courts failing to enforce a judgment of this Court is not a near certainty."); *In re Cable & Wireless*, 321 F. Supp. 2d at 765-66 ("Defendants attached a declaration of Lord Grabiner QC, an English barrister [who] opined that there is a substantial risk that an English court would refuse to recognize a judgment entered in this action if a foreign class member were to later bring a similar proceeding in England. . . . Defendants . . . cite the 'mere possibility' that they may be exposed to multiple suits because a court in England may not recognize a judgment in this action. This argument . . . is unpersuasive. The *Cromer* court addressed this issue and drew a distinction from 'those circumstances in which there is a *possibility* that a foreign court may not recognize a judgment, and those in which there is a *near certainty* that [a U.S. judgment] will not be recognized.' The possibility of an English court failing to give res judicata to a judgment of this Court is not a near certainty.") (citation omitted).

even in the absence of rulings by the foreign country in question. This is simply not the law in the Second Circuit and this Court should decline to follow *Vivendi*.[25]

Finally, there is substantial reason to believe that, even under the restrictive test proposed in *Vivendi*, this Court ultimately will be in a position to conclude that it is "probable" that any judgment rendered in this case will be honored by German courts. In the *DaimlerChrysler Ag Securities Litigation,* Nos. CIV.A.00-993, 00-984, 01-004-JJF (D. Del.), defendants at the class certification stage raised the issue of whether a class action judgment in the United States would be enforced by German courts. Plaintiffs presented the expert opinion of Dr. Burkhard Hess, a professor at the University of Tuebingen who, at the time of his opinion, held a Chair of Civil and Procedural Law, Conflict of Laws and International Litigation, and who was the former Dean of the Faculty. (Jarvis Decl., Ex. B) Professor Hess concluded, after an exhaustive analysis of German law, that "it is likely that a United States securities class action settlement or judgment will have a 'negative preclusive effect' in a German Court."[26] This opinion is more than sufficient to even satisfy the *Vivendi* standard.

---

[25] In addition to improperly restating the applicable standard, the *Vivendi* court further erred by placing the burden on the plaintiffs to establish the requisite res judicata probability. This is also incorrect. The *Vivendi* court cited to *In re Initial Public Offerings Litigation*, 471 F.3d 24, 33 (2d Cir. 2006) ("*IPO*"), for the uncontroversial assertion that plaintiffs have the burden to produce some evidence of compliance with Rule 23 and to show that its requirements are met, *Vivendi*, 242 F.R.D. at 95, but went further in using *IPO* to shift to plaintiffs the burden of establishing the requisite res judicata probability. *Id.* Under the traditional approach, however, courts place the burden on defendants and focus on the *defendants'* failure to show the requisite "near certainty." *See, e.g., Cromer*, 205 F.R.D. at 136 ("In sum, the plaintiffs have shown that the benefits of class certification are significant and that this device is superior . . . Because *Deloitte has not presented arguments sufficient to outweigh these demonstrated benefits*, the motion to certify a class of investors is granted.") (emphasis added); *Jordan*, 102 F.R.D. at 52 ("*Defendant* has presented nothing in support of its contention that foreign courts will not recognize a judgment entered by this Court. Therefore, it is unnecessary to pursue this matter further.") (emphasis added); *Casper*, 560 F. Supp. at 243 ("'*Near certainty*' is the standard for abstention and *defendant* has failed to make such a showing.") (emphasis added). The district court's decision turned this burden on its head. *Vivendi*, 242 F.R.D. at 95 ("*Where plaintiffs are unable to show* that foreign court recognition is more likely than not, this factor weighs against a finding of superiority") (emphasis added).

[26] In *In re DaimlerChrysler AG Securities Litigation*, 216 F.R.D. 291 (D. Del. 2003), the court did not reach the issues related to enforcement of foreign judgments addressed in Professor Hess's Declaration because it declined to certify a class that included foreign investors for different reasons that were fact specific to that case, finding that the Lead Plaintiffs there had not adequately responded to Defendants' concerns regarding the issues of class management and damages suffered by purchasers on foreign exchanges. *Id.* at 301.

**B.** **Tallahassee's Kitchen Sink Attempts To Prove That The Institutional Investor Group Is Inadequate Lack Substance And Fail To Rebut The Statutory Presumption In The Institutional Investor Group's Favor**

**1.** **The Institutional Investor Group Is A Proper Group Containing The Institutional Investor With The Largest Financial Interest**

Tallahassee claims that the Institutional Investor Group is an improperly formed group and should not be appointed. Tallahassee Opp'n at 6-7. On the contrary, the Institutional Investor Group is a small, cohesive group of institutional investors – exactly the sort of lead plaintiff contemplated by the PSLRA – committed to the vigorous prosecution of this case. Courts in this District often appoint groups as lead plaintiffs in securities fraud class actions. *See, e.g., Olsen v. New York Cmty. Bankcorp*, 233 F.R.D. 101, 106-07 (E.D.N.Y. 2005) (appointing group including Metzler as lead plaintiff); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. at 98 (S.D.N.Y. 2005) ("The group is not required to suggest individual members as lead plaintiffs; rather, the group itself, governed by the individuals within it, may be named the lead plaintiff."); *Weltz v. Lee*, 199 F.R.D. 129, 133 (S.D.N.Y. 2001) (appointing group with seven members as lead plaintiff); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 436 (S.D.N.Y. 2000) ("The nomination of a group of investors as co-lead plaintiffs is specifically contemplated by the PSLRA.").

As Judge Scheindlin specifically noted in *eSpeed*, if a member of a group has a greater loss than any other movant even without including the losses of the other members of the group, then the other members may be included in the group. 232 F.R.D. at 100. Here, INDEXCHANGE (with nearly $11 million in losses), Deka (with $6.1 million in losses) and Metzler (with $7.3 million in losses) – each has a larger financial interest than any other movant. Therefore, the Institutional Investor Group itself is proper.

Finally, the members of the Institutional Investor Group have worked together to advance their appointment as lead plaintiff and will continue to work cohesively with each other to further the interests of the Class. *See* Joint Decl. in Supp. of the Institutional Investor Group's Mot. for App't as Lead Plf., Jarvis Decl., at Ex. A. The members of the Institutional Investor Group affirmatively decided to move together as a cohesive group. *Id.* ¶¶ 6, 12. The Group is committed to working closely as representatives of the Class and its members understand their fiduciary responsibilities to the class. *Id.* ¶ 9. Its members have conferred and agreed to exercise joint decision making to fairly and adequately protect the interests of the Class. *Id.* ¶ 15.

Tallahassee's attack on the Institutional Investor Group's status is unfounded and desperate. The Court should reject it.

### 2.    The Institutional Investor Group's Authority, Standing, and Financial Interests Are Not Seriously In Dispute

Tallahassee alone has raised challenges to the Institutional Investor Group's application based upon its specious claim that the members of the Institutional Investor Group failed to set forth in sufficient detail their financial interest in this suit and their standing and authority to sue to recover the losses in the funds the Institutional Investor Group represents. Tallahassee Mem. Opp'n at 5-6. These are not serious challenges to the Institutional Investor Group's appointment as Lead Plaintiff, and each argument should be summarily rejected.[27]

First, with respect to Tallahassee's argument that the Institutional Investor Group "failed to explain how its members calculated it losses" by not providing sufficient information about Glaxo stock sales after the Class Period, the average price used to calculate the value of retained shares, and the exchange rate used, Tallahassee is merely grasping at straws. The Institutional

---

[27] This particular argument is disingenuous because Tallahassee itself provided no greater detail than the Institutional Investor Group in its submissions to this Court. *See* Campisi Decl. Exs. A-B (Dkt. 11).

Investor Group provided affidavits in connection with its original application disclosing detailed, day by day, fund by fund transactions in all Glaxo securities the moving funds traded during the class period, listing the date of purchase or sale, price paid or received, and number of shares involved. *See* Liebesman Decl., Exs. A-C (Dkt. 8). This information alone is sufficient under the PSLRA. *See* 15 U.S.C. §78u-4(a)(2)(A)(iv) (requiring a proposed lead plaintiff to file a certification that sets "forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint" to enable a court to properly evaluate the financial stakes at issue.) Thus, from the information already disclosed, Tallahassee cannot possibly believe that its stated losses of $104,990 will somehow surpass the $28 million in losses – which are *268 times greater* than Tallahassee's – suffered by the Institutional Investor Group through some other method or manner of calculation.[28]    Especially egregious is Tallahassee's representation to this Court that the court in *In re Williams Sec. Litig.*, 02-CV-72-H(M), slip op. (N.D. Okla. July 8, 2002) "den[ied] lead plaintiff motion where movant 'failed to provide sufficient information for the Court to analyze the basis for its claimed financial interest.'" Tallahassee Mem. Opp'n at 5 n.6.[29]    Even a cursory reading of *Williams* shows that Tallahassee's claim is completely wrong; the court rejected Market Street, the movant who

---

[28] In calculating its losses, the Institutional Investor Group used a 90-day look back price of £12.94 for shares retained at the end of the Class Period and the May 21, 2007 currency exchange rate of 1.9714. While minor variations in exchange rates, 90-day look-back prices, and post-class period sales may have some impact on approximating damages, any such impact would be *de minimus* and not material here given the fact that the Institutional Investor Group's losses are so far in excess of the other lead plaintiff movants' losses.    For convenience, the Institutional Investor Group attaches loss charts prepared internally demonstrating INDEXCHANGE's loss under FIFO, LIFO and a pure net method (FIFO and LIFO are the traditional accounting methodologies employed by courts when ruling on PSLRA). Jarvis Decl., Ex. L. These charts are attached because they show that INDEXCHANGE's loss under any method unequivocally dwarfs the loss of all competing movants combined. In addition, loss charts for the other members of the Institutional Investor Group showing damages under the FIFO method also are included. Jarvis Decl., Exs. I-K.    This is not a situation, as with the UK Pension Fund Group, where one method was omitted because there was a problem with the calculation.

[29] Tallahassee attached a copy of the *Williams* opinion as Exhibit D to the Declaration of Jeffrey Campisi in Support of Tallahassee's Opposition (Dkt. 21).

"failed to provide sufficient information," because *its losses were significantly less* than the losses of the movant the court appointed:

> In accordance with the PSLRA, the Court finds that Mr. Meruelo is the WCG Subclass lead plaintiff movant with the "largest financial interest" in the outcome of the litigation. The Court's determination is based on the following findings: (1) Mr. Meruelo's loss calculations have survived scrutiny and are permissibly calculated used the 90-day average trading price under the PSLRA; (2) the Watkins Group's claimed losses are significantly less than those of Mr. Meruelo, and (3) *the claimed losses of Market Street are also significantly less than those of Mr. Meruelo*.

*Williams*, slip op. at 10 (emphasis added). Although Market Street had failed to provide certain information in its original submission that the Court specifically asked Market Street to supplement, that was not the basis for the denial of its motion. The opinion, moreover, is silent as to what it was that Market Street had not provided. In this case, however, the Institutional Investor Group's certifications provide all the transaction detail required by the PSLRA's certification requirement and there is no credible attack on whether it has the largest financial interest. The Institutional Investor Group's Joint Declaration in Support of the Institutional Investor Group's Motion for Appointment as Lead Plaintiff and Approval of its Selection of Counsel, filed concurrently herewith (Jarvis Decl., Ex. A), further attests to the completeness of the transaction detail provided. The funds listed all their data and did not trade in any Glaxo options, as Tallahassee wildly and without basis speculates.

Second, with respect to the issues of standing and authority to sue on behalf of the investors in the funds of the members of the Institutional Investor Group, the Joint Declaration addresses the concerns raised by Tallahassee. Joint Decl. at ¶ 7 (indicating that each member of the Institutional Investor Group "controls and manages the various investment and mutual funds it manages and serves as attorney-in-fact for these funds, with authority to bring suit to recover

losses sustained by the funds").[30]  Indeed, these averments are exactly the type of statements of authority, even under the most restrictive of tests employed, that are regularly found to be adequate to confer standing on an investment manager who institutes suit to recover the losses suffered by investors in a manager's fund.[31]

### 3.    Institutional Investor Group Member Metzler Is Not A Professional Plaintiff

Tallahassee's argument that the Institutional Investor Group should not be appointed lead plaintiff because Metzler is a "professional plaintiff" under the PSLRA directly contradicts this Courts order in *MBIA*: "Even viewing [a group movant member] as a 'professional plaintiff' under 15 U.S.C. § 78u-4(a)(3)(B)(vi), its participation will be permitted with its co-lead plaintiff which has served as lead plaintiff in only two other cases in the last three years." *Capone v.*

---

[30] It should be further noted that both Deka and Metzler, in their affidavits submitted with the Institutional Investor Group's original application, which are virtually identical in form to the certifications they filed in other cases, set forth the fact that they have collectively satisfied three courts in this Circuit, and four more federal courts in other jurisdictions, in just the last three years, and that they have both the authority and the standing to sue on behalf of the investors in the underlying funds they represent. *See* Certification of Deka, ¶ 7 (disclosing that Deka was appointed lead plaintiff in two securities class actions over the last three years, including one in this district); Certification of Metzler, ¶ 7 (disclosing that Metzler was appointed lead plaintiff in six securities class actions over the last three years, including two in this Circuit) (Liebesman Decl. Exs. A & B) (Dkt. 8); *see also In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147 (D. Del.) (finding that there was sufficient evidence "that Metzler is serving as attorney in fact for the investors in the identified funds, has authority to make decisions and act on their behalf, and is able to recover moneys for them.").

[31] *See, e.g., EZRA Charitable Trust v. Rent-Way, Inc.*, 218 F.R.D. 101, 107-09 (W.D. Pa. 2003) (finding standing because the investment advisory agreements between the asset manager and its clients giving the Asset Manager full authority in its discretion to purchase and sell stocks, bonds and other securities and manage the daily affairs of the accounts; "we do not view the 'power-of-attorney' / 'attorney in fact' language (or lack thereof) as a controlling factor," but rather the "level of discretion exercised . . . in the day-to-day purchase of securities for its clients"); *Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627 (D.N.J. 2002) (requiring not only evidence that the asset manager has the authority to invest on the client's behalf, but also to initiate suit on its behalf); *In re Daimler Chrysler*, 216 F.R.D. 291; *Weinberg*, 216 F.R.D. at 255 ("Generally a client's grant of authority to an investment manager to purchase stock on his or her behalf does not also confer authority to commence suit on his or her behalf. However, when the investment advisor is also attorney-in-fact for its clients with unrestricted decision making authority, the investment advisor is considered the 'purchaser' under the federal securities laws with standing to sue in its own name."); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. at 98 (holding that the standing of an investment advisor to sue to recover for the losses of investors is predicated upon both "unrestricted decision-making authority and the specific right to recover on behalf of his clients."); *Roth v. Knight Trading Group, Inc.*, 228 F. Supp. 2d 524, 529 (D.N.J. 2002) (same); *In re the Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *5 (N.D. Ohio May 12, 2004) (same); *Olsen*, 233 F.R.D. at 107 (same); *In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d 562 (D.N.J. 2006) (concluding that investment advisor with complete authority over its trades and acting as agent and attorney-in-fact with full power and authority to act in connection with its investments had standing to sue).

*MBIA Inc.*, No. 05-3514, slip op. at 4 (S.D.N.Y. July 25, 2005). Exactly the same situation exists here. Although Metzler has been appointed lead plaintiff more than five times in the past three years, the other members of the Institutional Investor Group have not. Deka has been appointed lead plaintiff only twice in the past three years and neither INDEXCHANGE nor INKA has ever been appointed lead plaintiff in a PSLRA action. The Court should reject Tallahassee's weak argument.

## III.    THE COMPETING MOTIONS SHOULD BE DENIED

The competing movants have substantially smaller financial interests than the Institutional Investor Group and three of its four members individually. For that reason alone, their motions should be denied. Moreover, Tallahassee[32] and North Yorkshire of the UK Group[33] are net sellers and , as this Court has held, "thus not an adequate representative of a class of purchasers." *Capone v. MBIA Inc.*, No. 05 Civ. 3514, slip op. at 4 (S.D.N.Y. July 25, 2005) (Stanton, J.) (attached as Ex. A to the Institutional Investor Group's Opp'n. (Dkt. 17)); *Capone v. R&G Fin. Corp.*, 05-4186 (JES), Tr. at 23 (finding that, in a class of purchasers, "it is a safe assumption that if you are a net purchaser rather than a net seller, it is more likely you suffered a loss") (Attached as Ex. B. to the Institutional Investor Group's Opp'n (Dkt. 17); *see also In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001) (net seller is "totally out of the running for designation as lead plaintiff"); *In re Mills Corp. Sec. Litig.*, No. Civ. A. 1:06-77 (GEL), 2006 WL 2035391, at *3 (E.D. Va. May 30, 2006) ("Courts generally reject a party's motion for lead plaintiff if the party is a net seller of shares during the class period."); *In re*

---

[32] During the Class Period, Tallahassee purchased 98,359 GSK OTC shares and sold 100,559. *See* Decl. of Jeffrey P. Campisi in Supp. of Tallahassee Mot., Ex. B (Dkt. 11).

[33] North Yorkshire purchased 854,938 GSK LSE shares and sold 1,190,984. *See* Aff. of David Rosenfeld in Supp. of the UK Group's Mot., Ex. A (Certification of North Yorkshire County Council, Schedule A) (Dkt. 14).

*McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 997 (N.D. Cal. 1999) (noting that "a net seller has arguably *profited* more from the fraud than it has been injured").

In addition, Tallahassee should be rejected because it is inadequate, as noted *supra*, and because it is atypical for the reasons briefed in the Institutional Investor Group's opposition memorandum.    *See* Institutional Investor Group Mem. Opp'n at 2, 5-6.    In summary, Tallahassee's trading data is subject to question because the majority of its reported trades, which the Institutional Investor Group understands were on the OTC exchange, do not match the publicly available information for trades on the OTC.

31

## CONCLUSION

For all the above reasons, the Institutional Investor Group respectfully requests that the Court grant the Institutional Investor Group's Motion and (i) appoint the Institutional Investor Group to serve as Lead Plaintiff for the Class; and (ii) approve the Institutional Investor Group's selection of Grant & Eisenhofer P.A. and Motley Rice LLC to serve as Lead Counsel for the Class.

Dated: September 7, 2007

Respectfully submitted,

  /s/ Geoffrey C. Jarvis
Jay W. Eisenhofer (JE-5503)
Geoffrey C. Jarvis (GJ-7040)
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:    (646) 722-8500
Fax:    (646) 722-8501

OF COUNSEL:

Alexander Reus
Diaz Reus Rolff & Targ LLP
GLOBAL EXPANSION GROUP
Bank of America Tower at International Pl.
100 SE Second Street, Suite 2610
Miami, FL 33131
Tel:    (786) 235-5000
Fax:    (786) 235-5005

Deborah Sturman
Sturman LLC
112 Madison Avenue
7th Floor
New York, NY 10016
Tel:    (212) 784 6263
Fax:    (917) 546 2544

MOTLEY RICE LLC
Joseph F. Rice
Ann K. Ritter
P. O. Box 1792 (29465)
28 Bridgeside Blvd.
Mount Pleasant, SC 29465
Tel:    (843) 216-9000
Fax:    (843) 216-9450

*Counsel for The Institutional Investor Group and Proposed Lead Counsel for the Class*