# EXHIBIT A

LEXSEE 2007 U.S. DIST. LEXIS 67173

**IN RE FLAG TELECOM HOLDINGS, LTD. SECURITIES LITIGATION THIS DOCUMENT RELATES TO: ALL ACTIONS**

**02 Civ. 3400 (WCC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 67173*

**September 4, 2007, Decided**

**COUNSEL:** [*1] For MILBERG WEISS LLP, Lead Counsel for Plaintiff and the Class: BRAD N. FRIEDMAN, ESQ., LAUREN BLOCK, ESQ., ANN GITTELMAN, ESQ., MICHAEL MIARMI, ESQ., Of Counsel, New York, New York.

For MILBANK, TWEED, HADLEY & McCLOY LLP Attorneys for Defendant: JAMES N. BENEDICT, ESQ., DOUGLAS W. HENKIN, ESQ., C. NEIL GRAY, ESQ., KEVIN ASHBY, ESQ., Of Counsel, Citigroup Global Markets, Inc., New York, New York.

For SHEARMAN & STERLING, Attorneys for Individual Defendants Andres Bande, Larry Bautista, Lim Lek Suan, Edward McCormack, Edward McQuaid, Daniel Petri, and Philip Seskin: JEROME S. FORTINSKY, ESQ., PANAGIOTIS KATSAMBAS, ESQ., JAE WOO PARK, ESQ., Of Counsel, New York, New York.

**JUDGES:** William C. Conner, Sr. United States District Judge.

**OPINION BY:** William C. Conner

**OPINION**

**OPINION AND ORDER**

**CONNER, Senior D.J.:**

Plaintiffs Peter T. Loftin and Norman H. Hunter bring this proposed class action raising claims under the federal securities laws against Citigroup Global Markets

Inc. f/k/a Salomon Smith Barney Inc. ("Citigroup") and eight individual defendants, namely, Andres Bande, Edward McCormack, Stuart Rubin, Larry Bautista, Daniel Petri, Edward McQuaid, Philip Seskin and Dr. Lim Lek Suan in connection with plaintiffs' purchase [*2] of common stock from Flag Telecom Holdings, Ltd. ("Flag" of the "Company"). [1] Plaintiffs purport to bring a class action on behalf of those who purchased Flag common stock between March 6, 2000 and February 13, 2002, as well as those who purchased Flag common stock pursuant to or traceable to Flag's initial public offering ("IPO") between February 11, 2000 and May 10, 2000 (the "Class Period"). [2] Plaintiffs allege that defendants induced investors to purchase Flag securities pursuant to a registration statement and prospectus containing materially false and misleading information in violation of *§§ 11, 12(a)(2)* and *15* of the Securities Act of 1933 (the "'33 Act"), and that defendants made materially false and misleading statements regarding Flag's financial condition, thereby causing Flag securities to trade at artificially inflated prices in violation of *§§ 10(b)* and *20(a)* of the Securities Exchange Act of 1934 (the "'34 Act") and *Rule 10b-5* promulgated there under. Plaintiffs now move pursuant to *FED. R. CIV. P. 23* to certify the proposed class, and Joseph Coughlin, a purchaser of Flag common stock, [3] simultaneously moves pursuant to *FED. R. CIV. P. 24* to intervene in the action [*3] to serve as a class representative. [4] For the following reasons, their motions are granted.

1     In the Spring of 2002, several lawsuits asserting claims under the federal securities law were filed against Flag, Citigroup, Verizon Communications, Inc. ("Verizon") and the

individual defendants (in addition to Andrew Evans, Vice President of Strategy and Marketing for Flag). On October 18, 2002, this Court consolidated the suits against defendants, named Loftin lead plaintiff and appointed Milberg Weiss Bershad Hynes & Lerach LLP n/k/a Milberg Weiss LLP as lead counsel. Loftin subsequently filed a Second Corrected Consolidated Amended Complaint ("2CCAC"), which Citigroup, Verizon and the individual defendants moved to dismiss. We dismissed the 2CCAC, but granted plaintiff leave to replead his claims against all defendants named therein. *See In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249 (S.D.N.Y. 2004)* (Conner, J.) *(Flag I)*. Plaintiff thereafter filed a Third Consolidated Amended Complaint ("3CAC" or the "Complaint") adding plaintiff Norman H. Hunter to the action, which Flag, Citigroup, Verizon and the individual defendants moved to dismiss. In an Opinion and Order dated **[*4]** January 12, 2005, this Court granted the motions of Flag, Evans and Verizon, denied in part and granted in part Bautista's motion to dismiss and denied in their entirety the motions filed by Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan and Citigroup. *See In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429 (S.D.N.Y. 2005)* (Conner, J.) *(Flag II)*. Plaintiffs' claims against Flag and Evans were dismissed with prejudice, and their claims against Verizon were dismissed without prejudice. *See id.*

2  Hunter purchased 200 shares of Flag common stock in the IPO and is the only proposed class representative who bought shares in the IPO. He sold all of his shares in November 2001. *(See* Gray Decl. Opp. Class Cert., Ex. Z (Hunter Dep. at 53, 58-59).)* Loftin purchased approximately 1.7 million shares of Flag common stock between July 17, 2000 and September 22, 2000. *(See id.,* Ex. Y (PL 00037).)*

3  Coughlin purchased 250 shares of Flag common stock on February 23, 2000 and 100 shares of common stock on July 3, 2001. *(See* Gray Decl. Opp. Class Cert., Ex. P (Coughlin Dep. at 68-69).)*

4  Defendants have not submitted a memorandum of law in opposition to Coughlin's motion to intervene and **[*5]** oppose it on the sole ground that he is not typical of the putative class members and incapable of adequately and fairly representing them, which are requirements to certifying a proposed class representative pursuant to *FED. R. CIV. P. 23(a)*. Therefore, because the analysis of Coughlin's motion to intervene is identical to our determination of plaintiffs' motion to certify him as a class representative, we will address the motions in tandem.

**BACKGROUND**

The facts of this case are set forth extensively in our previous opinions, familiarity with which is presumed. *See Flag I, followed by, Flag II.* Accordingly, we recite only the facts relevant to our resolution of the present issues and such background facts as are helpful in providing context.

Flag offered its shares to the general public in an IPO held on February 16, 2000. *(See* 3CAC P 90.)* The Company's Prospectus was incorporated into the Registration Statement filed with the Securities and Exchange Commission ("SEC") in connection with the IPO which took effect on February 11, 2000. *(See id.* PP 80, 90.)* Around the time of the IPO, Bande was Flag's Chief Executive Officer ("CEO"), McCormack was Flag's Chief Financial Officer ("CFO"), **[*6]** Rubin was General Counsel and Assistant Secretary, McQuaid, Petri, Seskin and Suan were all members of Flag's Board of Directors and Bautista served as the Company's Vice President of Finance and Treasurer. *(See id.* PP 53-54, 56-61; Gray Decl. Opp. Class Cert., Ex. C (the Prospectus at 57-60).)* It appears that all the individual defendants signed the Registration Statement in connection with Flag's IPO, except for McQuaid, Seskin and Bautista. [5] *(See* Gray Decl. Opp. Class Cert., Exs. B (Registration Statement at II-7), D (Amended Registration Statement II-7).)* Citigroup served as the lead underwriter of the IPO and assisted Flag in selling shares of Flag common stock to the public. *(See* 3CAC P 65.)* Plaintiffs allege that the price of Flag's common shares was artificially inflated during the Class Period as a result of defendants' materially false and misleading statements in the Registration Statement, Flag's SEC filings and certain press releases. They contend that they and other investors suffered damages when the falsity of defendants' statements was revealed and the value of Flag stock plummeted.

5  Plaintiffs allege:

[I]ndividual defendants, because of their positions with the Company, **[*7]** possessed the power and authority to control the contents of FLAG's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. Each defendant was provided with copies of the Company's reports and press releases alleged . . . to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

(*See* 3CAC P 62.)

## I. Pre-IPO

Flag was a "company that owned its own telecommunications infrastructure and sold access to it, on a wholesale basis, to other telecommunications companies that would, in turn, use such access to provide services to retail customers." (*See* Defs. Mem. Opp. Class Cert. at 4; *see also* 3CAC P 2.) In the Prospectus, Flag described itself as a "carriers' carrier" that developed and offered a range of innovative telecommunications products and services to licensed international carriers, internet service providers and other telecommunications companies. (*See* 3CAC P 2; Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 2, 37).) At the time of the IPO, Flag's network consisted of: (1) the Flag Europe-Asia **[*8]** cable system ("FEA system"), which linked "the telecommunications markets of Western Europe and Japan through the Middle East, India, Southeast Asia and China along a route . . . adjoin[ing] countries with approximately 70% of the world's population"; [6] (*see* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 2, 46)); and (2) terrestrial connections linking a host of major European metropolitan areas. (*See id.* at 37.) Customers could purchase broadband telecommunications capacity on Flag's network pursuant to Right of Use contracts ("ROUs") or Indefeasible Right of Use agreements ("IRUs"). (*See id.* at 43.) Since capacity on Flag's network was "portable," customers that acquired capacity

on one segment of Flag's network could later obtain capacity on a different segment in response to their changing needs. (*See id.*)

> [6]   The FEA system consisted of approximately 28,000 kilometers of undersea digital fiberoptic cable that comes ashore at sixteen operational landings in thirteen countries. (*See* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 37).) "It ha[d] an aggregate capacity of [ten] gigabits per second transmitting on two fiber pairs[,]" and was upgradeable to **[*9]** between twenty and forty gigabits per second depending on the location of the segment. (*See id.*) Around the time of the IPO, it served sixty-two customers. (*See id.*) Flag claimed that it was the world's longest independent, privately-owned digital fiberoptic undersea cable system. (*See id.;* 3CAC P 4.)

In the Prospectus, Flag indicated that it was in the process of expanding its network through the construction of the Flag-Atlantic 1 cable system (the "FA-1 system"). (*See* 3CAC PP 4, 80.) The FA-1 system was a joint venture between Flag and GTS Transatlantic Holdings Ltd. ("GTS") to build two digital fiberoptic cables connecting Paris and London to New York. (*See id.;* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 37).) The two cables would create a "self-healing ring"; if one cable failed, Flag could re-route the traffic on that cable onto the other cable in order to avoid service interruptions. (*See* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 37).) According to the Prospectus, the FA-1 system intended to have a capacity more than fifteen times the maximum capacity of the most advanced cable in service on the Atlantic route at that time. (*See id.*) The **[*10]** estimated cost of its construction was $ 1.1 billion. (*See id.* at 38.)

The Prospectus also stated that Flag intended to further expand Flag's network by constructing or acquiring digital fiberoptic cables in other areas of the world or by purchasing capacity from competitors where "rapid access to a market [was] required or where it [was] not economically feasible to" construct or acquire new systems. (*See id.* at 2, 38.) In addition, it indicated that Flag was "in the preliminary stages of evaluating and developing a plan for a new trans-Pacific cable project that would link the telecommunications markets of the United States and Japan." [7]  (*See id.* at 38.) The

Prospectus stated that Flag's ultimate goal was "to establish FLAG Telecom as the leading global carriers' carrier by offering a wide range of cost-effective, capacity use options and wholesale products and services across [its] own global network." *(See id.* at 40.)

> 7   The Prospectus warned, however, that Flag had not yet reached a final decision to pursue the construction of a trans-Pacific cable system. *(See* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 38).)

Plaintiffs claim, however, that defendants, at the time **[*11]** of the IPO, had "data in hand that demonstrated that, contrary to the rosy statements in the IPO Registration Statement and Prospectus, demand for FLAG's capacity was anything but strong." *(See* 3CAC P 3.) Plaintiffs allege that defendants "touted the supposed demand for FLAG's fiber optic cable while there in fact existed in the broadband market an over-supply of fiber optic capacity." *(See id.)*

In *Flag II,* we held that, although defendants' representations in the Prospectus regarding the projected growth of the demand for telecommunications and broadband capacity did not give rise to any claims under the federal securities law, *see 352 F. Supp. 2d at 450-51,* plaintiffs alleged sufficient facts to demonstrate that the Prospectus contained a material misstatement concerning capacity pre-sales on the FA-1 system in violation of the '33 Act. *See id. at 451.* Specifically, plaintiffs allege that Flag and Alcatel Submarine Networks ("Alcatel") entered into an improper agreement for the purchase of capacity on the FA-1 system (the "Alcatel Sales Agreement"), which was part of a "fraudulent scheme" to inflate FA-1 system pre-sales to create the illusion that demand existed for capacity on the **[*12]** FA-1 system and to secure a line of credit necessary for its construction. *(See id.* PP 91-92, 95, 98.) Plaintiffs claim that, on January 12, 1999, Flag entered into an agreement with Alcatel to construct the FA-1 cable system in exchange for $ 646 million, but on September 20, 1999, Flag and Alcatel inexplicably revised the agreement to increase the contract price by $ 100 million to $ 746 million. *(See id.* P 92.) Then, on October 8, 1999, Flag entered into an agreement with Alcatel wherein Alcatel agreed to purchase 6.2 gigabits of capacity on the FA-1 system for $ 50 million. *(See id.* PP 93-94.) This transaction was disclosed in the Amended Registration Statement issued on February 9, 2000. *(See id.* P 91; Gray Decl. Opp. Class Cert., Ex. D

(Amended Registration Statement at Cover Page, 50).)

On the same date that Flag entered into this capacity sales agreement with Alcatel, Flag executed a new credit agreement with Barclays Bank, plc ("Barclays") wherein Flag was required to commit $ 100 million in pre-sale capacity on the FA-1 system in order to secure its desired credit facility. *(See* 3CAC P 95.) Plaintiffs allege that, because Flag was aware that it was unable to secure the $ 100 **[*13]** million level in pre-sale capacity commitments from creditworthy customers, it asked Alcatel to pledge a commitment to purchase $ 50 million worth of capacity, for which Alcatel had no use, in consideration for an increase of $ 100 million in the contract price of their original construction agreement. *(See id.* P 98.) They contend therefore that Alcatel's agreement to purchase pre-sale capacity on the FA-1 system was not a legitimate customer purchase commitment. *(See id.)* Plaintiffs emphasize that: (1) Alcatel is a construction company, not a telecommunications service provider, and would have no use for such a large capacity *(see id.* P 94); (2) the revised construction contract effected only a change in price *(see id.* PP 92-94); (3) the capacity sales agreement with Alcatel allowed Flag to reduce the amount of capacity it was required to provide to Alcatel if Flag could find other customers that wished to purchase the capacity, an arrangement that Alcatel would not have approved if it actually intended to use the capacity *(see id.* P 97); and (4) the Alcatel Sales Agreement was executed in close temporal proximity to the credit agreement with Barclays that required Flag to secure **[*14]** pre-sales on its FA-1 system. *(See id.* P 95.)

Recently, however, the individual defendants submitted evidence that Flag had released Alcatel from its purchase commitment well before the effective date of Flag's Registration Statement, tending to show that Flag's statements in the Amended Registration Statement concerning the amount of pre-sales for capacity on the FA-1 system were not based on the transaction with Alcatel. Specifically, they have produced evidence showing that Alcatel's initial commitment to purchase $ 50 million of capacity on the FA-1 system was reduced to zero as of January 11, 2000 - prior to the effective date of the Registration Statement on February 11, 2000. Plaintiffs contend, however, that the fact that Alcatel's commitment was reduced to zero prior to the effective date of the Registration Statement does not foreclose the possibility that Flag wrongfully induced Barclays to enter into the credit agreement that was referenced in the

Amended Registration Statement, which was central to Flag's ability to convince potential investors of the Company's financial viability. In any event, plaintiffs have requested leave to amend their Complaint to include specific **[*15]** allegations that Flag entered into other sham pre-sale contracts not involving Alcatel that contributed to the total amount of pre-sales disclosed in the Amended Registration Statement, and it should be entitled to discovery regarding whether or not each contract constituted a true pre-sale. [8]

> 8  Defendants revealed this evidence in a letter to the Court and opposing counsel, dated April 27, 2007, requesting permission to file a motion for partial summary judgment on behalf of the individual defendants as to plaintiffs' claims under *§§ 11, 12(a)(2)* and *15* of the '33 Act. Defendants argued that, because plaintiffs' allegation that the Registration Statement was misleading is solely based on Flag's statement that it had secured in excess of $ 750 million in pre-sales for capacity on its FA-1 system, which included the amount of the allegedly phony, pre-sale contract with Alcatel, they were entitled to partial summary judgment because the evidence unequivocally shows that Flag had released Alcatel from its pre-sale obligation prior to the effective date of the Registration Statement, and therefore Flag's statements concerning the value of the pre-sales in the Registration Statement were **[*16]** not based on the transaction with Alcatel. At the pre-motion conference, we granted them permission to file the motion and indicated that we will first address plaintiffs' request for leave to amend the Complaint submitted by letter brief, as our decision with respect thereto will substantially affect defendants' arguments on their motion for partial summary judgment. Specifically, if Flag allegedly entered into other sham pre-sale contracts and relied upon them in computing the $ 750 million figure in the Amended Registration Statement in order to mislead investors as to the company's financial viability, plaintiffs' claims under *§§ 11, 12(a)(2)* and *15* of the '33 Act may remain viable.

## II. The IPO

At the IPO, Flag offered 20,592,000 common shares in the United States and Canada and 11,088,000 shares outside the United States and Canada (excluding shares sold pursuant to an over-allotment provision). *(See* Gray Decl. Opp. Class Cert., Ex. C (Prospectus at Cover Page, 3).) The IPO was a success. *(See* 3CAC P 90.) The offering commenced on February 11, 2000 and closed on February 16, 2000 during which the company sold 27,963,980 common shares at a price of $ 24.00 per share and shareholders **[*17]** sold 8,436,320 common shares at the same price for total net proceeds to the company of approximately $ 634.6 million. *(See* Gray Decl. Opp. Class Cert., Ex. F at 21.) In addition, on February 16, 2000, Flag registered 6,763,791 shares on SEC Form S-8 in connection with its Long Term-Incentive Plan ("LTIP") pursuant to which certain Flag employees were granted options to acquire Flag common shares and were able to sell the acquired stock as of August 9, 2000. *(See id.,* Ex. E.) Shares also entered the market through sales by inside shareholders who owned all of the Flag common stock prior to the IPO, including companies such as Bell Atlantic Corporation, Telecom Asia Corporation Public Co. Ltd. and Marubeni Corporation. *(See id.,* Ex. C (Prospectus at 63); *compare id.* Exs. F at 40 *with* G at 9.)

## III. Post-IPO

After the IPO, Flag's common stock was listed and actively traded on the NASDAQ National Market under the symbol FTHLQ. *(See* 3CAC P 68.) Plaintiffs allege that Flag continued to mislead investors by issuing materially false and misleading financial statements in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules, as well as providing materially false and misleading **[*18]** information in various press releases. [9] *(See id.* PP 76-77, 79, 99-135.) According to plaintiffs, "[r]ather than acknowledge the market conditions that were impacting FLAG's financial performance and prospects, [] defendants issued press releases and SEC periodic filings that falsely portrayed demand for FLAG's products and services as being strong and robust." *(See id.* P 8.) Specifically, plaintiffs allege that Flag "artificially and fraudulently inflated its financial results through the use of reciprocal transactions with its competitors for the purchase and sale of fiber optic cable on various of FLAG's cable routes." *(See id.* P 9 (emphasis removed).) They allege that Flag "and its competitors began entering into transactions whereby two companies would 'sell' each other cable that neither needed, so that both could book supposed revenues." [10] *(See id.)* These swap transactions allegedly had no

business purpose and were designed to conceal the true financial condition of the participating companies. [11] *(See id.)* In addition, according to the Complaint, Flag's "public statements [regarding] these swap[] [transactions] were utterly misleading and omissive, designed to make it impossible **[\*19]** for an investor to understand that, in fact, there was no 'sale' and no 'revenue' on any of these deals." *(See id.* P 138.) For example, it would issue statements regarding each side of the transaction on different days and describe each as a separate transaction. *(See id.* PP 138-39.)

> 9    In *Flag II,* we held that plaintiffs did not sufficiently allege that any statements made prior to April 1, 2001 were materially false or misleading. *See* 352 F. Supp. 2d at 466. We did hold, however, that plaintiffs' allegations were sufficient regarding the falsity of statements in Bande's press releases on April 24, 2001 and November 6, 2001, as well as those in Flag's SEC form 10-Q filing for the second quarter of 2001. *See id.*
> 10    For example, plaintiffs allege that, on June 23, 2000, Flag and Qwest entered into an ROU agreement wherein Qwest agreed to acquire capacity on the FEA system for a purchase price of $ 16.8 million. Shortly thereafter, on June 28, 2000, Flag purchased $ 16.8 million of capacity on Qwest's network linking the United States and Japan ("KPNQwest Swap # 1"). *(See* C3AC P 137). Similarly, plaintiffs allege that, on June 27, 2001, Qwest agreed to purchase from Flag $ 20 million worth **[\*20]** of capacity on Flag's North Asian Loop system (the "FNAL system") for a term of twenty-one years payable upon execution. On that same date, Flag agreed to purchase from Qwest $ 20 million worth of capacity on a Qwest cable connecting the Pacific Northwest to Tokyo, Japan ("KPNQwest Swap # 5"). *(See id.)*
> 11    As alleged by plaintiffs, the swap transactions had only a positive effect on Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA") because Flag recorded the expenditures related to the swap as capital expenditures, rather than as expenses, and thus resulting depreciation expense, if any, was recognized in future periods, while the company recorded the receipt of capacity as revenue for the period in which the transaction took place. *(See* 3CAC P 12.) Plaintiffs also allege that Flag, in

contravention of GAAP, used inflated fair market values rather than book values *(i.e.,* the recorded amount) to account for its swap transactions. *(See id.* PP 15, 17.) Furthermore, they allege that Flag failed to disclose key elements of the swap deals in its financial statements as required by GAAP, including that the deals were in fact non-monetary and non-recurring. *(See id.* PP 26, 184.) **[\*21]** According to plaintiffs, Flag combined stated revenues from the swap deals with recurring revenues to overstate revenue growth percentages. *(See id.* PP 22, 25, 184.)

Plaintiffs also allege that Flag violated GAAP and SEC rules by accounting for revenue received from the sale of capacity pursuant to multi-year leases that were payable over the term of the lease by accounting for the full contract price at the inception of the lease in one lump sum. *(See id.* PP 19-20, 156-65.) Furthermore, according to the Complaint, Flag failed to recognize millions of dollars in impairment of the value of its FA-1 system throughout the Class Period, despite the fact that Flag was well aware of the decreasing demand for capacity in the market, in violation of GAAP and its own accounting policies. *(See id.* PP 34-35, 41-45, 194, 197.) In fact, in March of 2002, Flag disclosed in its SEC Form 10-K for the year ended December 31, 2001 that, given the "continued lack of demand," the asset value of the FA-1 system was impaired by $ 359 million. *(See id.* PP 35, 205 (emphasis removed).)

## IV. Flag Announces That It Is Reviewing Its Business

On February 13, 2002, Flag announced that "[a]pproximately 14% of GAAP revenues **[\*22]** for the full year 2001 was associated with reciprocal transactions entered into with other telecommunications companies and service providers[,]" and that it anticipated discontinuing operations in 2003. *(See id.* PP 28, 187.) Following this announcement, the market price of Flag shares declined by 46% in one day with a trading volume of 6,160,800 shares, compared to a daily average of 582,674 shares. *(See id.* P 190.) In Flag's 10-K for fiscal year 2001, filed with the SEC on April 1, 2002, the company disclosed that it would not be able to "make the required interest payments, due March 30, 2002, on . . . [certain] outstanding senior notes" and, in addition, that:

> [g]iven the high degree of competition in

terms of alternative supply, price erosion and continued lack of demand on the trans-Atlantic route . . . we now believe that the asset value of our FA-1 system is impaired. We determined that the carrying value of the FA-1 system exceeded its fair value and we have therefore recognized an impairment charge of $ 359.0 million in the year ended December 31, 2001.

*(See id.* P 192 (emphasis removed).)*

Flag filed its Chapter 11 bankruptcy petition on April 12, 2002. *(See id.* P 207.) During **[*23]** the bankruptcy proceedings, Flag prepared a "Pro-forma Reorganized Balance Sheet as of September 30, 2002." *(See id.* P 199.) According to plaintiffs, the balance sheet indicated that the estimated value of Flag's property and equipment was $ 385 million. Flag had reported in its financial results for the third quarter of 2001 that its property and equipment were worth $ 2.3 billion - a write down of its estimated property and equipment by $ 1.9 billion, of which plaintiffs allege that the company was well aware during the Class Period. *(See id.* PP 36, 199.) After these disclosures and Flag's bankruptcy, this purported class action ensued. Plaintiffs now move pursuant to *FED. R. CIV. P. 23* to certify the proposed class, and Coughlin simultaneously moves pursuant to *FED. R. CIV. P. 24* to intervene in the action to serve as a class representative along with Loftin and Hunter.

## DISCUSSION

### I. Class Action Requirements Pursuant to *FED. R. CIV. P. 23*

The legal prerequisites for a class action under *FED. R. CIV. P. 23* are well-established. First, a plaintiff must establish that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common **[*24]** to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *FED. R. CIV. P. 23(a).* If these requirements are met, a plaintiff must then show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *FED. R. CIV. P. 23(b)(3).* We have

the benefit of deciding plaintiffs' motion after the Second Circuit's recent clarification "of a district court's role in assessing a motion for class certification." *See In re Initial Public Offering Sec. Litig., 471 F.3d 24, 39-40 (2d Cir. 2006).* The Second Circuit held:

(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement **[*25]** have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Id. at 41.* Having set forth the appropriate analytical framework, as there seemed to be some dispute among the parties, we can now turn to each specific requirement of *Rule 23.*

### A. *Rule 23(a)(1)*: Numerosity

*Rule 23(a)(1)* requires that "the class is so numerous that joinder of all members is impracticable . . . ." "'Impracticability means difficulty or inconvenience of joinder [not] . . . impossibility of joinder,' *In re Blech Sec. Litig., 187 F.R.D. 97, 103 (S.D.N.Y. 1999)* **[*26]** (citation omitted), and the Second Circuit has observed that 'numerosity is presumed at a level of 40 members.' *Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473,*

Case 1:07-cv-05574-LLS     Document 32-2     Filed 09/19/2007     Page 9 of 26

Page 8
2007 U.S. Dist. LEXIS 67173, *26

*483 (2d Cir. 1995), cert. denied, 515 U.S. 1122, 115 S. Ct. 2277, 132 L. Ed. 2d 281 (1995)* (citing 1 NEWBERG ON CLASS ACTIONS § 3.05 (2d ed.1985)) . . . ." *In re Vivendi Universal, S.A., 242 F.R.D. 76, 83 (S.D.N.Y. 2007)*. Precise quantification of class members is not necessary, and "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Id. at 83-84* (collecting cases) (internal quotation marks omitted; citations omitted). Indeed, "[c]lass certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market." *In re Deutsche Telekom AG Sec. Litig., 229 F. Supp. 2d 277, 280-81 (S.D.N.Y. 2002)* (citing *In re Painewebber Ltd. P'ships Litig., 171 F.R.D. 104, 123 (S.D.N.Y. 1997)).*

In the present case, Flag common stock was traded on NASDAQ and had daily average trading volumes **[\*27]** of more than half a million shares and a final trading volume of 6,160,800 shares on the final day of the Class Period. More than twenty million shares of Flag common stock were sold in the United States during the Class Period. Thus, there may be thousands of putative class members dispersed throughout the nation. *See In re Interpublic Secs. Litig., No. 02 Civ. 6527, 2003 U.S. Dist. LEXIS 19784, 2003 WL 22509414, at \*2 (S.D.N.Y. Nov. 6, 2003)* ("The number of persons who purchased or otherwise acquired IPG stock during the proposed class period is estimated to be in the 'thousands.' The putative class consists of a sufficient number of persons to make joinder impracticable."). Accordingly, plaintiffs have established, and defendants do not dispute, that joinder is impracticable and that the proposed class satisfies the numerosity requirement.

### B. *Rule 23(a)(2)*: Commonality

*Rule 23(a)(2)* requires that there be "questions of law or fact common to the class . . . ." While "[p]laintiffs' grievances [must] share a common question of law or of fact[,]" *Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)* (per curiam), "[n]ot every 'issue[ ]' must be identical as to each [class] member . . . ." *In re Vivendi, 242 F.R.D. at 84* **[\*28]** (alterations added; alterations in original); *see also In re: Deutsche Telekom AG, 229 F. Supp. 2d at 281* ("Commonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class

members.") (internal quotation marks omitted; citation omitted). Plaintiffs must only "'identify some unifying thread among the members' claims that warrants class treatment.'" *In re Vivendi, 242 F.R.D. at 84* (quoting *Cutler v. Perales, 128 F.R.D. 39, 44 (S.D.N.Y. 1989)*; *see also In re Nortel Networks Corp. Sec. Litig., No. 01 Civ. 1855, 2003 U.S. Dist. LEXIS 15702, 2003 WL 22077464, at \*3 (S.D.N.Y. Sept. 8, 2003)* ("The commonality requirement of *Rule 23(a)(2)* has been applied permissively by courts in the context of securities fraud litigation.") (internal quotation marks omitted; citations omitted).

Here, the following questions of fact and law are common to all members of the proposed class: (1) whether defendants violated the federal securities law by the acts and conduct alleged in the Complaint; (2) whether Flag issued false and misleading statements in the IPO Prospectus and elsewhere during the Class Period; (3) whether the individual defendants caused Flag **[\*29]** to issue false and misleading statements in the Prospectus and elsewhere during the Class Period; (4) whether defendants acted with the requisite scienter in connection with their alleged violations of the securities law; and (5) whether the market price of Flag securities was artificially inflated or distorted during the Class Period as a result of defendants' conduct as alleged in the Complaint. These similarities are sufficient to satisfy Rule 23's commonality requirement. *See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 290-91 (2d Cir. 1992).* Defendants do not contend otherwise, and courts have consistently found substantially similar allegations to be sufficient. *See id.; see also In re Vivendi, 242 F.R.D. at 84*

> (Here, plaintiffs allege the following questions of fact or law are common to all members of the proposed class: (1) whether defendants violated the securities laws by the acts and conduct alleged in the FACC; (2) whether defendants issued false and misleading statements during the class period; (3) whether defendants acted with scienter in issuing materially false and misleading statements; (4) whether the market prices of Vivendi ordinary shares and ADSs during **[\*30]** the class period were artificially inflated because of defendants' misconduct, and (5) whether the members of the class sustained

damages, and, if so, what is the appropriate measure of damages. (FACC P 45.) *Cf. In re Interpublic*, [] *2003 U.S. Dist. LEXIS 19784, 2003 WL 22509414, at *3* [] (finding commonality requirement satisfied where plaintiffs raised common issues as to whether defendants' public filings and statements contained material misstatements, whether the defendants acted with scienter in misrepresenting material facts in the company's public filings and press releases, and whether the damages to the investors were caused by the defendants' misstatements); *In re Ashanti Goldfields Sec. Litig., No. CV 00-0717(DGT), 2004 U.S. Dist. LEXIS 5165, 2004 WL 626810, at *12 (E.D.N.Y. Mar. 30, 2004)* (finding commonality on similar allegations). Defendants do not dispute commonality. Plaintiffs have adequately demonstrated that these claims are common to the members of the proposed class, and the Court finds the commonality requirement is satisfied.);

*see also In re Nortel Networks, 2003 U.S. Dist. LEXIS 15702, 2003 WL 22077464, at *3*; *In re Deutsche Telekom AG, 229 F. Supp. 2d at 281.*

**C.** *Rule 23(a)(3)*: **Typicality**

*Rule 23(a)(3)* requires that "the claims or defenses of [*31] the representative parties are typical of the claims or defenses of the class" This requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham, 960 F.2d at 291.* "While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *In re Vivendi, 242 F.R.D. at 84-85* (internal quotation marks omitted; citation omitted). It is oft-said that "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993)*; *see also In re Vivendi,*

*242 F.R.D. at 85*; *In re NASDAQ Market-Makers Antitrust Litig., 172 F.R.D. 119, 126-27 (S.D.N.Y. 1997)*. Our analysis should focus on whether the class representatives "have the incentive to prove all the elements **[*32]** of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re NASDAQ Market-Makers, 172 F.R.D. at 126* (internal quotation marks omitted; citation omitted).

In the present case, the typicality requirement is met because plaintiffs and Coughlin, like the putative class members, will attempt to prove that they purchased Flag common stock during the Class Period and were injured by defendants' false and misleading representations made in the Registration Statement and throughout the Class Period in violation of the securities laws. In prosecuting their case, they, along with the putative class members, "will necessarily seek to develop facts relating to the alleged accounting irregularities and the dissemination of allegedly false or misleading statements underlying their claims." *In re Vivendi, 242 F.R.D. at 85.* Additionally, they will all seek to prove that defendants acted with the intent to deceive. *See id. at 90.* "Such allegations are generally considered sufficient to satisfy the typicality requirement." *Id. at 85*; *see also In re Interpublic, 2003 U.S. Dist. LEXIS 19784, 2003 WL 22509414, at *3* (finding typicality when plaintiffs alleged **[*33]** "that the defendants distributed materially false and misleading information that artificially inflated the price of [the company's] common stock throughout the class period[]" and "[b]oth of the classes and its representatives [would] necessarily seek to develop facts sufficient to prove [the company's] underlying accounting fraud and subsequent dissemination of material misrepresentations regarding the company's projected Restatement, and to show why the misrepresentations were made."); *In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 280-81 (S.D.N.Y. 2003)* (substantially the same); *In re Crazy Eddie Sec. Litig., 135 F.R.D. 39, 39-41 (E.D.N.Y. 1991)* (substantially the same).

Defendants argue, however, that the typicality requirement is not satisfied because a "fundamental conflict" exists between plaintiffs' two sets of claims, namely, that: (1) the Registration Statement and the accompanying Prospectus, in violation of the '33 Act, contained materially false and misleading information regarding pre-sales of capacity on the FA-1 system misleading investors as to the company's economic

viability; and (2) the individual defendants throughout the class period, in violation of the '34 [*34] Act, made materially false and misleading statements regarding the company's financial condition by, *inter alia,* accounting for swap transactions in violation of GAAP and SEC rules in order to artificially inflate the Company's revenue. As defendants point out, those asserting claims under the '33 Act may have to overcome the affirmative defense of "negative causation" - that the decline in Flag's stock price was due to something other than the alleged misstatements concerning the pre-sales listed in Flag's Registration Statement and Prospectus. Those asserting claims under the '34 Act must show "loss causation" - that the decline in Flag's stock price was due to, *inter alia,* the failure to appropriately disclose the reciprocal transactions that took place after the IPO. [12] Therefore, defendants contend, "[i]f plaintiffs asserting '34 Act claims prove that their injury was caused by the alleged nondisclosures and misstatements relating to the reciprocal transactions, which is an affirmative element of their claims, they will necessarily establish that the decline in Flag's stock price was *not* caused by the alleged misstatements relating to pre-sales." *(See* Defs. Mem. Opp. Class Cert. [*35] at 1-2.) We disagree.

> 12   *See, e.g., In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288, 2005 U.S. Dist. LEXIS 2216, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("the negative causation defense in *Section 11* and the loss causation element in *Section 10(b)* are mirror images; in the former, the burden of proving negative causation is on the defendant, and in the latter, the burden of proving the existence of loss causation is on-the plaintiff.").

Defendants' argument overlooks that the decline in value of Flag stock may have been caused by *both* the alleged fraud relating to the reciprocal transactions *and* the alleged misstatements relating to pre-sales found in the Registration Statement. Under the doctrine of proximate causation, the harm may have been caused by either or both of these alleged acts of deception. *See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)* ("a plaintiff [asserting claims under the securities law must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.") (alteration added); *Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007)* (same); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group,*

*Inc., 343 F.3d 189, 197 (2d Cir. 2003)* [*36] ("We have often compared loss causation to the tort law concept of proximate cause, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.'") (quoting *Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001))* (citing *Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992)* (comparing loss causation to proximate cause)); *In re Initial Public Offering Sec. Litig., 297 F. Supp. 2d 668, 675 (S.D.N.Y. 2003)* ("It is important not to lose sight of why loss causation is a requirement of a securities fraud claim. At base, loss causation is nothing more than a securities fraud analog to the tort concept of proximate causation, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any' scheme to defraud.") (quoting *Castellano, 257 F.3d at 186).*

Therefore, the two sets of claims are not antagonistic to each other because proof of one does not negate an essential element of the other. Moreover, in the present case, proposed class members may well have claims under both the '33 Act and '34 Act. [13] *See, e.g., In re Deutsche Telekom AG, 229 F. Supp. 2d at 283-84* (rejecting the [*37] identical argument and explaining that courts "have routinely certified a single class asserting both Securities Act and Exchange Act claims.").

> 13   Defendants argue in their Sur-Reply that the number of plaintiffs with claims under both the '33 Act and '34 Act is likely small because, as explained *infra* pp. 44-46, the class period for the '33 Act claims is from February 11, 2000 to May 10, 2000, while the class period for the '34 Act claims is from March 6, 2000 to February 13, 2002 - an overlap of only a little more than two months. *(See* Defs. Sur-Reply Mem. Opp. Class Cert. at 3.) We do not see the relevance of this temporal overlap, as a plaintiff could assert a claim under the '33 Act with respect to his purchase of shares in February 2000, for example, as well as a claim under the '34 Act with respect to-his purchase of additional shares in, for example, December 2000.

We recognize, however, that if plaintiffs ultimately show that the decline in stock value was caused by both the misstatements in the Registration Statement and those made throughout the Class Period, a jury will have to determine the extent of harm caused by each, and it is

here that the interests of class members **[*38]** could diverge. But it is well-established that "[t]he fact that the interests of some members of [the class] may ultimately diverge when it comes time to allocate damages does not warrant the denial of class certification where, as here, there is no current conflict that goes to the heart of the lawsuit." *In re Avon Sec. Litig., No. 91 CIV. 2287, 1998 U.S. Dist. LEXIS 18642, 1998 WL 834366, at *11 (S.D.N.Y. Nov. 30, 1998)* (internal quotation marks omitted; citation omitted). Accordingly, defendants' argument is unavailing, [14] and, for the reasons stated above, plaintiffs have satisfied the typicality requirement of *Rule 26(a)*.

> 14    Defendants assert the same argument in support of their contention that the representative parties cannot fairly and adequately protect the interests of the class, as required by *Rule 26(a)(4)*. For the same reasons, we are unpersuaded.

### D. *Rule 23(a)(4)*: Adequacy of Representation

*Rule 23(a)(4)* requires that "the representative parties . . . fairly and adequately protect the interests of the class." "[A]dequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, **[*39]** experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)* (citing *In re Drexel Burnham, 960 F.2d at 291*); *see also In re Vivendi, 242 F.R.D. at 85*. Relevant to the first inquiry is whether the class representatives "possess the same interest and [have] suffer[ed] the same injury as the class members." *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*; *see also In re WorldCom, 219 F.R.D. at 282*. "As many courts have observed, the issues of typicality and adequacy tend to merge because they 'serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" *In re Vivendi, 242 F.R.D. at 85* (quoting *Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*); *see also In re NASDAQ Market-Makers, 172 F.R.D. at 127* ("The commonality and typicality requirements blend together in determining whether the representative [p]laintiffs' claims are sufficiently typical of the classwide claims that the representatives will adequately

represent the class.").

In the **[*40]** present case, the record clearly shows that the interests of plaintiffs and the putative class members are aligned. Specifically, they all allegedly purchased Flag common stock in reliance upon certain materially false and misleading information provided by defendants pursuant to a single scheme of deception and were injured thereby. *See In re Drexel Burnham, 960 F.2d at 291*; *In re WorldCom, 219 F.R.D. at 282*; *In re Interpublic, 2003 U.S. Dist. LEXIS 19784, 2003 WL 22509414, at *4*; *In re Deutsche Telekom AG, 229 F. Supp. 2d at 282*. As explained *supra* pp. 19-21, the fact that some putative class members relied upon materially false statements in the Registration Statement and others relied on materially false or misleading statements in Flag's financial statements, does not make the interest of any proposed class representative antagonistic to that of any member of the putative class.

Indeed, defendants do not directly contest the adequacy of the proposed class representatives under either of the two criteria identified by the Second Circuit. Instead, they contend that, in light of the indictment of Milberg Weiss, the class representatives "will potentially face difficult decisions about how to manage the case in **[*41]** the event that [the firm] is convicted or the firm collapses before its criminal trial begins[, and] . . . [they] have shown no interest, willingness, or ability to take an active role in or control the litigation for the benefit of the class." *(See* Defs. Mem. Opp. Class Cert. at 2.) Defendants' argument is, to say the least, unpersuasive.

"'[I]t is well established that "in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected."'" *In re Vivendi, 242 F.R.D. at 88* (quoting *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 181 (S.D.N.Y. 2005)* (citation omitted)); *see also County of Suffolk v. Long Island Lighting Co., 710 F. Supp. 1407, 1416 (E.D.N.Y. 1989)* (quoting *In re AM Int'l, Inc. Sec. Litig., 108 F.R.D. 190, 197 (S.D.N.Y. 1985)* (citing cases)). "The Supreme Court has indicated that, in the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance or credibility are rarely appropriate." *Long Island Lighting, 710 F. Supp. at 1416* (citing **[*42]** *Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-74, 86 S. Ct. 845, 15 L.*

*Ed. 2d 807* (1966)). It is sufficient if the class representatives are "aware of the basic facts underlying the lawsuit and . . . not . . . likely to abdicate his obligations to fellow class members." *In re Crazy Eddie, 135 F.R.D. at 41* (internal quotation marks omitted; citation omitted). "[A] class representative will be found inadequate due to ignorance only when they 'have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *In re WorldCom, 219 F.R.D. at 286* (quoting *Baffa, 222 F.3d at 61*).

Defendants emphasize that the representatives have failed to engage in more than a perfunctory review of the documents involved in the case, lack detailed knowledge of the claims asserted in the Complaint, have not communicated with each other and have given no thought to the indictment of Milberg Weiss. The record, however, shows otherwise. The proposed representatives are sufficiently familiar and involved with the litigation. Specifically, they have all received and reviewed the pleadings, consulted with Milberg **[*43]** Weiss on various issues relevant to the lawsuit, produced documents and participated in depositions. *(See* Friedman Reply Aff., Ex. 28 (Loftin Dep. at 131, 165), Ex. 29 (Hunter Dep. at 49-50, 88-100), Ex. 30 (Coughlin Dep. at 94-95, 97, 107-09).) Loftin, for example, is intimately familiar with the claims and was uniquely involved in the drafting of the Complaint, particularly with respect to the decision to initially name Verizon as a defendant. *(See id.,* Ex. 28 (Loftin Dep. at 165-66, 201, 205).) Hunter testified that he receives copies of various documents, including motions, "every two to three" months, which he reviews and discusses with attorneys from Milberg Weiss. *(See id.,* Ex. 29 (Hunter Dep. at 88-89).) And Coughlin, during his deposition, cogently explained the underlying basis for the litigation. *(See id.,* Ex. 30 (Coughlin Dep. at 79-81).) Moreover, it appears that they have an understanding of their role as representatives of the proposed class and have expressed an intention to and eagerness to consult with counsel in the future. [15] *(See id.,* Ex. 28 (Loftin at 200), [16] Ex. 29 (Hunter Dep. at 86-87), Ex. 30 (Coughlin Dep. at 93-94, 109-10).) Furthermore, all the representatives **[*44]** are aware that Milberg Weiss has been indicted and do not believe that retaining new counsel is warranted at this time. For example, Loftin testified that he learned of the indictment by reading an article in *Forbes* magazine and that he believed new counsel was not necessary in part because

the allegations of criminal wrongdoing seemed to focus on Milberg Weiss's practice in California and not New York. [17] *(See id.,* Ex. 28 (Loftin Dep. at 154-56).) Accordingly, we believe that the proposed class representatives are sufficiently knowledgeable and involved to adequately represent the putative class. *See Baffa, 222 F.3d at 61-62; In re Vivendi, 242 F.R.D. at 88; In re WorldCom, 219 F.R.D. at 287; In re Nortel Networks, 2003 U.S. Dist. LEXIS 15702, 2003 WL 22077464, at *5.*

15    The fact that the proposed representatives have not spoken with each other has little, if any, bearing on our analysis. *See In re Avon, 1998 U.S. Dist. LEXIS 18642, 1998 WL 834366, at *9-11.*
16    *(See id.* ("Well, I have got responsibilities to make sure that all the documents are provided that need to be provided; that I have given my deposition; that I am involved in any assistance that's needed by counsel and concerning questions, et cetera, things that I [] know about the case. **[*45]** *It is my job to keep up with the case and to make sure I understand where we are with the case and if there are settlement discussions, to be involved in those settlement discussions.")* (emphasis added).)
17    *(See also* Friedman Reply Affd., Ex. 28 (Loftin Dep. at 154-56) ("Q. Did you consider any Milberg Weiss' ethics to be important in your selection of the firm? A. Absolutely. Q. Do you have any reason to believe that that - do you have any reason why your view in that regard may have changed? A. No. Q. Are you aware that Milberg Weiss and Mr. Schulman in particular have been indicted with respect to sharing fees with other individuals serving as plaintiffs in cases brought by Milberg Weiss? . . . A. I understand that there is something going on about that. . . . I thought about it, but it seemed to me that most of the allegations were based in California and not in New York and from what I read, and so it didn't seem to me to matter to me. . . . Q. Would you be concerned if for your interest and the interest of the class you are seeking to represent, if the firm were to be found guilty of the charges it is being accused of?. . . A. Every partner at Arthur Andersen wasn't guilty.").)

Moreover, **[*46]** "plaintiffs' lack of knowledge concerning the details of the litigation is not a ground to

deny a class certification; plaintiffs are entitled to rely upon their counsel to conduct this litigation." *In re Avon, 1998 U.S. Dist. LEXIS 18642, 1998 WL 834366, at *9*; *see also Baffa, 222 F.3d at 62* (recognizing that "[f]ar from showing [the plaintiffs'] ignorance of the litigation or his inability to serve as class representative, [reliance on counsel] demonstrates [the plaintiffs'] ability to appreciate the limits of his knowledge and rely on those with the relevant expertise."). Defendants argue, however, that such reliance is inappropriate in the present litigation because of the much-publicized indictment of Milberg Weiss. Defendants emphasize that: (1) Milberg Weiss may be convicted and subsequently dissolved; (2) it may have conflicts of interest antagonistic to the class as a result of the indictment, *e.g.*, the firm may have its own reasons, irrespective of the class's best interests, for wanting to dispose of the litigation prior to its criminal trial or plea agreement or decision to dissolve the firm; and (3) it is possible that the government will call Loftin or other putative class members to testify in connection [**47**] with its criminal prosecution of Milberg Weiss. These arguments, which are largely speculative, deserve little attention, if any.

We believe that it would be entirely inappropriate to deny class certification (where it is otherwise appropriate) because of the prospect of Milberg Weiss's conviction and subsequent dissolution. To date, Milberg Weiss has competently and vigorously represented plaintiffs and the putative class members, and defendants concede, as they must, that Milberg Weiss is eminently qualified to represent the proposed class and arguably has unrivaled experience in securities class actions. *(See* Defs. Mem. Opp. Class Cert. at 22 n.65.) Milberg Weiss attorneys have done a significant amount of work during the course of this litigation, which dates back to 2002, and none of them are personally implicated in the indictment. They have conducted a significant amount of discovery and engaged in voluminous motion practice, and consequently have a vast institutional knowledge of the case. *See In re Initial Pub. Offering Sec. Litig., No. 21MC92, 2007 U.S. Dist. LEXIS 42635, 2007 WL 1705668, at *4 (S.D.N.Y. June 11, 2007)*. Removing Milberg Weiss as counsel would undoubtedly prejudice the rights of the [**48**] putative class members, who thus far have been capably represented by the firm and we have no reason to doubt will continue to be so. *See id.* As a colleague recently wrote:

This Court takes seriously the

presumption of innocence afforded to defendants until proven guilty. I will not disqualify and remove Milberg Weiss solely on the basis of the allegations in the indictment.

*Id.* In accord with the overwhelming majority of courts faced with this issue, we decline to do so as well. *See id.* at *4 n.22 (collecting cases). *(See also* Pls. Reply Mem. Supp. Class Cert., Ex. A.)

Next, defendants assert various individualized arguments regarding the adequacy and typicality of the proposed class representatives. [18] First, defendants argue that Loftin cannot adequately represent those asserting '33 Act claims because he lacks standing to assert such claims, which plaintiffs do not appear to dispute. *(See* Defs. Mem. Opp. Class Cert. at 29-33.) It is axiomatic, however, that lead or representative plaintiffs in class actions are not required to have standing to bring all claims asserted in the Complaint. *See, e.g., Fishbury, Ltd. v. Connetics Corp., No. 06 Civ. 11496, 2006 U.S. Dist. LEXIS 90696, 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006)* ("It is well settled law in this Circuit that the lead plaintiff in a securities class action need not have standing to sue on all causes of action raised in the underlying class complaint.") (citing *Hevesi v. Citigroup, Inc., 366 F.3d 70, 82 (2d Cir. 2004))*.

> 18    Defendants arguments in this regard are relevant to both Rule 23's typicality and adequacy of representation requirements. As we noted earlier, courts have recognized that the determinations with respect to *Rule 23(a)(3) and (4)* are overlapping. In analyzing defendants' arguments, we will apply the principles relevant to both requirements.

Defendants also contend, however, that Loftin is not typical of those asserting '34 Act claims because he is not entitled to the fraud-on-the-market presumption of reliance and is thus incapable of adequately representing them. "'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Baffa, 222 F.3d at 59* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d*

*176, 180 (2d Cir. 1990)* [\*50] (internal citation omitted)). *(See* Defs. Mem. Opp. Class Cert. at 33-36.) The issue here -- the fraud-on-the-market doctrine - "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." *Hevesi, 366 F.3d at 77* (citing *Basic v. Levinson, 485 U.S. 224, 245-47, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)).* "This presumption, if unrebutted, thus allows plaintiffs to satisfy the element of reliance in securities fraud claims under the 1934 Act." *Id.* If, on the other hand, a plaintiff is not entitled to this presumption, he must prove individual reliance. *See Basic, 485 U.S. at 247.*

Defendants contend that Loftin is not entitled to the fraud-on-the-market presumption because of "his superior knowledge of the industry in which Flag operated . . . ." *(See* Defs. Mem. Opp. Class Cert. at 33.) They emphasize that Loftin was the founder and former CEO of Business Telecom Incorporated ("BTI"), an integrated telecom services provider, and was consequently familiar with the telecom industry and its "upturns and downturns . . . that affected the capital markets" [\*51] during the Class Period. *(See id.* at 34.) Loftin started BTI in 1983 as a domestic long distance retail company that targeted a commercial client base. *(See* Friedman Reply Aff., Ex. 28 (Loftin Dep. at 6, 8).) It later entered the local-phone market and, at some point, provided internet services. *(See id.* at 10-11.) At first, it bought watts lines from AT&T, but later developed its own network by installing fiberoptic cables in residential neighborhoods to provide local and long distance services. *(See id.* at 11-12.) On July 16, 1999, BTI filed a registration statement with the SEC to launch an IPO, but withdrew it on January 5, 2001 because of "unfavorable market conditions in [the] industry, as indicated by the IPO market for comparable companies and by the reductions in the stock prices of comparable public companies over the past few months." *(See* Gray Decl. Opp. Class Cert., Exs. V-W.) Accordingly, defendants argue that, because of Loftin's experience with BTI, he cannot rely on the integrity of the market and is not entitled to the fraud-on-the-market presumption.

Even assuming that Loftin is a more sophisticated investor than other putative class members by virtue of his experience [\*52] with BTI, which we have reason to doubt, [19] it is well-established that an investor's sophistication does not preclude him from relying on the integrity of the market and asserting the fraud-on-the-market presumption. [20] Although we agree with other courts that, when direct reliance is alleged in a complaint, the plaintiffs' investment sophistication is relevant to that issue, *see In re AES Corp. Sec. Litig., 849 F. Supp. 907, 910 (S.D.N.Y. 1994)* (Conner, J.) (collecting cases); *see also Degulis v. LXR Biotechnology, Inc., 176 F.R.D. 123, 126 (S.D.N.Y. 1997)*, "[a] plaintiff's sophistication as an investor generally is irrelevant to whether or not his claims are typical of the class where subjective reliance is *not* an issue in the case." *In re Avon, 1998 U.S. Dist. LEXIS 18642, 1998 WL 834366, at \*8* (emphasis added) (collecting cases). Here, the Complaint alleges only fraud-on-the-market presumptive reliance, not actual reliance.

19  The business of BTI is substantially different than that of Flag. In particular, Flag was an international telecommunications wholesale provider, while BTI is a small, domestic telecommunications retail provider. Moreover, Loftin testified that he had no involvement with BTI's accounting [\*53] practices and that he had no experience with swap transactions. *(See* Friedman Reply Aff., Ex. 28 (Loftin Dep. at 38, 49).).

20  Defendants argue that the "[t]he issue in this regard is not whether Loftin is sophisticated, but how different he is from an 'average' investor." *(See* Defs. Mem. Opp. Class Cert. at 34.) This is clearly a distinction without a difference, and obviously an attempt to avoid the import of our prior Opinion and Order in this matter dated June 21, 2006, in which we held that defendants were not entitled to discovery of Loftin's investment history to rebut the fraud-on-the-market presumption because his investor sophistication was irrelevant to such an argument. We have not changed our position.

The Supreme Court in *Basic* provided examples of how defendants may rebut the presumption of reliance.

For example, if petitioners could show that the "market makers" were privy to the truth about the merger discussions . . . . Similarly, if, despite petitioners' allegedly fraudulent attempt to manipulate market

price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded . . . shares after the corrective [*54] statements would have no direct or indirect connection with the fraud. Petitioners also could rebut the presumption of reliance as to plaintiffs who would have divested themselves of their . . . shares without relying on the integrity of the market.

*Basic,* 485 U.S. at 248-49 (footnotes omitted). In the present case, there is no evidence, for example, that Loftin was aware of any inside information, particularly the sort that would have revealed that Flag's statements were materially false or misleading. *See In re Indep. Energy Holdings PLC Sec. Litig.,* 210 F.R.D. 476, 482 (S.D.N.Y. 2002) (explaining that atypicality has been found only "where there is evidence that the named plaintiff received information, either directly or indirectly, from an officer or director[,]" and not when plaintiff merely has some familiarity with the company or industry involved). The record sufficiently shows that Loftin relied on the integrity of the market, [21] and defendants have produced no evidence to the contrary.

21    (*See Friedman Reply Aff., Ex. 28 (Loftin Dep. at 88 (explaining that, in buying Flag stock, he relied on "the analyst reports and et cetera that were saying great things about Flag and some [*55] company information that had come out and sa[id] various positive things about Flag. So it all had to do with the positive outlook on Flag from the company and from the analysts."), 98 ("The answer is I read what Flag Telecom put out and I believed them to tell the truth."), 102 ("Just read what the chairman of the company says about their outlook, the positive outlook of the company, et cetera, and I took it at [] face value that the company was OK."), 102-03 ("The industry, the telecom industry was taking a turn, but the company itself kept talking about how great it was and what it was going to continue to do. So I just thought it was a market fluctuation. I didn't think that the company was lying to me about what they were going to do and what they had."), 120 ("I'm not a telecom expert . . . .").)

Defendants next contend that Coughlin lacks standing to assert claims under the '33 Act. As explained *infra* pp. 44-46, those who have purchased shares prior to May 11, 2000 are able to trace those shares to the IPO and thus have standing to bring claims under the '33 Act with respect to such shares. Since Coughlin purchased 250 shares of Flag common stock on February 23, 2000, he has standing [*56] to bring claims relating to those shares under the '33 Act. However, with respect to the 100 shares of common stock that he purchased on July 3, 2001, Coughlin has no standing to assert claims under the '33 Act in connection with these shares [22] because they are not traceable to the IPO. [23]

22    It is unclear whether Coughlin intends on alleging claims under the '34 Act with respect to the shares that he purchased on July 3, 2001.

23    Incidentally, defendants argue that, even if Coughlin were to have standing to assert claims under the '33 Act, he would be atypical and incapable of adequately representing the class because he would be required to prove that he relied upon the alleged misrepresentations in the Registration Statement. Defendants reason that, under *§ 11(a)* of the '33 Act, a plaintiff who purchased shares after the issuance of an earnings statement covering a period of at least twelve months after the effective date of the Registration Statement must prove reliance upon the alleged misrepresentation in the Registration Statement to establish liability. Defendants assert that Flag's Form 10-K for the fiscal year ending on December 31, 2000 filed with the SEC on March 30, 2001 [*57] and Form 10-Q for the quarterly period ending on March 31, 2000 filed with the SEC on May 15, 2001 serve, collectively, as an earnings statement for purposes of *§ 11* of the '33 Act, as they cover a period exceeding twelve months beginning after the effective date of the Registration Statement. Thus, defendants contend, any plaintiff who purchased Flag stock on or after May 15, 2001 -- the time of the second filing -- would be required to prove that he relied on the alleged misrepresentations in the Registration Statement in order to prevail on his § 11 claims under the '33 Act. Defendants argue that, because Coughlin purchased 100 shares on July 3, 2001, he would be required to prove individual reliance in order to establish liability under *§ 11* of the '33 Act with respect to those shares. (*See Defs. Mem. Opp. Class Cert. at 37-38.) However, this

argument is now moot, as we have held that Coughlin does not have standing to assert '33 Act claims with respect to the shares he purchased on July 3, 2001. In any event, plaintiffs have alleged that the Forms 10-K and 10-Q, which defendants assert comprise the earnings statement, contained materially misleading information. Such an earnings **[*58]** statement that violates the SEC filing requirements is incapable of shifting to plaintiff the burden to prove reliance under *§ 11* of the '33 Act. *See In re WorldCom, 219 F.R.D. at 294*.

Lastly, defendants argue that "in-and-out" purchasers, including Hunter, should be excluded from the proposed class. "In the context of securities fraud cases, 'in-and-out' traders are those persons or entities who both bought and sold their shares before a company allegedly violating securities laws publicly disclosed the violations." *Roth v. Aon Corp., 238 F.R.D. 603, 607 (N.D. Ill. 2006)* (citing *In re Tyco Int'l, Ltd. Multidistrict Litig., 236 F.R.D. 62, 70 (D.N.H. 2006)*; *In re BearingPoint, Inc. Sec. Litig., 232 F.R.D. 534, 543 (E.D. Va. 2006))*. Specifically, defendants point to those purchasers, including Hunter, who sold their shares of Flag common stock prior to Flag's announcement on February 13, 2002 [24] after which the value of Flag common stock declined by 46%. [25] Defendants reason that these purchasers cannot show that they were damaged by the alleged fraud or, at the very least, are subject to unique causation defenses.

> 24   Hunter purchased his 200 shares of Flag common stock in the IPO and sold **[*59]** them all in November 2001. *See supra* n.2.
> 25   In the February 13, 2002 announcement, Flag announced that fourteen percent of Flag's 2001 GAAP revenues were associated with reciprocal transactions and the company anticipated that it may have insufficient liquidity to continue operations in 2003. *See supra* p. 11.

There is no doubt that the gravamen of plaintiffs' allegations is that defendants engaged in a fraudulent scheme to artificially inflate the value of Flag common stock, and that their conduct was the proximate cause of the decline in stock value, as evidenced by the rapid decline in the value of Flag common stock after the corrective disclosure in the February 13, 2002 announcement. Plaintiffs emphasize, however, that they have alleged and submitted evidence that purchasers of stock who sold their shares prior to the announcement are able to show a causal connection between the alleged fraud and their economic loss because the truth regarding Flag's financial condition began to leak into the market prior to the February 13, 2002 announcement, causing the value of Flag common stock to decline.

Specifically, plaintiffs cite their allegation in the Complaint that reads:

> FLAG thus continued **[*60]** to issue false and misleading statements about its condition and prospects, even though its competitors were beginning to acknowledge the difficulties they were facing. For instance, Level 3 is a company that FLAG listed in its SEC filings as a competitor. On June 19, 2001, as reported on *First Call*, Level 3 "cut its financial forecasts materially, citing weaker-than-expected demand from its targeted customer base and the macro economic environment."

*(See* 3CAC P 172.) In addition, Dr. Scott D. Hakala, plaintiffs' expert, [26] opined:

> With respect to loss causation, there were demonstrable signs of slowing demand and concerns regarding excess long-haul and international optical fiber network capacity beginning in October 2000. These concerns increased significantly between February and June 2001 as a result of the financial distress of Winstar and, subsequently, 360Networks and further evidence of declining demand for long-haul and international optical network capacity. Beginning in February 2001, these "industry events" began to reveal the problems in the optical network industry and raised concerns relating to the relevant truths alleged in the Complaint and sustained by the Court in **[*61]** its rulings on the Motions to Dismiss, including concerns regarding the impairment in the values of optical fiber networks and the inflating of revenues and earnings attributable to capacity swaps and presales of optical fiber network capacity.

*Further revelations of problems, including specific news concerning Flag Telecom, adversely affected the share price of Flag Telecom in August, September and October 2001.* The announcement of Global Crossing's financial problems, including disclosure of accounting problems, was associated specifically with Flag Telecom and led to a large decline in Flag Telecom's share price on January 28 and 29, 2002. Flag Telecom's share price fell further on February 13, 2002, on specific disclosures by the Company . . . . It is clear that Flag Telecom's allegedly false and misleading statements and earnings disclosures were generally inflationary in nature but, ultimately, could not prevent investors from partially realizing the relevant truth through both industry news events and through various admissions by Flag Telecom between February 2001 and April 2002. The event study and loss causation analyses summarized in Exhibit D [the chart] provide a basis **[*62]** for demonstrating that the company-specific and industry-specific corrective events were extremely significant and did not cause investors to realize the full extent of the damages until April 2002. However, economic losses were realized throughout most of the Class Period as various industry news events and adverse disclosures affected the share price of Flag Telecom. Additionally, this analysis demonstrates that a common method for analyzing and determining economic losses and allocating those losses to individual investors can be devised consistent with methods I have employed in other cases.

*(See* Hakala Decl. PP 6, 26 (emphasis added).) Accordingly, plaintiffs argue that they "may be able to demonstrate 'leakage' of the truth before the end of the class period[,]" and that they should be entitled to fully develop the facts surrounding this theory. *(See* Pls. Reply Mem. Supp. Class Cert. at 18-19.) In light of Hakala's affidavit, we agree that the record shows that it is conceivable that in-and-out purchasers asserting claims

under both the '33 Act and '34 Act may be able to overcome defendants' affirmative defense of negative causation and prove loss causation, respectively, notwithstanding **[*63]** that the February 13, 2002 announcement is the most critical corrective disclosure.

> 26     In their Reply, plaintiffs submitted the affidavit of Hakala, whom they retained to opine on, *inter alia,* the efficiency of the market for shares of Flag's common stock and its response to the release of certain financial statements, press releases and company statements, as well as other market occurrences. *(See generally* Hakala-Decl.)

It still remains to be determined, however, whether these traders should remain as part of the proposed class. The court in *Roth* addressed this very issue.

> Defendants in various securities fraud cases have asserted that these "in-and-out" traders cannot have been damaged by any alleged fraud, as these traders have sold their shares before the disclosure of the fraud, and the resulting drop in stock price. *See BearingPoint, 232 F.R.D. at 543* ("defendants contend that in-and-out trading members of the proposed class who sold before the April 20, 2005 disclosure cannot prove loss causation because any damage that resulted from their purchase of BearingPoint shares at an inflated price during the class period was cancelled out by the sale of their shares at a similarly inflated **[*64]** price later in the class period."). In support of this assertion these defendants typically cite to *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005)* for the proposition that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss."

> The courts in these cases must therefore determine "whether in-and-out traders could conceivably satisfy the requirement of loss causation, and [should] therefore [be] included in the proposed class." *BearingPoint, 232 F.R.D. at 543.* If these traders can demonstrate a

2007 U.S. Dist. LEXIS 67173, *64

loss, they should remain part of the class. *Id. at 544.* It is not impossible for "in-and-out" traders to make such a showing. . . .

> And although in-and-out traders often have no associated damage because they purchased and sold at prices with the same artificial inflation, this is not always the case. In cases where, as here, there are multiple disclosures, in-and-out traders may well be able to show a loss. *Moreover, it is also conceivable that the inflationary effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance* **[*65]** *would be able to prove loss causation* . . . In sum, because in-and-out traders may conceivably prove loss causation, they are appropriately counted as members of the proposed class.

*BearingPoint, 232 F.R.D. at 544* (internal citations omitted). It is therefore premature for courts to attempt to determine whether in-and-out traders have suffered losses at the class certification stage of the game. *See id.* Courts thus may properly include "in-and-out" traders as part of potential classes in securities fraud cases. *See id.*

*238 F.R.D. at 607-08* (emphasis added; alterations in original); *see also In re Vivendi, 242 F.R.D. at 86 n.5* ("[D]efendants oppose the inclusion of so-called in-and-out purchasers in any class certified-*i.e.,* those who purchased shares and sold them during the class

period. Defendants do not oppose the appointment of any of the proposed class representatives on this basis. However, even if they did raise such an argument, courts have consistently found that this does not render a representative's claim atypical.") (collecting cases); *BearingPoint, 232 F.R.D. at 544* ("[B]ecause in-and-out traders may conceivably prove loss causation, they are appropriately counted as members **[*66]** of the proposed class."). [27]

> [27]  *See also Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993)* ("in-and-out traders[] . . . are still proper members of a plaintiff class"); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Dynegy, Inc. (In re Dynegy, Inc. Secs. Litig.), 226 F.R.D. 263, 283 (S.D. Tex. 2005)* ("Defendants argue that original allocants who sold prior to late April of 2002 could not have suffered a loss actionable under the 1933 Act because their losses could not have been caused by misstatements that had not yet been revealed. . . . Defendants have not cited and the court has not found any case that has relied on the negative causation defense to limit a putative class at the class certification stage of litigation.") (footnote omitted); *In re Tyco, 236 F.R.D. at 71*

> (The plaintiffs have satisfied this requirement by pleading that their claimed losses were caused by corrective disclosures. That they have specifically identified certain corrective disclosures in the complaint does not preclude them from later identifying additional disclosures. Thus, it is too early in the litigation to exclude former shareholders from the class simply because their losses were caused by corrective disclosures that have not **[*67]** yet been specifically identified. Tyco remains free to develop the issue further during discovery and to renew its argument in a properly supported motion for summary judgment at the appropriate time. . . . I also am unpersuaded by Tyco's assertion that the proposed class is

unmanageable because some class members will have stronger loss causation arguments than others based upon when they sold their Tyco stock. As the First Circuit has recognized, classes are routinely certified where common issues predominate even though individual issues exist with respect to other matters such as affirmative defenses or damages. *Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003).* There is no reason why this principle should not also apply to the subject of loss causation. Here, the need to make different loss causation determinations for class members depending on when they sold their stock does not alter the "sufficient constellation of common issues [that] binds class members together" into a single class. *Waste Mgmt. Holdings [Inc. v. Mowbray], 208 F.3d [288,] 296 [(1st Cir. 2000)].*").

Here, plaintiffs have adequately shown that in-an-out purchasers, like Hunter, may **[*68]** be able to overcome defendants' negative causation argument or prove loss causation. Indeed, the fact that Hunter sold his shares in November 2001 and is himself an in-and-out purchaser ensures that plaintiffs' counsel will further attempt to collect evidence and establish that sufficient leakage occurred at least prior to that date. *See In re Tyco, 236 F.R.D. at 71.* If plaintiffs' leakage theory proves to be sustainable after further discovery, plaintiffs will be able to present their theory through the presentation of expert testimony without distracting from the common issues of fact in this litigation. Accordingly, in-and-out purchasers should not be excluded from the proposed class at this time, particularly in light of the fact that discovery is still incomplete and plaintiffs intend to further develop their leakage theory.

Defendants argue, however, that the affidavit of Hakala is inadmissible under *FED. R. EVID. 702* and *703* and cannot be considered on this motion. (*See* Defs. Sur-Reply Mem. Opp. Class Cert. at 5 n.15.) In order to

determine the admissibility of expert witness testimony under *FED. R. EVID. 702* and *703*, the Supreme Court has set forth a two-prong inquiry into the **[*69]** reliability and relevance of the evidence. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).* First, the trial judge must determine whether the expert is proposing to testify to scientific knowledge. *See id. at 592.* "The adjective 'scientific' implies a grounding in the methods and procedures of science[]" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *See id. at 590.* Second, the court must determine whether the testimony "will assist the trier of fact to understand or determine a fact in issue." *Id. at 592* (footnote omitted). In other words, the proper analysis is one that ensures that the proffered expert testimony "is not only relevant, but reliable." *Id. at 589.* Finally, the court must take into consideration the expert's background and practical experience when deciding whether an expert is qualified to render opinion testimony. *See McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995).*

Defendants do not dispute that Hakala's proffered opinions are relevant and that he has adequate background and practical experience in the field of business valuation and market efficiency. Specifically, Hakala's opinions address **[*70]** the efficiency of the market for shares of Flag common stock and the market's responsiveness to certain material events throughout the Class Period. (*See generally* Hakala Decl.) This is relevant to loss causation -- a necessary element of a claim under the '34 Act. Hakala also opines as to when unregistered shares entered the market, which is relevant to the parties' tracing arguments and the duration of the Class Period for the putative plaintiffs asserting claims under the '33 Act. (*See id.* P 9.) As to Hakala's experience, he is a director of CBIZ Valuation Group, LLC, a publicly traded company and one of the largest business valuation and consulting firms in the United States with offices in Dallas, Chicago, Atlanta, Milwauke, St. Louis and Princeton. (*See id.* P 1.) He has a Doctor of Philosophy in Economics from the University of Minnesota. (*See id.* P 2.) Hakala has received the professional designation of Chartered Financial Analyst, awarded by the Association for Investment Management and Research, and has taught classes on asset pricing and market efficiency at the doctoral level. (*See id.*) He has served as a consultant and expert witness on numerous occasions in litigations **[*71]** similar to this one. (*See id.*)

Defendants appear to challenge only the reliability of Hakala's opinions. This Court's reliability assessment must focus on whether the reasoning or methodology underlying the testimony is scientifically valid. *See Daubert, 509 U.S. at 590.* In *Daubert,* the Supreme Court set forth four non-exclusive factors to aid in the reliability assessment: "(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id. at 593-94.* However, the reliability inquiry is a "flexible" one, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150-51, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).* Thus, this Court's role is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level [*72] of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id. at 152.*

In reaching his conclusions, Hakala employed what is commonly termed as an event study. *(See* Hakala Decl. P 5.) "In the majority of applications, the focus [of an event study] is the effect of an event on the price of a particular class of securities of the firm, most often common equity. . . ." *See generally* A. Craig MacKinlay, *Event Studies in Economics and Finance,* XXXV Journal of Economic Literature 13 (1997). That is precisely the focus of Hakala's study. Specifically, his event study covered the period from February 11, 2000 through February 13, 2002, and identified certain material events made public in analysts' reports, press releases, securities filings and news articles. *(See id.* PP 5, 16.) It also identified and analyzed possible market indices and the two most comparable companies in the telecommunication industry, as well as three additional competitive fiberoptic companies, to track market and industry elements of the movement in Flag's share price. *(See id.* P 17.) The study then used integrated regression analysis to ultimately measure the effect of each selected event [*73] in the context of daily returns. *(See id.* P 18.)

Despite defendants' arguments, we find nothing unreliable about Hakala's methodology. The study culminates in an eighteen-page chart detailing 154 events

and their effects on the value of Flag common stock. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587, 2000 U.S. Dist. LEXIS 3742, 2000 WL 310352, at *607 (S.D.N.Y. Mar. 24, 2000)* (admitting a similar report based on a similar event study). Indeed, numerous courts have held that an event study is a reliable method for determining market efficiency and the market's responsiveness to certain events or information. *See, e.g., In re Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993)* ("Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to [the company] which defendants allegedly have distorted. . . . As a result of his failure to employ such a study, the results reached by [the expert] cannot be evaluated by standard measures of statistical significance. Hence, the reliability of the magnitude and direction of his value estimates are incapable of verification."). Moreover, his analysis is based upon relevant and reliable [*74] data, which defendants do not appear to dispute. *See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).* Accordingly, our consideration of Hakala's affidavit and his opinions contained therein is permissible under the Federal Rules of Evidence. [28]

28    We understand that defendants' *Daubert* challenge was abbreviated, and, as a result, they may renew their objection to the admissibility of Hakala's opinions at a future date.

Defendants contend, however, that, even if we were to consider Hakala's opinions, the leakage theory detailed in his affidavit cannot, as a matter of law, establish loss causation. *(See* Defs. Sur-Reply Mem. Opp. Class Cert. at 8-10.) They rely on the following passage from the Supreme Court's decision in *Dura.*

[I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. *But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation,* [*75] *but changed economic circumstances, changed investor expectations, new*

> *industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.*

*Dura, 544 U.S. at 342-43* (emphasis added). Defendants contend that Hakala's affidavit shows that market and industry forces, and not company-specific information, including, for example, statements and news relating to the fraud, were actually causing the decline in the value of Flag common stock. Therefore, defendants argue, Hakala's leakage argument is not sufficient to establish loss causation in light of *Dura's* "recognition that market and industry events must be factored out in order to determine whether any part of the alleged economic loss was caused by the alleged fraud." *(See* Defs. Sur-Reply Mem. Opp. Class Cert. at 9.)

As plaintiffs correctly point out, defendants' argument misrepresents the Supreme Court's holding in *Dura.* Contrary to defendants' suggestion, the Supreme Court in *Dura* was **[*76]** simply explaining that no liability exists under the securities law when the value of the stock declines as a result of some subsequent event that is unrelated to the alleged fraud. Indeed, the sale of stock at a "lower price may reflect, not the earlier misrepresentation, but *changed* economic circumstances, *changed* investor expectations, *new* industry-specific or firm-specific facts, conditions, or other events . . . ." *See Dura, 544 U.S. at 342-43* (emphasis added). Under these circumstances, loss causation would not be established because the decline in value of stock would be due to subsequent events that have no connection to the alleged fraud. If, however, the publication of new information reveals that the alleged fraudulent information is incorrect, then this corrective information can serve as evidence of loss causation. As explained by the court in *Jefferson Ins. Co. v. Rouhana (In re Winstar Communs.), No. 01 CV 3014, 2006 U.S. Dist. LEXIS 7618, 2006 WL 473885, at *14-15 (S.D.N.Y. Feb. 27, 2006):*

> The Winstar defendants argue that a corrective disclosure must be based on fact-specific information, and cannot simply be opinions or speculations. The *Dura* opinion did not specify what was

required to adequately plead loss causation. **[*77]** The Supreme Court spoke in terms of the "relevant truth" and the "truth" making its way into the market place. *Dura, 125 S. Ct. at 1631-32.* The Court did not address the means by which the information is imparted to the public. Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality. Thus, it is the inherent veracity of the information that is of paramount concern in *Dura.* It is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation. . . . [I]n addition to formal disclosure by a defendant, "the market may learn of possible fraud [from] a number of sources: *e.g.,* from whistleblowers, analysts' questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc."

(Internal citations omitted). Accordingly, plaintiffs have sufficiently demonstrated that in-and-out purchasers may be able to overcome defendants' negative causation defense or establish loss causation by virtue of leakage **[*78]** over the course of the Class Period, and, for the reasons stated above, they should not be excluded from the proposed class.

## E. *Rule 23(b):* Predominance and Superiority

Having addressed the requirements of *Rule 23(a),* the Court now turns to whether *Rule 23(b)(3)* has been satisfied. *See In re Vivendi, 242 F.R.D. at 89. Rule 23(b)(3)* requires a court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The predominance element of *Rule 23(b)* "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., 521 U.S. at 623.* It requires that "law or fact questions common to the class predominate over

questions affecting individual members . . . ." *In re Initial Public Offering Sec. Litig., 471 F.3d 24, 33 (2d Cir. 2006)*. This "'is a more demanding criterion than the commonality inquiry under *Rule 23(a)*. Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as **[*79]** a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *In re Vivendi, 242 F.R.D. at 90* (quoting *Moore v. Paine Webber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002))* (internal citations and quotation marks omitted). "The predominance requirement is 'readily met' in many securities fraud actions." *In re WorldCom, 219 F.R.D. at 288* (quoting *Amchem Prods., 521 U.S. at 625*).

In the present case, "there are common questions of law and fact involving violations of the securities laws based on a common course of conduct directed at the entire class [] . . . that predominate over any individualized questions that may exist." *In re Vivendi, 242 F.R.D. at 90*. The common issues in this action include: (1) whether Citigroup and the individual defendants misrepresented the amount of presales in the Registration Statement; (2) whether the individual defendants made materially false and misleading statements as to Flag's financial viability by, *inter alia,* reporting swap transactions in such a way as to artificially inflate revenues; (3) whether they failed to knowingly write-down assets, **[*80]** including the FA-1 system; (4) whether all defendants acted with the requisite scienter; and (5) whether the alleged misrepresentations proximately caused economic loss to the putative plaintiffs. Moreover, as fully explained *supra,* all members of the proposed class will be relying on the same legal theories and set of facts to prove their case. Specifically, all '33 Act plaintiffs may rely on the fraud-on-the-market presumption, and "the conclusion that the proposed class includes in-and-out traders, does not, alter the conclusion that common issues of law and fact will predominate over individual issues. The issue of whether in-and-out traders can satisfy loss causation is a single legal issue, not dependent on individual factual determinations, and the proper determination of individual damages can be determined at trial through the use of expert witnesses." *In re BearingPoint, 232 F.R.D. at 544* (citing *In re Rent-Way Sec. Litig., 218 F.R.D. 101, 119-20 (W.D. Pa. 2003))*. Because plaintiffs may be able to establish their leakage theory through the presentation of expert testimony, we do not believe that these issues

will "make class litigation unwieldy or inefficient." *See id.* Accordingly, **[*81]** we conclude that there are questions of law and fact common to the members of the class that predominate over any questions affecting only individual members. *See In re Avon, 1998 U.S. Dist. LEXIS 18642, 1998 WL 834366, at *10*.

The second requirement of *Rule 23(b)(3)* is "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." "The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *In re Vivendi, 242 F.R.D. at 91* (citing *FED. R. CIV. P. 23* Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385). In determining whether a class action is superior to other available methods, *Rule 23(b)(3)* identifies several relevant factors to consider: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely **[*82]** to be encountered in the management of a class action." "This list of pertinent factors is nonexhaustive, . . . and the purposes of *Rule 23* should weigh heavily in this determination . . . ." *In re Vivendi, 242 F.R.D. at 91* (internal citations omitted; internal quotation marks omitted). "[I]n general, [a] class action[] [is] particularly well-suited to resolution of [a] securities fraud case[,]" *In re Avon, 1998 U.S. Dist. LEXIS 18642, 1998 WL 834366, at * 11*, and is certainly best-suited for this case.

The proposed class consists of hundreds or even thousands of potential class members who are dispersed across the country. *See In re WorldCom, 219 F.R.D. at 304*. "Few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail[,]" particularly when many of the putative plaintiffs have suffered economic loss of *de minimis* value. *Id.; see also In re Vivendi, 242 F.R.D. at 92*. Indeed, the prospect of investors filing separate actions is nightmarish, and we are unaware of any investors who have indicated a desire to do so. *See In re WorldCom, 219 F.R.D. at 304* ("[S]hould shareholders **[*83]** and bondholders file their

own individual lawsuits, such suits would risk disparate results, threaten to increase the costs of litigation for all parties exponentially, pose an enormous burden for courts throughout the land, and encourage a race to judgment to obtain the limited funds that are available to fund any recovery that plaintiffs may win here."). Furthermore, a class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses. *See id.; see also In re Interpublic, 2003 U.S. Dist. LEXIS 19784, 2003 WL 22509414, at \*4; In re Deutsche Telekom AG, 229 F. Supp. 2d at 282*. Lastly, we do not believe that this case poses manageability difficulties that justify denying certification, which defendants do not appear to dispute. *See In re Vivendi, 242 F.R.D. at 107* ("The determination of whether a particular action is manageable is 'peculiarly' within the discretion of the district court.") (citing *In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001), cert. denied, 536 U.S. 917, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (2002))*. Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this litigation. **[\*84]** Now that we have determined that the requirements of *Rule 23* are satisfied, the only issue remaining is the precise definition of the Class Period and the identity of the putative class members.

## II. Class Period

The parties agree, and the record shows, that the appropriate Class Period for class members asserting claims under the '34 Act is from March 6, 2000 to February 13, 2002, "in that the market rapidly reacted to and reflected all public information in the share price during that period of time." *(See, e.g.,* Hakala Decl. P 5.) The parties dispute, however, the appropriate Class Period for class members asserting claims under the '33 Act. In particular, the parties disagree as to the period in which secondary market purchasers, like Coughlin, are able to trace their shares back to the IPO and thus have standing to assert claims under the '33 Act.

The parties agree that shares that are bought on the market after unregistered shares have entered the market cannot be traced back to the IPO. *See, e.g., In re Initial Public Offering Sec. Litig., 227 F.R.D. 65, 117-18 (S.D.N.Y. 2004)* ("Tracing may be established either through proof of a direct chain of title from the original offering **[\*85]** to the ultimate owner *(e.g.,* if the owner was an allocant in the IPO, or took actual physical

possession of share certificates directly from an allocant), or through proof that the owner bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement."), *vacated on other grounds, 471 F.3d 24 (2d Cir. 2006)*. Plaintiffs contend that putative class members asserting '33 Act claims who bought their shares on or before May 10, 2000 can trace their shares back to the IPO, reasoning that SEC Rule 144 prohibited the entry of unregistered shares of Flag common stock into the market prior to that date. [29]

> 29  SEC Rule 144 imposes certain restrictions on the sale of so-called "restricted sales" before they can be sold into the market, including a minimum holding period. *See 17 C.F.R. § 230.144*. "Restricted securities include securities acquired directly or indirectly from the issuer in a transaction not involving any public offering." *S.E.C. v. Credit Bancorp, Ltd., 279 F. Supp. 2d 247, 251 n.3 (S.D.N.Y. 2003)*. Shares acquired through the exercise of stock options under Flag's LTIP would not be characterized as restricted shares. *See 17 C.F.R. § 230.144*.

Defendants **[\*86]** have produced evidence, however, that a significant amount of stock options pursuant to the LTIP were exercised by Flag employees on March 17, 2000 and March 23, 2000, which, if immediately sold, would have entered the market by that time. *(See* Gray Decl. Opp. Class Cert., Ex. ZZ.) In response, plaintiffs expert opined:

> [I]t would appear that the first exercise of employee stock options may have occurred on March 17, 2000. Assuming *arguendo* that those shares were sold into the open market, which does not appear to be the case, then the depository pool would be considered "contaminated" as of March 17, 2000.

*(See* Hakala Decl. P 9.) However, plaintiffs' expert did not find any evidence of unregistered shares in the market prior to May 10, 2000, tending to show that the employees who exercised their stock options in March of that year did not sell the shares on the market until after May. *(See id. P* 8.) Because defendants have produced no evidence that the shares acquired pursuant to the LTIP were actually sold on the market prior to May 10, 2000

and plaintiffs' expert has found no such evidence, we are inclined to resolve this dispute in favor of plaintiffs. Accordingly, the Class Period [*87] for '33 Act claims is February 11, 2000 to May 10, 2000, inclusive. This is, of course, subject to reconsideration upon the presentation of sufficient evidence showing that the market contained unregistered shares on or before May 10, 2000.

### III. The Proposed Class Should Include Purchasers of Shares that Entered Through the London Stock Exchange

Defendants argue that we must limit the class to those putative plaintiffs who purchased shares on U.S. exchanges because this Court lacks federal subject matter jurisdiction to adjudicate claims relating to shares purchased from non-U.S. exchanges. (See Defs. Mem. Opp. Class Cert. at 47-48.) "The Securities Exchange Act is silent as to its extraterritorial application. Cf. 15 U.S.C. § 78aa (1988) (vesting federal district courts with exclusive original jurisdiction for violations of the Act)." Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991). Thus, the Second Circuit has derived the "conduct test" to determine whether a federal court has subject matter jurisdiction over a federal securities claim involving stock purchased abroad. See id. "'Under the 'conduct' test, a federal court has subject matter jurisdiction if the defendant's conduct in [*88] the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad. . . .'" See In re Nortel Networks, 2003 U.S. Dist. LEXIS 15702, 2003 WL 22077464, at *7 (quoting Alfadda, 935 F.2d at 478); see also Consol. Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 261-62 (2d Cir. 1989).

In the present case, defendants' alleged activities in the United States satisfy the conduct test for subject matter jurisdiction. For example, Flag allegedly engaged in a swap transaction in the United States in an effort to artificially inflate its revenues. (See MacDonald Decl. P 2 (describing a $ 20 million swap transaction that took place in Flag's United States office)); [30] see In re Nortel Networks, 2003 U.S. Dist. LEXIS 15702, 2003 WL 22077464, at *8 ("Defendants' activities in the United States satisfy the test for subject matter jurisdiction [because]... defendants were consummating risky vendor financing deals in an effort to boost reported 'revenues' throughout the Class Period.") (internal quotation marks omitted). Moreover, the activities of Flag are alleged to be part of a single fraudulent scheme, which was closely connected to the [*89] U.S. telecommunications industry and its investment economy. See In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 73-75 (S.D.N.Y. 1999) ("Subject matter jurisdiction is thus supported by substantial fraudulent activity in the United States directly causing harm abroad, the manner in which the same fraudulent scheme allegedly straddled both sides of the border, and the degree of economic activity connecting [defendant] to the United States."). Thus, at this juncture, it appears that we have subject matter jurisdiction to adjudicate claims involving shares purchased on non-U.S. exchanges. Accordingly, we need not limit the class to those putative plaintiffs who purchased shares on U.S. exchanges.

> 30    Allegedly, Flag may have also issued materially misleading statements in the United States in an attempt to artificially inflate the value of its stock sold abroad.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion to certify the proposed class action pursuant to FED. R. CIV. P. 23 is granted in its entirety. Furthermore, Joseph Coughlin's motion to intervene pursuant to FED. R. CIV. P. 24 is granted in its entirety. Accordingly, the following proposed class is hereby certified: All [*90] persons or entities who purchased common stock of Flag Telecom Holdings, Ltd. ("Flag" or the "Company") between March 6, 2000 and February 13, 2002, inclusive, as well as those who purchased Flag common stock pursuant to or traceable to the Company's initial public offering between February 11, 2000 and May 10, 2000, inclusive (collectively, the "Class Period"), but shall exclude: (1) defendants herein, members of each individual defendants' immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors and predecessors in interest or assigns of any such extended party; (2) Verizon Communications, Inc.; and (3) entities that had the right to appoint a director to Flag's Board of Directors and proceeded to make such an appointment (or, for reasons unique to them, chose not to exercise such right), such as Dallah Albaraka Holding Company, Telecom Asia Corporation Public Co. Ltd., Marubeni Corporation, the Asian Infrastructure Fund and Tyco International Ltd. It is further ordered that Peter T. Loftin, Norman H. Hunter and Joseph Coughlin are

2007 U.S. Dist. LEXIS 67173, *90

appointed to serve as the representatives of **[*91]** the class, and the law firm of Milberg Weiss LLP is appointed to serve as Class Counsel pursuant to *FED. R. CIV. P. 23(g)*.

SO ORDERED.

Dated: White Plains, New York

September 4, 2007

/s/ [Signature]

Sr. United States District Judge