UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────── x
LEON D. BOROCHOFF, On Behalf of : Civil Action No. 1:07-cv-05574-LLS
Himself and All Others Similarly Situated, : (Consolidated)
:
Plaintiff, : CLASS ACTION
:
vs. : AMENDED COMPLAINT FOR
: VIOLATION OF THE FEDERAL
GLAXOSMITHKLINE PLC, et al., : SECURITIES LAWS
:
Defendants. :
:
─────────────────────────────────── x

Lead Plaintiff Avon Pension Fund, Administered by Bath & North East Somerset Council ("Avon Pension Fund") and Plaintiffs Plumbers & Steamfitters Local 773 Pension Fund ("Plumbers & Steamfitters Local 773") and Plumbers' Union Local No. 12 Pension Fund ("Plumbers' Union Local No. 12") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to them and their own acts, and information and belief as to all other matters, based upon *inter alia,* the investigation conducted by and through their attorneys, which included, among other things, a review of the public documents and announcements concerning GlaxoSmithKline PLC ("Glaxo", "GSK" or the "Company"), United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Glaxo, and information readily available on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought against Glaxo and certain of its directors and officers on behalf of purchasers of Glaxo American Depository Shares ("ADSs") and ordinary shares between October 27, 2005 and May 21, 2007 (the "Class Period"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. Jurisdiction is conferred by Section 27 of the Exchange Act. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act [15 U.S.C. §78aa].

- 1 -

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and practices complained of herein occurred in substantial part in this District. Also Glaxo's ADSs, which each represent two ordinary shares of Glaxo ordinary stock, are, pursuant to agreement with the Bank of New York, listed on the New York Stock Exchange, ("NYSE") which is located in this District.

5. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Lead Plaintiff Avon Pension Fund purchased Glaxo ordinary shares during the Class Period, as detailed in the certification previously filed in this case and incorporated herein by reference, and was damaged thereby.

7. Plaintiff Plumbers & Steamfitters Local 773 purchased Glaxo ADSs during the Class Period, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

8. Plaintiff Plumbers' Union Local No. 12 purchased Glaxo ordinary shares during the Class Period, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

9. Defendant Glaxo develops, produces and sells pharmaceuticals, over-the-counter (OTC) medicines, vaccines and health-related consumer products. Glaxo's products are sold in over 125 nations and it has primary operations in 116 countries. The Company's operations are principally based in two industry segments: consumer healthcare (nutritional healthcare, OTC medicines and oral care) and pharmaceuticals (vaccines and prescription pharmaceuticals). In 2000, Glaxo Wellcome and SmithKline Beecham merged to form Glaxo. That same year, shares of the

new company began trading on the London Stock Exchange ("LSE") and the NYSE. Glaxo also has extensive operations throughout the United States.

10. Defendant Jean-Pierre "JP" Garnier ("Garnier") was, at all relevant times, Chief Executive Officer ("CEO") of Glaxo.

11. Defendant David Stout ("Stout") was, at all relevant times, Glaxo's President, Pharmaceutical Operations.

12. Defendant Julian Heslop ("Heslop") was, at all relevant times, Glaxo's Chief Financial Officer ("CFO").

13. Defendant Simon Bicknell ("Bicknell") was, at all relevant times, the Company's Secretary.[1]

## CLASS ACTION ALLEGATIONS

14. This is a class action on behalf of all persons who purchased or otherwise acquired Glaxo ADSs on the NYSE or ordinary shares on the LSE during the Class Period. Excluded from the Class are Defendants; officers and directors of the Company; the immediate families of such Defendants, officers, and directors; any entity in which any Defendant has or had a controlling interest; and the legal representatives, heirs, successors or assigns of any such excluded person.

15. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Glaxo's ADSs and ordinary shares were actively traded on the NYSE and LSE, respectively. As of November 2, 2007, the Company had 2.8 billion shares of its ADSs traded on the NYSE and 5.5 billion ordinary shares traded on the LSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through

---

[1] Defendants Garnier, Stout, Heslop and Bicknell are collectively referred to herein as the "Individual Defendants."

appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Glaxo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts, as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period were materially false and/or misleading and omitted and/or misrepresented material facts; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

18.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Avandia

20. Defendant Glaxo develops, produces and sells pharmaceuticals, OTC medicines, vaccines and health-related consumer products.

21. The Company markets Avandia (rosiglitazone maleate) as a drug intended to help improve blood sugar control in type 2 diabetics.

22. Avandia was Glaxo's second best-selling drug in 2006, with global sales of $3.38 billion.

23. In 1999, Avandia was approved by the U.S. Food and Drug Administration ("FDA") for the treatment of type 2 diabetes. Type 2 diabetes is a life threatening disease that, according to the FDA as of June 2007, affects approximately 18 to 20 million Americans. Since its introduction, the labeling of Avandia has been altered several times, including the addition of a warning for the risk of congestive heart failure. Today, the label for Avandia is required to include a "black box"[2] warning for the risk of heart failure.

### Glaxo Fails to Disclose Internal Studies that Indicate that the Use of Avandia Causes Increased Risk of Heart Attack

24. Glaxo has conducted several studies regarding the efficacy of Avandia, including analyses that encompassed the risk of myocardial infarction and cardiovascular death associated with the use of Avandia.

---

[2] A "black box" warning is the most severe or highest level warning that can appear on a drug label, as required by the FDA.

25. In September 2005, Glaxo finalized the first of two meta-analyses[3] it performed in connection with Avandia. Specifically, Glaxo performed a patient-level meta-analysis of safety data from 37 clinical trials (the "First Meta-Analysis"). Glaxo's First Meta-Analysis showed an estimate of excess risk of ischemic cardiovascular events, *i.e.*, an increased risk of heart attack, associated with the use of Avandia. Glaxo did not, however, report or disclose to investors that the results of its First Meta-Analysis showed a risk of heart attacks associated with the use of Avandia.

26. In January 2006, Glaxo initiated a second meta-analysis of Avandia (the "Second Meta-Analysis"). The Second Meta-Analysis was performed in order to incorporate five additional studies that had been completed between September 2004 and August 2005, for an updated total of 42 clinical trials. The results of Glaxo's Second Meta-Analysis were finalized in March 2006. Glaxo's Second Meta-Analysis showed an estimate of excess risk of ischemic cardiovascular events associated with the use of Avandia that was even greater than the risk portrayed in the First Meta-Analysis. Glaxo did not, however, report or disclose to investors that the results of its Second Meta-Analysis showed a risk of heart attacks associated with the use of Avandia.

27. According to the FDA, in August 2006, Glaxo provided the FDA with a pooled analysis (meta-analysis) of 42 separate, double-blinded, randomized, controlled clinical trials to assess the efficacy of Avandia for treatment of type 2 diabetes, compared to either placebo or other anti-diabetic therapies in patients with type 2 diabetes. According to the FDA, it did not publicly discuss the data submitted by Glaxo at the time it was submitted in August 2006 because the FDA wanted to wait until it was able to perform a comprehensive internal re-analysis of that data. (The

---

[3] A meta-analysis is known as the synthesis of research results through the use of an array of statistical methods to cull and merge results from previously performed separate, but related, studies. This type of analysis is done when the individual studies, alone, would not be deemed large enough to adequately examine a particular question.

FDA's decision to postpone the release of the potential risks associated with Avandia has caused the FDA to be the target of much criticism and has contributed toward the holding of Congressional hearings to address the FDA's ability to timely respond and alert the public of dangers and risks of drugs as the information becomes available.)

28.     Despite knowing that the data of the Company's meta-analyses showed an increased risk of heart attacks associated with the use of Avandia, Defendants did not disclose this material information to investors during the Class Period. Instead, Defendants repeatedly highlighted the success of Avandia's sales and the sizeable contribution those sales made to the overall performance and growth of Glaxo without disclosing the material adverse facts they were aware of.

29.     Moreover, at the same time Defendants were aware of the conclusions from their own meta-analyses, they repeatedly positively highlighted studies which, according to Defendants, demonstrated that Avandia showed (or will show) no increase in myocardial infarctions or cardiovascular-related deaths. For example:

- A study funded by Glaxo entitled "The Diabetes Reduction Assessment with Ramipril and Rosiglitazone Medication" ("DREAM") was published by the Company in September 2006. In summary, Glaxo reported that its review of the cardiovascular data in the DREAM study showed no increased risk for myocardial infarctions or cardiovascular-related deaths from the use of Avandia.

- A study conducted by Glaxo entitled "A Diabetes Outcomes Progression Trial" ("ADOPT") was published by the Company in December 2006. In summary, Glaxo reported that its review of the data in the ADOPT study showed no statistically significant differences in cardiovascular-related deaths or myocardial infarctions.

- The "Rosiglitazone Evaluated for Cardiac Outcomes and Regulation of Glycaemia in Diabetes" ("RECORD") study is an ongoing study being conducted by Glaxo. RECORD is a long-term clinical trial that purports to study type 2 diabetes patients, with a focus on determining the cardiovascular-related deaths or hospitalizations resulting from the use of Avandia. The study is reported to be completed in late 2008, with the corresponding results to be published or released in early 2009.

30. Throughout the Class Period, analysts recommended Glaxo to investors based on Defendants' representations from these studies that the risks of cardiovascular events related to Avandia were minimal.

31. Then, on May 21, 2007, the FDA issued a safety alert that addressed the potential risks identified by its own pooled analysis of completed controlled clinical trials, *which demonstrated a potentially significant increase in the risk of heart attack and heart-related deaths in patients taking Avandia.* According to the FDA's initial analysis of Glaxo's meta-analyses, the data from Glaxo's analyses expressed a significant concern with respect to the excess risk of myocardial ischemic events (*e.g.* heart attacks) in Avandia-treated patients. (The FDA also identified significant concerns with the methodology used by Glaxo in its meta-analyses.)

32. Also on May 21, 2007, another meta-analysis of rosiglitazone (Avandia) studies, this one conducted by Dr. Stephen Nissen, was published in the *New England Journal of Medicine* ("*NEJM*").[4] *Dr. Nissen concluded that patients taking Avandia are at an increased risk for heart attacks.* Dr. Nissen's analysis was based on data derived from 42 controlled clinical trials. According to published reports and FDA statements, many (but not all) of the 42 controlled clinical trials utilized by Dr. Nissen were the same studies used by Glaxo in its meta-analyses.

33. As a result of Dr. Nissen's published findings on May 21, 2007 and the FDA's safety alert that same day, the price of Glaxo ADSs dropped $4.53 per share, or 7.8%, and the price of Glaxo's ordinary shares dropped 74 pence, both on unusually high trading volume.

34. On May 31, 2007, an article in *The Wall Street Journal* reported that in a letter published on the website of *The Lancet*, a medical journal, Glaxo's chief medical officer, Ronald

---

[4]   The FDA stated that it was not aware of Dr. Nissen's study methods or findings until the date of his study's publication in the *NEJM*.

Krall, wrote that the Company had found indications of increased risk of heart attacks associated with Avandia in its own previously conducted meta-analyses of clinical studies of Avandia.

35. On July 9, 2007, in an article in *The Wall Street Journal* concerning Glaxo and Avandia, defendant Garnier admitted that Glaxo had performed its own meta-analyses and also found that Avandia caused an increased risk of heart attack. Defendant Garnier also acknowledged in the article that Glaxo had failed to adequately communicate the risks of Avandia. The following question and answer is illustrative: Dr. Garnier was asked, "Has Glaxo done everything it could to study Avandia and communicate its risks to the public?" In response, Dr. Garnier stated: "We're not perfect. I'm sure. With 20-20 hindsight we could have done more."

36. In July 2007, an FDA advisory committee, in a 20-3 vote, agreed that Avandia was tied to increased ischemic risk, meaning an increased risk for heart attacks. Although no final determination has been made, it has been widely-reported that the FDA wants Glaxo to add a "black box" warning to Avandia concerning the risk of heart attacks associated with the drug. According to an October 24, 2007 *The Wall Street Journal* article, "a black box warning would still represent something of a middle ground in the debate over Avandia," when the alternative could be the outright removal of the drug from the market.

37. When analysts became aware of Dr. Nissen's findings and the corresponding risk of heart attack associated with Avandia, analysts downgraded Glaxo. The downgrades were attributed to the sales losses and negative earnings impact that Avandia's risk of heart attacks would have on Glaxo's overall company performance.

38. On June 7, 2007, for example, Bear Stearns trimmed its earnings per share estimates for Glaxo, stating: "In view of the risks to GSK's US Avandia franchise, we have reduced our

Avandia forecasts." The report added that "Avandia's cardiovascular risk profile remains an overhang on the stock...."

39. Then, on July 25, 2007, Bear Stearns downgraded Glaxo and wrote: "Since May 23, 2007, when Dr. Nissen's meta-analysis on Avandia's CV risk profile was published in the *NEJM*, GSK shares have come off 5.4% *to reflect the expected earnings impact.* We cut our Avandia sales projections on June 8, 2007...." [Emphasis added.]

40. Notably, prior to May 21, 2007 and dating back to the beginning of the Class Period, not one analyst mentioned or discussed a meta-analysis performed in connection with Avandia in their reports.

41. On October 24, 2007, Glaxo announced that it would be implementing layoffs and cost cuts after a 38% drop in sales of Avandia significantly hurt the Company's third quarter earnings.

### Materially False and Misleading Statements Issued During the Class Period

42. The Class Period starts on October 27, 2005. On that date, Glaxo issued a press release announcing its financial results for its third quarter of 2005, the period ending September 30, 2005. The press release was also filed with the SEC as an exhibit to a Form 6-K, which was signed by defendant Bicknell. For the quarter, the Company reported earnings of 21.3p per share, up from 17.7p per share for its third quarter of 2004. With respect to Avandia, the press release described it as one of the "key products" contributing toward Glaxo's "excellent pharmaceutical sales growth." The press release further added:

> Commenting on the performance for the quarter and GSK's outlook, JP Garnier, Chief Executive Officer, said: "This quarter's performance shows the vitality of our business, which is again being driven by great performances from key products such as ... Avandia ..."

43. The statements referenced above in ¶ 42 were materially false and misleading because they failed to disclose that the Company had completed the First Meta-Analysis, which showed a risk of heart attack linked to the use of Avandia. The positive statements made about Avandia and its contributions to the Company's financial results created an obligation to disclose the then-known adverse facts concerning the risks and safety issues attendant to the use of Avandia.

44. Also on October 27, 2005, the Company hosted a conference call with analysts and investors to discuss Glaxo's third quarter of 2005 financial results. During the call, defendant Stout positively highlighted Avandia and its contribution to the Company's financial success, stating, in pertinent part, as follows:

> So let's move now to our second largest franchise which is Avandia. If you go to the next slide, you see in total, the Avandia franchise grew 22% to £355 million in the third quarter again with strong sales acrossed all the region. And as you can see on the slide, the growth rate is very consistent. I also just wanted to point out that in the first three quarters Avandia has already achieved sales of almost £1 billion. **Obviously we've had tremendous success with Avandia, but I want to continue to – to emphasize that we do not expect the growth rate to slow down over the next couple of years.**

[Emphasis added.]

45. The statement referenced above in ¶ 44 was materially false and misleading for the reasons set forth in ¶ 43.

46. On February 8, 2006, Glaxo issued a press release announcing its financial results for the fourth quarter of 2005 and fiscal year 2005, the periods ending December 31, 2005. The press release was also filed with the SEC as an exhibit to a Form 6-K, which was signed by defendant Bicknell. For the year ending 2005, the Company reported earnings of 82.6p per share, up from 68.1p per share for the year ending 2004. The press release, specifically highlighted the performance of Avandia as one of the Company's "key growth products." Defendant Garnier

commented on the earnings announcement and the positive contribution of Avandia, stating, in pertinent part, as follows:

> Looking into 2006, the strong growth seen from key products such as Seretide/Advair, *Avandia* and from our vaccines business is set to continue. . . .

[Emphasis added.]

Dubbing Avandia as one of Glaxo's "key growth drivers", the press release added:

> *Avandia/Avandamet* (+18% to £1.3 billion) continues to maintain its leadership position in the TZD [thiazolidinedione] class of anti-diabetic agents.

47.   Also on February 8, 2006, the Company hosted a conference call with analysts and investors to discuss Glaxo's fourth quarter of 2005 financial results. During the conference call, defendant Stout highlighted Avandia, stating, in pertinent part, as follows:

> We still see Advair, Seretide, and *Avandia* as well as our vaccine portfolio as *significant growth drivers*.

[Emphasis added.]

48.   The statements referenced above in ¶¶ 46 & 47 were each materially false and misleading for the reasons set forth in ¶ 43.

49.   On March 3, 2006, Glaxo filed its 2005 Annual Report on Form 20-F with the SEC (the "2005 Annual Report"), which was signed by defendant Heslop and confirmed the previously-announced financial results. In the 2005 Annual Report, defendant Garnier specifically emphasized that the future success of the Company would be driven by products such as Avandia: "Looking into 2006, the strong growth seen from key products [including Avandia] and from our vaccines business is expected to continue. . . ." Separately, the "Outlook" section of the 2005 Annual Report's "Report of the Directors" pointed to Avandia as a key growth product for the Company. In doing so, the 2005 Annual Report stated, in pertinent part, as follows:

> Sales growth of existing products and launch of new products are key drivers of GSK's business performance. *The strong growth seen from key products such as*

- 12 -

> Seretide/Advair, *Avandia*/Avandamet and from GSK's vaccines business is expected to continue in 2006.

[Emphasis added.]

50. The statements referenced above in ¶¶ 49 were each materially false and misleading when made for the reasons stated above in ¶ 43. In addition, at the time the statements were made, Defendants were aware of Glaxo's (more expansive) Second Meta-Analysis, which showed an estimate of excess risk of ischemic cardiovascular events associated with the use of Avandia that was even greater than the risk portrayed in the First Meta-Analysis. Based on this adverse information, coupled with the results from the First Meta-Analysis, Defendants lacked a reasonable basis for their positive statements about Avandia and its growth prospects.

51. On April 27, 2006, Glaxo issued a press release announcing its financial results for the first quarter of 2005. The press release was also filed with the SEC as an exhibit to a Form 6-K, which was signed by defendant Bicknell. For the first quarter of 2006, the Company reported earnings of 26.5p per share, up from 21.1p per share for the first quarter of 2005. In the press release, Avandia was called one of the Company's "key growth drivers." The press release further stated:

> Sales of the Avandia product group, for the treatment of type 2 diabetes, grew 19% to £414 million. Strong growth was reported in all regions with sales in the USA up 17% to £294 million; in Europe up 12% to £57 million; and in International markets up 37% to £63 million.

52. The statement referenced above in ¶ 51 was materially false and misleading for the reasons set forth in ¶ 50.

53. On July 26, 2006, Glaxo issued a press release announcing its financial results for the second quarter of 2006, the period ending June 30, 2006. The press release was also filed with the SEC as an exhibit to a Form 6-K, which was signed by defendant Bicknell. For the second quarter, the Company reported earnings of 23.3p per share, up from 20.4p per share for the second quarter of

- 13 -

2005. Defendant Garnier, in "commenting on the performance in the quarter and GSK's outlook" attributed the Company's ability "to raise our earnings guidance" for 2006 to pharmaceutical sales growth, including a 32% increase in sales of Avandia.

54. The statement referenced above in ¶ 53 was materially false and misleading for the reasons set forth in ¶ 50.

55. On October 26, 2006, Glaxo issued a press release announcing its financial results for the third quarter of 2006, the period ending September 30, 2006. The press release was also filed with the SEC as an exhibit to a Form 6-K, which was signed by defendant Bicknell. For the third quarter, the Company reported earnings of 24.7p per share, up from 21.3p per share for the third quarter of 2005. The press release specifically highlighted the contributions that Avandia was making to the Company's financial results, stating: "The Avandia family of products, for the treatment of type 2 diabetes, continues to perform well with sales up 11% to £378 million in the quarter." The press release also highlighted the DREAM study, stating, in pertinent part, as follows:

> In September, results of the landmark DREAM study were presented to the European Association for the Study of Diabetes. These data demonstrated that Avandia reduced the risk of developing type 2 diabetes by 62% relative to placebo, among people at high risk of developing type 2 diabetes. This highly statistically significant reduction of 62% ($p<0.0001$) was additive to standard counselling on healthy eating and exercise, and is the first evidence that Avandia can reduce the risk of progression from pre-diabetes to type 2 diabetes in high-risk patients.

56. Also on October 26, 2006, the Company hosted a conference call with analysts and investors to discuss Glaxo's third quarter of 2006 financial results. During the conference call, defendant Garnier positively described Avandia, stating, in pertinent part, as follows:

> This is a big engine. This is not a product that is going to stall anytime soon, and we are prepared to back it up in a way that's going to be a big driver for the Company for years to come.

Defendant Stout highlighted the DREAM trial, stating, in pertinent part, as follows:

> In September, the results of the DREAM trial were presented at the European Association for the Study of Diabetes conference. This was a huge study, over three years and over 5,000 patients. The results showed that, as we had expected, Avandia does significantly reduce the risk of patients progressing into type 2 diabetes. Most of the key opinion leaders were extremely excited about these results, and they feel they are very supportive of Avandia and the treatment guidelines being changed.

57.     The statements referenced above in ¶¶ 55 & 56 were materially false and misleading for the reasons set forth in ¶ 50. In addition, defendant Stout's specific reference to the purported positive results from the DREAM study further created an obligation to disclose the adverse information from the First Meta-Analysis and Second Meta-Analysis.

58.     On February 8, 2007, Glaxo issued a press release announcing its financial results for the fourth quarter of 2006 and fiscal year 2006, the periods ending December 31, 2006. The press release was also filed with the SEC as an exhibit to a Form 6-K, which was signed by defendant Bicknell. For the year ending 2006, the Company reported earnings of 95.5p per share, up from 82.6p per share for the year ending 2005. The press release highlighted the financial contribution made by sales of Avandia, stating, in pertinent part, as follows:

> Sales of Avandia products, for the treatment of type 2 diabetes, grew 24% to £1.2 billion in the USA. In Europe, sales grew 40% to £217 million driven by the increasing use of Avandamet. Sales in International markets rose 19% to £234 million.

The press release also positively described the ADOPT study as indicative of the positive attributes of Avandia, stating, in pertinent part, as follows:

> In December, GSK presented data from the landmark ADOPT study, which demonstrated that Avandia is more effective than metformin, or sulphonylurea, in long-term blood sugar control in type 2 diabetes. These data are in addition to those recently presented from the DREAM study, which showed that Avandia can reduce the risk of progression to type 2 diabetes. Data from both these studies are expected to be filed with regulatory agencies during the first half of 2007.

59.     The Company's Form 6-K, filed on February 8, 2007, was signed by defendant Bicknell.

60. Also on February 8, 2007, the Company hosted a conference call with analysts and investors to discuss Glaxo's financial results for the fourth quarter and fiscal year 2006. During the conference call, defendant Stout positively described the DREAM and ADOPT studies, stating, in pertinent part, as follows:

> Of course, the really important news for 2006 was the release of two very important outcomes trials, DREAM, and more importantly, the ADOPT study, which you all heard about in December. Just to remind you what the results of that trial were, were I think we exceeded everyone's expectations, in some cases even our own, where we beat metformin on performance and we tied them on the cardiovascular safety. So this is a very positive study.

61. The statements referenced above in ¶¶ 58 & 59 were materially false and misleading for the reasons set forth in ¶ 50 & 57.

62. On March 2, 2007, Glaxo filed its 2006 Annual Report on Form 20-F with the SEC (the "2006 Annual Report"), which was signed by defendant Heslop and confirmed the previously-announced financial results. In the 2006 Annual Report, defendant Garnier highlighted the current and future successes of the Company's key pharmaceutical products, including Avandia, stating, in pertinent part, as follows:

> Your company delivered a strong financial performance in 2006. Turnover of £23.2 billion is an increase of 9 per cent at constant exchange rates (CER)*. Earnings per share (EPS) were 95.5 pence, with growth of 19 percent. This performance was driven by sales of key pharmaceutical products including. . . the Avandia group of products for diabetes. . . .
>
> *    *    *
>
> Looking ahead, we expect new clinical data to help deliver growth from Seretide/Advair and the Avandia group of products, and continued good performance from our vaccines business.

The 2006 Annual Report also positively described the DREAM and ADOPT studies, stating, in pertinent part, as follows:

> In December, GSK presented data from the landmark ADOPT study, which demonstrated that Avandia is more effective than metformin, or a sulphonylurea, in

- 16 -